## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION

| | |
|---|---|
| GREGORY MILLER, derivatively on behalf of Nominal Defendant EXTREME NETWORKS, INC., | Civil Action No. |
| | **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |
| Plaintiff, | |
| vs. | |
| | <u>DEMAND FOR JURY TRIAL</u> |
| EDWARD B. MEYERCORD III, JOHN C. SHOEMAKER, CHARLES P. CARINALLI, EDWARD H. KENNEDY, KATHLEEN M. HOLMGREN, RAJ KHANNA, INGRID J. BURTON, RÉMI THOMAS, CRISTINA TATE, KEVIN RHODES, NORMAN J. RICE III, JONAS BROWN, JOSEPH VITALONE, and NABIL BUKHARI, | |
| Defendants, | |
| and | |
| EXTREME NETWORKS, INC., | |
| Nominal Defendant. | |

Plaintiff Gregory Miller ("Plaintiff"), by and through his undersigned attorneys, brings this stockholder derivative complaint for the benefit of nominal defendant, Extreme Networks, Inc. ("Extreme" or the "Company"), against current and/or former members of its Board of Directors (the "Board") and certain of its current and/or former executive officers (the "Individual Defendants", defined herein), seeking to remedy the Individual Defendants' breaches of fiduciary duties, violations of the federal securities laws, and other misconduct that resulted in material damage to the Company and its stockholders. Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, such as filings by Extreme with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and other matters of public record.

## I.  INTRODUCTION

1.      This is a stockholder derivative action brought for the benefit of nominal defendant Extreme against the Individual Defendants, all of whom are current and/or former officers and directors of Extreme, based on their non-exculpable breaches of fiduciary duty and other serious misconduct from July 27, 2022 through January 30, 2024 (the "Relevant Period"), as alleged in detail herein.

2.      On March 11, 2020, the World Health Organization (the "WHO") declared COVID-19 to be a pandemic, which substantially impacted numerous global supply chains. As relevant here, the consequences of the COVID-19 pandemic included significant manufacturing and shipping disruptions and bottlenecks that led to global semiconductor shortages, amongst other shortages of supplies for networking products manufactured by Extreme.

3.      Nominal defendant Extreme, a Delaware corporation headquartered in

1

Morrisville, North Carolina, is a publicly-traded provider and manufacturer of wired and wireless networking products, including wired, wireless, and software-defined wide area-network infrastructure equipment. As the Company entered the constrained supply chain environment brought on by COVID-19, its business faced the dual pressures of limited supply of its most in-demand products and limited demand for its less popular products.

4.      By early-to-mid 2021, analysts reported on and were concerned about Extreme's ability to deliver and generate revenue from its products. Indeed, by the time Extreme's earnings conference call announcing its third fiscal quarter results and outlook was held on April 28, 2021, analysts asked certain of the Individual Defendants to "quantify how the supply chain constraints are impacting your [fourth quarter of 2021] outlook? And how much revenue you think you're leaving on the table or pushed out to later quarters?" Defendants Edward B. Meyercord III ("Meyercord"), a Board member and the Company's President and Chief Executive Officer ("CEO"), and Rémi Thomas ("Thomas"), the Company's then-Chief Financial Officer ("CFO"), responded that the supply chain constraints were having a material impact and were creating downward pressure on revenues, and that therefore, they expected Extreme's "backlog" to be built up. Accordingly, the Individual Defendants announced that they would begin reporting quarterly the amount of the Company's orders on backlog.

5.      Reported backlog referred to the amount of revenues the Company would recognize based upon the present amount of "confirmed" orders for products. Importantly, the majority of the Company's revenues—about 70% of its total revenues during the Relevant Period—were "product" revenues, as opposed to revenues derived from its subscription-based business. And of Extreme's product revenues, more than 80% of these revenues were premised on Extreme's ability to ship orders out to its (i) distributors or (ii) partners, who then themselves

deliver the product to the final customer in the sales chain, referred to as the "end user." According to Extreme's adopted "Sales In" revenue recognition model, the Individual Defendants caused the Company to report revenue on orders that were shipped at the time of shipment to the distributor or partner, regardless of when the product reached the end user. However, because Extreme could not supply and fulfill its backlog orders due to supply chain constraints, Extreme could not ship those orders to its distributors and partners and therefore could not report them as revenue, but only as backlog.

6.      While the Individual Defendants represented that the orders reflected in the backlog would convert to future revenues, the pressure to generate immediately reportable revenues in this challenging environment led the Individual Defendants to perpetrate an undisclosed, improper scheme which allowed them to represent to stockholders that Extreme was experiencing organic demand and strong growth. These representations, however, were illusory and misleading. According to consistent and corroborative accounts of multiple confidential witnesses contained in the operative complaint filed on February 14, 2025 (the "Securities Complaint") in the pending securities fraud class action captioned *Steamfitters Local 449 Pension & Retirement Security Funds v. Extreme Networks, Inc., et al.,* Case No. 3:24-cv-05102-TLT (N.D. Cal.) (the "Securities Action"), all of are described therein as former Extreme employees, rather than allow sales, pipeline, and flow of purchase orders to be generated organically based on actual demand from end users, the Individual Defendants engaged in or turned a deliberate blind eye to the following improper business practices designed to force through end of quarter sales to inflate Extreme's product revenues throughout the Relevant Period: (i) shipping unwanted and outdated inventory at the distributor/partner level in exchange for incentives such as discounts, monetary rebates, or prioritization in the product backlog line (*i.e.*, "stuffing" the channel); (ii) shipping

inventory to partners early, without a confirmed end user purchase order, in order to "pull in" sales for the quarter; (iii) incentivizing distributors to take unwanted and unneeded inventory by encouraging the use of a right to return a portion of the stock in future quarters; (iv) reneging on those same agreements, which forced the distributors to hold the unwanted product; and (v) manipulating revenue figures and forecasts by including multi-million dollar orders that the Individual Defendants knew Extreme had lost out on to competitors or were improperly double counted—without correction—until after the quarter was over.[1]

7.     These undisclosed manipulative sales and inventory tactics had the effect of "pulling in" sales from future quarters and "borrowing" customer demand from future quarters, to elevate Extreme's current revenue figures for the present quarter. Importantly, these undisclosed manipulative sales and inventory tactics were not reflective of actual demand and masked the true reduced organic demand from Extreme's customers as the Individual Defendants reported the Company's revenues for the quarter.

8.     The Individual Defendants hid these tactics from stockholders and misled stockholders as to the reason for the Company's well-received revenue growth. Throughout the Relevant Period, the Individual Defendants attributed Extreme's impressive revenue growth to purportedly "***strong***" and "***unabated market demand***" for the Company's products.

9.     On July 27, 2022, the Individual Defendants caused Extreme to announce "double-digit" revenue growth for fiscal year 2022, stating that this growth was achieved "***due to strong demand***," that "***[o]ur teams continue to see unabated market demand***," and that Extreme "***achieved double-digit growth for the year*** and improved operating margins, ***even in the current supply chain environment***." Analysts repeated and relied upon these misrepresentations, with

---

[1]     All of the confidential witness accounts referred to herein appear in the Securities Complaint.

Lake Street Capital Markets ("LSCM") stating in a report issued that day that the "tale of FY2022 was that **market demand remains strong for Extreme networking products** . . . We thought Q4 (Jun) might hint at signs of a slowdown . . . **but that was not the case**." LSCM further stated, "Extreme maintained its FY23 revenue target of 10%-15% growth, **driven by strong demand amongst all major verticals and the unlocking of the backlog**." Given this "**robust demand**," LSCM issued a Buy rating and raised its price target for Extreme stock to $15.

10. Thereafter, the Individual Defendants continued to tell this impressive revenue growth story, making repeated false and misleading statements attributing the Company's product revenue growth to organic customer demand—without disclosing that manipulative sales and inventory tactics were the reason the Company met or exceeded its revenue targets.

11. For example, in Extreme's earnings conference call for the first quarter of 2023, defendant Meyercord stated: "[w]e **had a record quarter as demand for cloud-driven networking and for Extreme Solutions has never been stronger**. Again, **our share gains are evident by double-digit revenue growth, record revenue and continued growth of backlog, which now sits at $555 million**." Similar representations continued to be made and repeated by the Individual Defendants throughout the Relevant Period. Consequently, analysts continued to rely on the Individual Defendants' statements and assurances that organic demand was strong and growing.

12. The reality was that quarterly product revenue numbers were met not by organic demand and growth, but by a systemic channel stuffing scheme directed from the highest levels of the Company. The detailed accounts of numerous confidential witnesses in the Securities Complaint, who are alleged therein to have been intimately involved with the Company's sales and business operations during the Relevant Period, describe how Extreme's revenue growth story was a fabrication, and how the undisclosed manipulative sales and channel stuffing conduct was

orchestrated to meet quarterly revenue targets that could not be met by organic customer demand and sales. Importantly, these confidential witness accounts explain that the channel stuffing and manipulative sales conduct occurred on a global scale, touching Extreme's most important distributors and partners, including its top three distributors that together generated more than half of Extreme's product revenues.

13. For example, the confidential witness referred to in the Securities Complaint as "FE-1" and alleged to have been a Senior Distribution Account Manager at Extreme from May 2016 through August 2022, described a "Buy-In" process that would occur at the end of every fiscal quarter during FE-1's tenure. This process was tailored to meet Extreme's financial revenue targets. According to the account of FE-1, through this "Buy-In" process, Extreme would send unwanted and outdated inventory to the Company's distributors through multiple incentives including: (1) the offer of "points" or rebates, *i.e.*, a monetary discount on the inventory in exchange for the distributors' agreement to take inventory by the end of the quarter; (2) the offer of a valued priority position in front of the backlog line for backlogged products—allowing the distributor to cut the line in front of other distributors with earlier-placed orders (and penalizing distributors who refused to play ball by knocking them to the back of the line); and (3) the use of stock rotation agreements whereby distributors were encouraged to return some portion of unneeded inventory in subsequent quarters. According to the Securities Complaint, FE-1 described the end of quarter "Buy-In" deals as a "structured deal" with each of the distributors that were made in order for Extreme to "sell more inventory to distribution than distribution needs." All these incentives and tactics resulted in an unsustainable situation whereby Extreme lost total revenue through unnecessary incentives and rebates, and distributors built up inventory in an unsustainable manner that would result in reduced future sales once inventory levels grew too

large. The Securities Complaint alleges that ultimately FE-1 left the Company as a result of unethical conduct FE-1 witnessed.

14. Notably, according to the account of FE-1, this channel stuffing conduct was organized and directed by defendant Norman J. Rice III ("Rice"), a member of Extreme's C-Suite as Chief Operating Officer ("COO") of the Company at that time. Moreover, the Securities Complaint alleges that FE-1 has provided documentation to lead counsel for the Securities Action plaintiffs demonstrating that FE-1 brought these channel stuffing and manipulative sales tactics **directly** to the attention of defendant Thomas—Extreme's then-CFO—and others. Specifically, it has been alleged in the Securities Action that FE-1 conveyed concerns directly to defendant Thomas, and also forwarded numerous documents to defendant Thomas attached to a July 20, 2022 email— one week before the beginning of the Relevant Period—in which FE-1 stated that defendant Jonas Brown ("Brown") (who reported to defendant Rice) "works with the distributors to buy bad product that is not sellable to make the corporate number and then artificially suppresses them from rotation [of] bad product to order good product." According to the Securities Complaint, FE-1 specifically recounted how, based upon FE-1's recent conversations with distributor leadership who continues to work with Extreme, the Company remained engaged in similar inappropriate and unethical channel stuffing practices following FE-1's departure from Extreme, through the end of the Relevant Period.

15. Several other confidential witness accounts in the Securities Complaint corroborate that under the Individual Defendants' direction and on their watch, Extreme continued to engage in undisclosed manipulative sales and inventory tactics during and throughout the Relevant Period, all while the Individual Defendants made repeated false representations attributing the Company's product revenue growth to strong customer demand and organic sales.

16.     The confidential witness referred to as "FE-3" in the Securities Complaint and described therein as a senior level manager of pricing at Extreme from before the Relevant Period until the second half of 2023, is alleged to have reported into the Finance leadership of defendant Cristina Tate ("Tate"), who herself reported to defendant Thomas, and later to defendant Kevin Rhodes ("Rhodes"). According to the Securities Complaint, FE-3 explained that it was "***well known internally at Extreme***" throughout FE-3's tenure that the sales team was "channel stuffing" by pushing distributors to take orders early to meet sales goals and earn commissions, and that this resulted in extra inventory taken by distributors.

17.     Notably, this manipulative conduct was not only directed at the Company's distributors, but also its partners.

18.     Per the account in the Securities Complaint of the confidential witness referred to as "FE-2" and described therein as a Director of Sales at Extreme from before the Relevant Period until mid-2023, FE-2 witnessed and experienced channel stuffing conduct occur with Extreme's partners. FE-2 explained that with respect to partner sales, inventory is normally shipped by Extreme to the partner only when there is an end user purchase order placed. In other words, the end user signing a purchase order triggers the sale, and the product ships thereafter and should only then be recognized as revenues. According to confidential witness accounts in the Securities Complaint, including that of FE-2, at the end of each fiscal quarter, Extreme would ship product to a partner and recognize revenues, ***even though it was known that there was no firm end customer order to justify such shipment***. As a result, partners would hold the inventory for months before the end user ever received delivery of that order. Indeed, in some cases, the end customer purchase order was never even issued.

19.     Extreme's reported revenues and the growth story that the Individual Defendants

publicly reported and repeated were not attributable to the represented organic demand for Extreme's products, but rather, were only made possible by undisclosed, unsustainable, and accelerated sales tactics that robbed from one quarter to prop up another, creating for each period a misleading representation of organic demand and sustainable growth.

20.     In addition to the channel stuffing and improper incentives described above, the Individual Defendants' manipulation of the truth took another form: as the Individual Defendants portrayed a false revenue growth story, they simultaneously misrepresented the nature of Extreme's backlog orders, which had ballooned up to $555 million during the Relevant Period. These misrepresentations, combined with those described above, communicated to stockholders that not only was Extreme realizing actual increased organic demand for its core products (a lie), but that the "firm" orders on its backlog— totaling over half a billion dollars—ensured continued growth and revenues into the near future (another lie).

21.     During and throughout the Relevant Period, the Individual Defendants made numerous assurances to stockholders concerning Extreme's backlog, stating that it was poised to unleash product revenue growth, because Extreme's backlog consisted of "*firm*" customer commitments that were simply "*not cancelable*," and that reflected "*end user demand*." Indeed, the Individual Defendants led stockholders to believe the "*vast majority*" of the orders reflected in the over half billion-dollar backlog were "*real projects*" and that they did not "*see double ordering*" of Extreme's products on the backlog. Moreover, to the extent there was any risk of cancellation, the Individual Defendants led stockholders to believe it was just "1%" of orders.

22.     These assurances were critical to stockholders, because backlog was intrinsically intertwined with product revenues and the financial health of the Company. The Individual Defendants themselves routinely stated that Extreme's product revenues were "understated" by

the amount of backlog on the pipeline—meaning revenues would have been higher had the orders not been on backlog. Analysts and stockholders believed them. For example, on July 27, 2022, Needham & Co. ("Needham") stated in its analyst report that Extreme had "Visibility Down to the Deal Level: *No Double Ordering* as Orders are Tailored to Specific Structured Project Deployments. *Extreme has long had an order cancellation rate that's solidly less than 1% and that is not changing*. Extreme can see these orders *with high degree of specificity* down to the details of the deployment architectures*. They argue they are confident with this visibility . . . the orders are real and sustainable.*" Similarly, Rosenblatt Securities ("Rosenblatt") stated in its August 28, 2022 analyst report that Extreme's revenue "*forecast appears particularly safe due to the Company's highly elevated backlog*." And Rosenblatt wrote in its March 29, 2023 analyst report, in reliance on the Individual Defendants' misrepresentations, that: "*Backlog risks seem low. We believe Extreme has excellent visibility to its backlog, and we are confident the risk of double ordering is low*. The company has software tools to know what's in backlog and that no projects are duplicates."

23.     In reality, the orders reflected in Extreme's increasingly large backlog—which was five times larger than its baseline pre-COVID backlog—were not firm and therefore were not reasonably correlated to future revenues. Specifically, the Individual Defendants failed to disclose that: (1) Extreme's backlog orders as communicated to stockholders during the Relevant Period, instead of reflecting "firm" customer commitments, could be cancelled at will at any time by Extreme's customers, and did not reflect end user demand; (2) Extreme's backlog orders with its customers *included contractual language* that allowed these orders to be cancelled if another manufacturer met the order and not Extreme; (3) it was well known internally that customers were "double-booking," meaning they were placing orders with both Extreme and other competitors

simultaneously and cancelling the orders with Extreme if the other competitor fulfilled the order first; (4) it already had been internally hedged that 10% of the backlog would be cancelled and not be converted to product revenue—a rate materially greater than the 1% of backlog cancellation communicated to stockholders; and (5) the internal hedge of 10% was itself known to be severely understated, with one confidential witness in the Securities Action, who is alleged to have met quarterly with the C-Suite and reported directly to the C-Suite, explaining that the more appropriate hedge for backlog cancellations was up to 66%.

24.     Moreover, as mentioned above, the questionable sales tactics employed at Extreme to force through sales at the end of each quarter included leveraging distributors' place on the backlog line with their agreement to take early inventory. The logical ramification of this practice was to deprioritize the backlog position of certain distributors who did not cave to channel stuffing demands, increasing the likelihood that those distributors would acquire the product from a competitor and cancel their Extreme orders.

25.     The Individual Defendants were strongly focused on the backlog issues.  As alleged in the Securities Complaint, one internal message ("IM") from defendant Brown to FE-1 explained that there were "[l]ots of eyes on this backlog process – ***it's updated all the way up to [defendant] Ed [Meyercord]***."

26.     Thus, throughout the Relevant Period, the Individual Defendants falsely and misleadingly asserted that: (1) the Company's strong product revenues were resultant from organic demand from Extreme's customers; and (2) the hundreds of millions of dollars of backlog that the Individual Defendants touted represented "firm," present, commitments from customers and were assured product revenues. In truth, Extreme's revenues were inflated by the concealed channel stuffing and manipulative sales practices of unwanted and undesired products, and its backlog was

inflated by double-booked and readily cancellable orders that were highly unlikely to result in revenues.

27.     The truth of Extreme's actual financial state was revealed through a series of partial corrective disclosures during the Relevant Period. For example, on August 24, 2023, the Individual Defendants caused Extreme to file with the SEC its Annual Report on Form 10-K for fiscal year 2023 (ended June 30, 2023) (the "2023 10-K"), signed by defendants Meyercord, Rhodes, John C. Shoemaker ("Shoemaker"), Charles P. Carinalli ("Carinalli"), Kathleen M. Holmgren ("Holmgren"), Edward H. Kennedy ("Kennedy"), Raj Khanna ("Khanna"), and Ingrid J. Burton ("Burton"). The 2023 10-K stated that Extreme lost ***$245 million of backlog***, which reflected an extraordinary decline of 48% year-over-year. On this news, the price of Extreme stock dropped by 9%.

28.     Thereafter, on November 1, 2023, the Individual Defendants caused Extreme to report its financial results for the first quarter of 2024, reporting sequential total revenue losses from $363.9 million in the fourth quarter of 2023 to $353.1 million in the first quarter of 2024. Notably, the Individual Defendants also stated that they would discontinue disclosure of the Company's current backlog figure on a quarterly basis. On this news, the price of Extreme stock dropped by 13% in a single day, with a total decrease of 18% over the following days.

29.     Then, on January 8, 2024, the Individual Defendants caused Extreme to issue a press release that provided a business update lowering the Company's second quarter of 2024 and long-term revenue outlook, stating in relevant part that "second quarter revenues are now expected to be approximately $294 to $297 million, compared to the prior outlook of $312 to $327 million." On this news, the price of Extreme stock dropped by an additional 7%.

30.     Finally, rather than being on a trajectory of increasing revenues for fiscal year

2024, as the Individual Defendants previously guided for, the Individual Defendants disclosed on January 31, 2024 that Extreme's revenues had significantly ***declined*** for the second quarter of 2024, falling from $353.1 million of total revenues in the first quarter of 2024 to $296.4 million in the second quarter of 2024. Critically, the Individual Defendants revealed that of that total, product revenues took the largest hit, totaling only $186.6 million for the second quarter of 2024, compared to $253.5 million from the prior quarter. This represented a decline of $66.9 million, or a ***26% decline*** in product revenue losses quarter-over-quarter.

31.     Furthermore, the Individual Defendants disclosed that: "[o]ur distributors and partners have lowered inventory purchases, which we expect to accelerate in the third quarter." The Individual Defendants also revealed that Extreme's product backlog had already normalized during the quarter, "earlier than we initially anticipated." In sum, the Individual Defendants stated that they made the "conscious decision to put channel digestion behind [Extreme] in the March quarter [*i.e.*, the third quarter of 2024]," leading to a "***$40 million to $50 million reduction in channel inventory in the third quarter***" that would result in "[d]emand . . . be[ing] masked by inventory flowing out of the channel."

32.     Following this final corrective disclosure, stockholders understood that Extreme was not in fact growing, calling into serious question the revenue growth story the Individual Defendants previously touted. Indeed, UBS Research ("UBS") downgraded Extreme from a "Buy" to a "Neutral" rating on January 31, 2024—and found that "Extreme's double-digit [revenue] growth in FY22 and FY23 was the result of pandemic-related supply chain delays and depressed demand in FY20/FY21 followed by double-ordering by customers in FY22/FY23 to protect against the possibility of supply chain issues. Supply and demand are normalizing in FY24/FY25 and ***it is now apparent that Extreme is not growing at a sustainable double-digit rate***."

33.     As a result of this news, the price of Extreme stock collapsed from $16.64 per share when the market closed on January 30, 2024, to $12.59 per share on February 2, 2024, a 24% decline over three trading days. In total, the price of Extreme stock declined from a Relevant Period high of $32.27 per share to a low of $12.59 per share after the revelation of the truth, a greater than *60%* decline.  The Company's stock price has never recovered, and currently trades for around $15 per share.

34.     These events precipitated the initiation of the Securities Action in the U.S. District Court for the Northern District of California, in which various claims under the federal securities laws, including claims for fraud, have been asserted against Extreme and several of the Individual Defendants named herein – Meyercord, Thomas, Tate, Rhodes, Rice, and Brown.  The Securities Action is brought on behalf of investors who purchased or acquired shares of Extreme stock from July 27, 2022 through January 30, 2024 (the "Class Period").  The operative Securities Complaint, which is based in part on the detailed confidential witness accounts referenced herein, was filed on February 14, 2025.

35.     As alleged with particularity herein, under Delaware law, there is reason to doubt that at least half the members of the Company's current Board could disinterestedly and/or independently respond to a litigation demand.  As a result, this derivative action brought against the Individual Defendants for the benefit of Extreme should proceed.

## II.    JURISDICTION AND VENUE

36.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a-9 (17 C.F.R. § 240.142-9) promulgated thereunder by the SEC, as well as Section 21D of the Exchange Act (15 U.S.C. §78u-4(f)).  Plaintiff's claims also raise a federal question pertaining to

the claims made in the Securities Action based on violations of the Exchange Act.

37. This Court also has supplemental jurisdiction over the state law claims asserted herein under 28 U.S.C. §1367(a). This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

38. In connection with the acts, conduct and other wrongs complained of herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

39. This Court has personal jurisdiction over each Defendant named herein because each Defendant is either a corporation that conducts business in and is headquartered in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

40. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b) because nominal defendant Extreme is headquartered in this District and conducts business in this District.

### III.     THE PARTIES

#### A.     <u>Plaintiff</u>

41. Plaintiff is a current shareholder of Extreme and has continuously held shares of Extreme common stock since May 2022.

#### B.     <u>Nominal Defendant</u>

42. Nominal defendant Extreme is a Delaware corporation with its principal executive offices located in Morrisville, North Carolina. The Company's common stock trades on the NASDAQ exchange under the symbol "EXTR."

## C. The Individual Defendants

43. Defendant Meyercord has served as President and CEO of Extreme since 2015, and as a member of the Board since 2009. From 2011 to 2015, defendant Meyercord served as Chairman of the Board. Defendant Meyercord is named as an individual defendant in the Securities Action.

44. Defendant Shoemaker has served as a Board member since 2007 and as Chairman of the Board since 2017.

45. Defendant Carinalli has served as a member of the Board since 1996.

46. Defendant Kennedy has served as a member of the Board since 2011 and is also a member of the Board's Audit Committee (the "Audit Committee").

47. Defendant Holmgren has served as a member of the Board since 2015 and is also a member of the Audit Committee.

48. Defendant Khanna has served as a member of the Board since 2014 and is also the Chair of the Audit Committee.

49. Defendant Burton has served as a member of the Board since 2019.

50. Defendant Thomas served as the Company's CFO from 2018 until February 2023. Defendant Thomas is named as an individual defendant in the Securities Action.

51. Defendant Tate has served as the Company's Senior Vice President, Finance since August 2022. Previously, defendant Tate served as Vice President, Finance from 2019 until July 2022. Defendant Tate also served as Extreme's Interim CFO from January 2023 until May 2023. Defendant Tate is named as an individual defendant in the Securities Action.

52. Defendant Rhodes has served as the Company's Executive Vice President ("EVP") and CFO since May 2023. Defendant Rhodes is named as an individual defendant in the Securities Action.

53.     Defendant Rice has served as the Company's Chief Commercial Officer ("CCO") since January 2024.  Previously, defendant Rice served as Extreme's COO from 2019 through February 2024.  In the COO role, defendant Rice led the Company's Global Supply Chain Management and Operations.  Defendant Rice is named as an individual defendant in the Securities Action.

54.     Defendant Brown has served as the Company's Senior Director of Worldwide Sales and Strategy since 2018.  Defendant Brown is named as an individual defendant in the Securities Action.

55.     Defendant Joseph Vitalone ("Vitalone") served as the Company's Chief Revenue Officer ("CRO") from June 2020 until his resignation on January 8, 2024.  From the time of his resignation until August 2024, defendant Vitalone remained with the Company as a "strategic advisor."

56.     Defendant Nabil Bukhari ("Bukhari") joined the Company in 2017 and has served as its Chief Technology and Product Officer, EVP/GM Subscription Business since July 2020.

57.     Defendants Meyercord, Shoemaker, Carinalli, Kennedy, Holmgren, Khanna, Burton, Thomas, Tate, Rhodes, Rice, Brown, Vitalone, and Bukhari are collectively referred to herein as the "Individual Defendants."

## IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS

58.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were, and are, required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of the Company and its stockholders so as

to benefit all stockholders equally and not in furtherance of their personal interests or benefit. Each director and officer owed to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

59.     The Individual Defendants, because of their positions of control and authority as directors and/or officers, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

60.     At all times relevant hereto, each of the Individual Defendants was the agent of the other Individual Defendants and of the Company and was at all times acting within the course and scope of such agency.

61.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the Individual Defendants were required to, among other things:

        a.      manage, conduct, supervise and direct the business affairs of the Company in accordance with all applicable laws;

        b.      neither violate, nor knowingly permit any officer, director or employee of the Company to violate, applicable laws, rules and regulations;

        c.      establish and maintain systematic and accurate records and reports of the business and affairs of the Company and procedures for the reporting of the business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

d.        neither engage in self-dealing, nor knowingly permit any officer, director or employee of the Company to engage in self-dealing;

e.        ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

f.        conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

g.        ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times; and

h.        remain informed regarding how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

62.        Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and its stockholders the fiduciary duties of loyalty, good faith, the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants alleged herein involves a violation of their obligations as directors and/or officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company. The conduct of the Individual Defendants, who were also officers and/or directors of the Company, has been ratified by the

remaining defendants.

63.     Extreme's Audit Committee operates pursuant to a charter (the "Audit Committee Charter").   According to the Audit Committee Charter, the primary functions of the Audit Committee include: (i) reviewing and reporting to the Board on financial reports and financial information to be disclosed by the Company and the Company's compliance with legal and regulatory requirements; (ii) reviewing the qualifications, independence and performance, and approving the terms of engagement, of the Company's independent auditors; (iii) reviewing the performance of the Company's internal audit function; and (iv) overseeing and reviewing the Company's policies and programs that govern risk assessment and risk management.

64.     Per the Audit Committee Charter, the members of the Audit Committee are specifically responsible, among other things, for:

•       Reviewing with the independent auditors on a quarterly basis the critical accounting policies and practices used by the Company, all alternative treatments of financial information within generally accepted accounting principles that the independent auditors have discussed with management, the ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditors and any audit adjustments or proposed audit adjustments;

•       Discussing with management, the internal auditors, and the independent auditors the adequacy and effectiveness of the accounting and financial controls, including the Company's policies and procedures to assess, monitor, and manage business and financial risk and legal and ethical compliance programs;

•       Reviewing and discussing with management and the independent auditors the Company's annual audited financial statements, any certification, report, opinion, or review

rendered by the independent auditors, and recommend to the Board whether the audited financial statements should be included in the Company's Annual Report on SEC Form 10-K;

- Reviewing and discussing with management and the independent auditors the Company's Quarterly Reports on Form 10-Q prior to filing with the SEC;

- Reviewing and discussing earnings press releases and other information provided to analysts and rating agencies, including "pro forma" or adjusted financial information;

- Reviewing annually with management its assessment of the Company's internal controls and procedures for financial reporting, and reviewing annually with the independent auditors the attestation to and report on the assessment made by management of the effectiveness of the Company's internal control structure and procedures for financial reporting, each as required under the rules of the SEC, and considering whether any changes to the internal controls processes and procedures are appropriate based on management's assessment or the independent auditor's report;

- Reviewing with the principal executive and financial officers of the Company any report on significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize, and report financial data, any material weaknesses in internal controls, and any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls;

- Establishing procedures for the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters;

- Adopting, as necessary, appropriate remedial measures or actions with respect to

such complaints or concerns; and

• Meeting and discussing with the Company's legal counsel any report provided by such counsel concerning evidence of a material violation of securities laws or breach of fiduciary duty or similar violation by the Company or any agent, and adopt, as necessary, appropriate remedial measures.

V. **FACTS**

A. **Overview of the Company and Its Business**

65. Nominal defendant Extreme is a global provider of cloud-based computer networking equipment and related services. Extreme develops, manufactures, and sells wired and wireless network infrastructure equipment (*i.e.*, "product"), such as wireless access points. Extreme conducts business in three major geographic regions: (1) Americas, (2) Europe, Middle East, and Africa ("EMEA"), and (3) Asia Pacific ("APAC").

66. Extreme's fiscal year ends on June 30 of each calendar year. For example, the Company's 2023 fiscal year ("FY") ended on June 30, 2023. Thus, herein, 1Q refers to the fiscal quarter ended September 30 of each calendar year; 2Q refers to the fiscal quarter ended December 31; 3Q refers to the fiscal quarter ended March 31 (of the following calendar year); and 4Q refers to the fiscal quarter ended June 30. As an example, 1Q2024 refers to calendar fiscal quarter ended September 30, 2023.

67. The Individual Defendants caused the Company to report both: (1) product revenues and (2) subscription-based revenues, with product revenues accounting for approximately 70% of Extreme's total revenues during and throughout the Relevant Period. Specifically, according to Extreme's SEC filings, product revenues accounted for 62.6% of total revenues for FY2024, 71% of total revenues for FY2023, and 68.5% of total revenues for FY2022.

68. During the Relevant Period, Extreme's total revenues were also reported by its

two major channels: (1) Direct and (2) Distributor. The Direct channel refers to Extreme selling its products directly to its direct end user customers. The Distributor channel refers to Extreme selling its products to end users through: (a) its distributors (who sold to partners/resellers); or (b) its partners/resellers (who sold directly to end users).

69.     The Individual Defendants disclosed that Extreme's revenues through the Distributor channel were 85% of total product revenues for FY2024, 83% of total product revenues for FY2023, and 80% of total product revenues for FY2022.

70.     Further, the Individual Defendants disclosed in Extreme's SEC filings that its three "largest distributors" were TD Synnex Corporation ("TD Synnex"), Jenne Inc. ("Jenne"), and Westcon Group Inc. ("Westcon"). Specifically, it has been disclosed in Extreme's annual SEC filings that these three distributors collectively accounted for ***more than 50%*** of Extreme's revenues during and throughout the Relevant Period.

71.     **Revenue Recognition:**  According to its filings with the SEC, Extreme recognized product revenues at the moment its products were shipped to Extreme's "customers" (*i.e.*, its distributors or partners in the Distribution channel, and end users in the Direct channel)— specifically, when "control of the product is transferred to the customer (*i.e.*, when the Company's performance obligation is satisfied), which typically occurs at shipment for product sales."

72.     **Backlog:**  Additionally, the Individual Defendants caused Extreme to report product backlog as a key metric during the Relevant Period, which indicated the amount of revenue to be recognized based on the present amount of "confirmed orders with a purchase order for products to be fulfilled and billed to customers with approved credit status."  Importantly, and as discussed further below, orders on backlog represented orders that had not been "fulfilled" or shipped, and thus, could not be counted as revenue.

73.  **Bookings:**  Bookings represented the total value of orders that were received that quarter on a total contract value basis.

B.  **The COVID-19 Pandemic Leads to Supply Chain Constraints, Increasing the Company's Backlog**

74.  Extreme's networking products rely on several key components, such as merchant silicon, microprocessors, integrated circuits, and power supplies. Extreme utilized a global sourcing strategy that obtained procurement of these materials and product manufacturing from third-party suppliers and original design manufacturers ("ODM") such as Foxconn, Alpha Networks, Lite-On Technology Corp., Senao Networks, Sercomm Corp., and Wistron NeWeb Corp. These third-party manufacturers produced and supplied Extreme's key components for its products.

75.  Prior to and throughout the Relevant Period, the Individual Defendants emphasized the significance and importance of Extreme's supply chain, stating in the Company's SEC filings that:

> We currently purchase several key components used in the manufacturing of our products from single or limited sources and are dependent on supply from these sources to meet our needs. At present, semiconductor chips and other components are currently in high demand with limited supply. These shortages have been exacerbated by increased energy, raw material, and transportation costs, which are resulting in higher overall component costs, higher delivery costs for expedited shipments, and significantly longer than usual lead times for these components.

76.  The Individual Defendants further stated in the Company's SEC filings that Extreme's supply chain and component suppliers had been negatively affected by the COVID-19 pandemic.

77.  On March 11, 2020, the WHO declared COVID-19 a pandemic. By late 2020, multiple published studies and articles concluded that the COVID-19 pandemic impacted global supply chains substantially. Specifically as it related to the networking industry, the COVID-19

pandemic created disruptions and bottlenecks that led to a global semiconductor shortage, amongst other shortages of Extreme's supplies for its networking products.

78. As a result, by early 2021, analysts and stockholders were concerned about Extreme's ability to deliver products and generate revenue during this constrained supply chain environment. Thus, in April 2021 (a year before the start of the Relevant Period), analysts asked certain of the Individual Defendants during the Company's 3Q2021 earnings call whether Extreme can "quantify how the supply constraints are impacting your 4Q[2021] outlook? And how much revenue you think you're leaving on the table or pushed out to later quarters?" Defendants Meyercord and Thomas responded that the ongoing supply chain constraints had a "material" "revenue impact" to Extreme and represented that there would be a building up of backlog for the upcoming 4Q2021 quarter (ending June 30, 2021) – stating that "from a revenue perspective, you've seen our book-to-bill[2] number greater than 1. And I think you could expect to see that in this [4Q2021] quarter as well. . . . With our forecast, we're expecting to build backlog in this [4Q2021] quarter."

79. The result of these supply chain constraints led to a large and significant increase in Extreme's backlog of orders from otherwise normal baseline levels. Indeed, the Individual Defendants began causing the Company to publicly report its total cumulative product backlog on a quarterly basis in 4Q2021 (ending June 30, 2021), and Extreme's backlog grew from approximately $100 million in 4Q2021 to a high of $555 million in 1Q2023. As the Individual Defendants touted positively to stockholders, this increase in backlog gave "confidence" to their assurances of revenue growth, because, as the Individual Defendants explained, the backlog

---

[2]     The Book-to-Bill or "B-B" ratio refers to the flow of orders for a specified period, *i.e.*, the dollar value of orders received divided by the dollar value of orders shipped and billed during the quarter.

represented assured revenues based off current confirmed orders that simply could not be met at the current moment due to supply chain constraints. Notably, the Individual Defendants caused Extreme to report backlog on a quarterly basis from 4Q2021 through 4Q2023, after which the Individual Defendants stopped reporting backlog on a quarterly basis.

<blockquote>

**C.**     **The Individual Defendants Report Revenue Growth Over FY 2022 and 2023, and Attribute Such Growth to "Exceptionally Strong" Demand and Improvement in the Supply Chain**

</blockquote>

80.     As Extreme's backlog ballooned up to $513 million from 1Q2022 to 4Q2022 during the constrained supply chain environment initiated by the COVID-19 pandemic, the Individual Defendants nonetheless reported strong revenue growth over that same time frame, touting that Extreme's revenues increased year-over-year ("YoY") at the start of the Relevant Period (*i.e.*, quarter-end 4Q2022). In other words, even as Extreme's backlog increased to more than half a billion dollars—which could not yet be counted as revenue—the Individual Defendants nonetheless reported increased revenues.

81.     Specifically, Extreme's total revenues increased by $100 million YoY, and total product revenues increased by $62 million YoY. The Individual Defendants touted these results as "*double-digit revenue growth for the year . . . even in the current supply chain environment*," and attributed that growth "*due*" to Extreme's "*strong*" and "*unabated market demand*." Specifically, the Individual Defendants stated in Extreme's 4Q2022 earnings press release, issued on July 27, 2022, that "*For FY22 we achieved double-digit growth* in both bookings and *revenue due to strong demand*," that "*[o]ur teams continue to see unabated market demand*," and that they "*achieved double-digit growth for the year* and improved operating margins, *even in the current supply chain environment*."

82.     Moreover, the Individual Defendants indicated in the Company's 4Q2022 earnings call on July 27, 2022 that while Extreme's "double-digit revenue growth led to an all-

time high revenue of $1.1 billion," it was still "understated by the $400 million of incremental backlog we built during the year."

83.     The Individual Defendants not only touted Extreme's results and "unabated market demand" during the July 27, 2022 earnings call, but also projected that Extreme's revenue growth would continue—based off the strength of its current backlog and the digestion of that "record" backlog into revenue once those orders would ship. Specifically, the Individual Defendants told stockholders that: "[a]s we enter FY23, *our record backlog, combined with the expected improvement in the supply chain environment through the course of the year gives us further confidence that we can grow the topline between 10-15%*." Defendant Meyercord further emphasized that: "*our revenue outlook is really a function of supply chain and product that we are able to release, given the massive backlog that we've built up*."

84.     Analysts believed the Individual Defendants' misstatements concerning the attribution of revenue growth to "strong" organic demand. For example, on July 27, 2022 (the first day of the Relevant Period), in response to the 4Q2022 earnings call, LSCM issued an analyst report stating that the "tale of FY22 was that market demand remains strong for Extreme networking products . . . and services . . . We thought Q4 (Jun) might hint at signs of a slowdown, especially in Europe, but that was not the case." LSCM further stated: "Extreme maintained its FY23 revenue target of 10%-15% growth, driven by strong demand amongst all major verticals and the unlocking of the backlog." Given this "robust demand," LSCM reiterated its Buy rating and raised its price target for Extreme stock to $15.

85.     Similarly, Needham stated in its July 27, 2022 report that "Extreme believes their demand and robust backlog will enable them to produce double-digit Revenue growth across a wide range of potential scenarios and outcomes." Needham also stated that Extreme: "beat our

Revenue and EPS forecast . . . and importantly, noted a strong, robust pipeline with no evidence of erosion or softening[.]"  Needham gave Extreme a "Buy" rating and increased the price target to $14.50.

86.     During FY2023, the Individual Defendants continued to publicly report revenue growth. Both total revenues and distributor channel revenues reported an increase from 4Q2022 to 4Q2023, followed by a sharp and significant decline throughout FY2024.  Similarly, product revenues also demonstrated a significant increase from 4Q2022 to 4Q2023, followed by a significant decline throughout FY2024.

87.     Again, as in the 4Q2022 earnings call, the Individual Defendants throughout FY2023 articulated that the reason for Extreme's ongoing revenue growth was because of "exceptionally strong" demand. Specifically, the Individual Defendants asserted:

> "*We had a record quarter as demand for cloud-driven networking and for Extreme Solutions has never been stronger*. Again, our share gains are evident by double-digit revenue growth, record revenue and *continued growth of backlog, which now sits at $555 million*." (1Q2023 Earnings Conference Call)

> "*We had another record quarter, as demand for cloud-driven networking and for Extreme Solutions remains exceptionally strong* . . . With a strong outlook for bookings growth and the gradual improvement of supply, *we expect backlogs to remain relatively stable for the next several quarters. We're in the beginning stages of an accelerated wave of product shipments and revenue growth over multiple quarters*." (2Q2023 Earnings Conference Call)

> "*And we're seeing good demand. We're seeing double-digit growth* in our weighted funnel year over year. And so that gives us confidence that demand is going to continue." (Needham Technology & Media Conference – May 17, 2023)

88.     As the Company's revenues began to decline slightly in 1Q2024, the Individual Defendants nonetheless continued to tout the revenue results as positive growth, and continued to assert that revenues were strong and attributable to improvements in the supply chain environment. For example:

> "*In the first quarter, we again demonstrated strong financial and operational*

***performance. . . First quarter revenue of $353.1 million grew 19% year-over-year, exceeding the high end of our expectations entering the quarter. . . Product revenue of $253.5 million grew 23% year-over-year, reflecting continued improvement in our supply chain environment***." (1Q2024 Earnings Conference Call)

89.     Throughout the Relevant Period, analysts (and stockholders) continued to believe the Individual Defendants' repeated misrepresentations concerning the attribution of revenue growth to Extreme's purported strong organic demand.  For example, LSCM stated in its October 27, 2022 analyst report in response to the Individual Defendants' statements during the 1Q2023 earnings call that: "Extreme maintained its FY23 revenue target of 10%-15% growth, ***driven by strong demand*** amongst all major verticals." Accordingly, LCSM again reiterated a "Buy" rating for Extreme stock.

90.     Similarly, Craig-Hallum Capital Group LLC ("Craig-Hallum") stated in its October 28, 2022 analyst report that: "Extreme Networks reported another quarter of solid results. Strong demand and bookings continued to outpace supply and the company continued to build its record backlog. . . . With material backlog set to be a multi-year tailwind to already solid demand trends, and margins to expand and drive material leverage at the same time, we remain very encouraged with Extreme's setup from here. We are reiterating our Buy rating and raising our price target to $22[.]"

91.     And, again, Craig-Hallum stated in its January 26, 2023 analyst report—in reliance on the Individual Defendants' false and misleading misrepresentations—that: "management believes demand will remain strong and expect its strong backlog to remain relatively stable through the next several quarters before beginning to be worked down. . . . With revenue growth expectations in FY23 to be near the high end of the company's previous 10%-15% range, management stated they expect FY24 growth to be within the company's long-term targeted range of 13%-17%. . . with an expectation for continued strong multi-year growth we are

maintaining our Buy rating and $22 price target."

**D. Unbeknownst to Stockholders, the Individual Defendants Implemented Manipulative Sales and Inventory Tactics at Extreme to Inflate Demand, Masking the True, Limited Organic Demand**

92.     While the Individual Defendants were making their public statements attributing Extreme's revenue growth to "exceptionally strong" and "unabated market demand," they implemented and/or permitted undisclosed channel stuffing and other manipulative sales and inventory tactics. These concealed business tactics allowed for the generation of record-high revenues, but only by improperly masking the reality that there was low organic demand, and that revenues were accelerating into the present by pulling in sales from the future. The Individual Defendants engaged in and/or turned a deliberate blind eye to this misconduct, in an effort to quell analysts' and stockholders' concerns about Extreme's ability to generate revenue during the constrained supply chain environment resultant from the COVID-19 pandemic.

93.     While there are several different ways to stuff a channel, channel stuffing as referred to herein is the act of a company sending more products to its distributors and partners than those distributors and partners are capable of selling downstream to end users. Thus, as alleged herein and described more fully below, while the Individual Defendants touted positive revenue results purportedly caused by organic consumer demand for Extreme's products, in reality the revenue results were a byproduct of adoption of undisclosed sales practices that, in large part, resulted in channel stuffing. Extreme's products were sold (or "stuffed") to distributors and partners far in excess of organic consumer demand, resulting in sales that were unsustainable because they resulted in undue channel inventory to the Company's distributors and partners.

94.     Per the recently-filed Securities Complaint, multiple confidential witness accounts confirm and corroborate that during the Relevant Period, undisclosed channel stuffing and other manipulative sales and inventory tactics were implemented at Extreme that were designed to

accelerate revenues for Extreme's products. These tactics included: (i) stuffing outdated and unwanted inventory at the distributor/partner level in exchange for incentives such as discounts, monetary rebates, or prioritization in the product backlog line for products that customers wanted; (ii) shipping inventory to distributors and partners early, and even without a purchase order by the end user customer, in order to "pull in" sales for the quarter; (iii) allowing distributors a right of return and stock rotation of a portion of the unwanted inventory for future quarters (to incentivize them to take the unwanted product); (iv) reneging on those same stock distribution rotation agreements (which forced the distributors/partners to hold the product); and (v) manipulation of revenue figures and forecasts by including million dollar orders which the Individual Defendants knew Extreme had lost out on to competitors or were improperly double counted—***without correction***—until the quarter was over.

95.     Notably, these confidential witness accounts in the Securities Complaint describe how channel stuffing and other manipulative conduct occurred with: (1) TD Synnex, Jenne, and Westcon—the three largest distributor customers of Extreme, which accounted for more than 50% of Extreme's revenues during and throughout the Relevant Period, and (2) Extreme's partners and resellers who had warehouse space for extra inventory.

### 1.     The Scheme Was Aided By Extreme's Chosen Revenue Recognition Model

96.     The Individual Defendants' scheme was made possible by Extreme's revenue recognition model, in which revenues were recognized at the moment of shipment of product to the distributor or partner, as opposed to the end user. As noted above, Extreme's backlog consisted of orders that were not shipped, and therefore, those orders could not be counted as revenue. Accordingly, to generate Wall Street-friendly revenue results, the Individual Defendants caused Extreme to ship what it had—outdated and unwanted products and inventory—to Extreme's

distributors and partners by offering incentives, rebates, promised returns, and pressures. These sales of outdated and unwanted product ballooned up inventory at the distributor and partner level, while the Individual Defendants misleadingly attributed these revenue results and growth to "exceptionally strong" organic demand for Extreme's products.

97.     According to the account of FE-1, a former Senior Distribution Account Manager at Extreme until August 2022, while the Company's former CRO, Bob Gault, was in office, the Company's revenue recognition model was changed from a "Point-of-Sale" ("POS") model— which FE-1 explained was recognition of revenue only when the end user bought the product from Extreme's reseller/partners—to a "Sales-In" model. Per FE-1's account in the Securities Complaint, with the "Sales-In" model, sales and revenue were recognized as soon as the merchandise physically left Extreme and was on its way into a distributor (as opposed to being recognized when the end user actually purchased and received the product). Importantly, FE-1 explained that purchase orders made by Extreme's customers that were on backlog could not be counted as revenue, because they had not been shipped.

98.     FE-1 also explained that the eventual if not desired "outcome" from the switch to a Sales-In model was that Extreme was "able to disguise a multitude of sins" and present "the illusion that things were better" than under the POS model.

99.     FE-1 further explained that the switch to a Sales-In model gave Extreme leverage with its distributors that it never had with end users, in order to meet the Company's targets. Specifically, FE-1 stated that the implementation of the Sales-In model allowed Extreme to inflate its revenue by pushing distributors to take inventory at the end of the quarter that the distributors did not need so that the Company's sales appeared larger than actual demand and revenue targets were met.

100.     Similarly, according to the Securities Complaint, FE-3 explained that Extreme's switch to the revenue recognition model that allowed it to recognize revenue when it shipped inventory to distributors (and not when received by end users) gave Extreme the ability to "stuff the channel" by incentivizing or forcing Extreme's distributors to take early inventory when they did not need it.

101.     In this way, Extreme's revenue recognition model—while not in and of itself improper or illegal—set the stage for the scheme and channel stuffing conduct discussed herein.

### 2.     To Boost Revenues in the Short Term, the Individual Defendants Caused Extreme to Ship Outdated and Unwanted Product to Its Distributors

102.     The supply chain constraints Extreme faced created pressure at the highest levels of the Company to generate revenue, which was compounded by the fact that because orders on backlog could not be shipped, those orders could not be counted as revenues. Indeed, the Securities Complaint alleges that FE-1 provided to the Securities Action plaintiffs' lead counsel personal notes evidencing meetings described as "**_Ed talks_**" (or Ed Meyercord talks), including one from March 17, 2022 (*i.e.*, in 3Q2022), which evidenced defendant Meyercord's involvement and knowledge of the supply chain constraints facing Extreme, and the inability for Extreme to ship the backlog out as revenue due to such constraints. The Securities Complaint alleges that according to these notes and FE-1's explanation of these notes, defendant Meyercord stated during this particular meeting that: (i) supply chain constraints were "not getting better," (ii) the "constraints were creating backlog," and (iii) as a result, Extreme "can't ship" this backlog out as revenue.

103.     Accordingly, under the Individual Defendants' direction and on their watch, Extreme shipped unwanted and outdated products to its distributors, and "stuffed" these distributors with product that was not reflective of organic demand by Extreme's end customers.

104.     The Securities Complaint alleges that FE-1 described a "Buy-In" process that would occur at the end of every fiscal quarter during FE-1's tenure, tailored to meet Extreme's financial revenue targets. According to the account of FE-1, Extreme would send outdated and unwanted inventory to its distributors through multiple incentives including: (1) "points" or rebates, *i.e.*, a monetary discount on the inventory; (2) priority position in front of the backlog line for backlogged products—allowing the distributor to cut the line in front of other distributors with earlier-placed orders; and (3) stock rotation agreements.

105.     Specifically, as to the stock rotation agreements, FE-1 explained that Extreme's contracts with its distributors included a clause where once every quarter, the distributor (TD Synnex) could rotate 15% of the inventory, based upon the prior quarter's receipt of Extreme product. As an example, FE-1 explained if TD Synnex agreed to take $10 million of unneeded/un-demanded inventory in one quarter from Extreme, the next quarter, TD Synnex could rotate up to $1.5 million back to Extreme. According to the account of FE-1, the "sentiment" behind all of this was that Extreme would tell distributors that it can stuff this inventory for this quarter, with the understanding that the distributor could return a portion of it the next quarter.

106.     According to the account of FE-1, defendant Brown organized the Buy-In deals at the end of the quarter. FE-1 described these end-of-quarter "Buy-In" deals as a "structured deal" with each of the distributors, in order for Extreme to "sell more inventory to distribution than distribution needs." Notably, FE-1 stated that defendant Brown reported to defendant Rice, and FE-1 explained that defendant Rice as Extreme's COO directed and was involved in all of the improper channel stuffing and manipulative sales conduct – and that "he would know 100%" about such conduct as he directed it.  FE-1 also described a process of weekly forecast calls and meetings in which the pipeline reports would be discussed, and ***which would indicate how bad and***

*"unclean" the deals were*.

107.     FE-1 further explained that because defendants Rice and Brown headed Global Distribution, they would target distributors within the global channel network where they could "stuff" inventory, especially toward the end of each quarter. FE-1 described that defendants Rice and Brown would do all the "dirty work" regarding channel stuffing and then send the data up to other Individual Defendants, including Meyercord and Thomas, whom Rice reported to.

108.     The Securities Complaint alleges that Extreme's CEO (defendant Meyercord) and CFOs during the Relevant Period (defendants Thomas, Tate, and Rhodes) knew about these sales practices and their intended effect. According to the Securities Complaint, FE-1 reported to Joseph Uraco, Extreme's Director of Distribution Sales, Americas, who in turn reported to defendant Brown, who in turn reported to defendant Rice. Per FE-1's account, defendant Rice as COO was a peer of the C-Suite, which included defendants Thomas, Vitalone, and Meyercord.

109.     As just one example of the undisclosed channel stuffing behavior, FE-1 recalled that at the end of the same quarter in which the model changed to Sales-In, defendant Brown directed FE-1 to push TD Synnex to take $1 million in hardware equipment inventory that TD Synnex did not need and had no customers for to help Extreme meet its targets—which TD Synnex did. Importantly, according to the account of FE-1, defendant Brown was not only doing this with FE-1 and TD Synnex, but with other colleagues and other distributors as well, such that the effects of the channel stuffing conduct were cumulative.

110.     The Securities Complaint alleges that according to FE-1's account and based on FE-1's recent conversations with TD Synnex leadership—who FE-1 "100% trusts has intimate knowledge" of the relationship between Extreme and TD Synnex—Extreme was still employing the same inappropriate and unethical channel stuffing practices during and into the end of the

Relevant Period (*i.e.*, January 2024). This included still doing buy-ins, still channel stuffing inventory to TD Synnex, and still forcing stock rotations to be reduced.

111. FE-1 described this conduct as allowing Extreme to boost sales and revenue during a downturn with the hope that it would not catch up with the Company in the next quarter if distributors refused to take even more inventory, which in turn led to the need to then push distributors to continue taking extra inventory. According to FE-1's account, the problem with this method is that while Extreme makes its sales and revenue targets appear larger for the current quarter, Extreme will then have to "worry about fixing the next quarter," such that Extreme would constantly have to push off underlying demand problems into the future.

112. According to FE-1's account, TD Synnex and Jenne were the top two distributors that were "being stuffed" at the end of each fiscal quarter and fiscal year in large part because of their willingness to take extra inventory to help Extreme meet fiscal targets in exchange for: (i) discounts and/or (ii) a position at the front of the inventory distribution list when backlogged product became available. Furthermore, FE-1 explained that TD Synnex had the largest account base out of Extreme's distributors and could absorb more inventory. FE-1 also explained that Jenne was a privately held company, as opposed to TD Synnex (which was public), and that Extreme accounted for 40% of Jenne's business. FE-1 described Extreme as having more "wiggle room" to push inventory onto Jenne, given that Jenne was a private company that did not have to report forecasts to the market, and also relied so heavily on Extreme for business.

113. As to discounts, according to the Securities Complaint, FE-1 explained that these were "incentives" in which the distributor would receive a percentage rebate off of the product, *e.g.*, 1% off the sale of the unwanted inventory. This was done to incentivize distributors to take

products they did not need based on current demands.[3]

114.     As to the tactics that involved incentivizing inorganic sales in exchange for granting a distributor priority in the backlog distribution line, FE-1 explained that Extreme employed a combination of incentivizing, pushing, pressuring, and leveraging distributors against each other to take on inventory at the end of each quarter to meet revenue targets. The resultant outcome was that these distributors who accepted the extra inventory would get moved up the backlog line and have priority for those in-demand but less available products.

115.     The Securities Complaint alleges that FE-1 provided specific details of this conduct. FE-1 explained that at one point during FE-1's tenure, TD Synnex had $150 million to $200 million on backlog purchase order. According to FE-1, defendant Brown then said that if TD Synnex bought $20 million of *another* product in the quarter, TD Synnex would get to "keep its place in line" in the backlog line. If TD Synnex did not buy that product, Extreme would shift inventory to distributors who would "play ball." Per the account of FE-1, TD Synnex would then buy product it did not need to keep its place in line. According to FE-1, this meant that where TD Synnex inventory of Extreme products that needed to be sold on to end users used to contain roughly 28 days of supply, as a result of these practices, by the time FE-1 left Extreme in October 2022, TD Synnex *had 100-200 days of supply*.

116.     According to the Securities Complaint, FE-1 also recalled other quarters when

---

[3]     Corroborating this, the Securities Complaint alleges that the confidential witness referred to therein as "FE-6" (described as having worked at Extreme as a Senior Account Manager from July 2017 until October 2022) similarly explained that products sitting in inventory were outdated – meaning they had old code or outdated "firmware." FE-6 recalled "fire sales" where current products with old code that Extreme did not want to "refresh" being moved. According to the account of FE-6, stock with "old code" required upgrades and additional steps which made it "harder" to sell to end users. FE-6 further explained that if the current model is, *e.g.*, #14 and those in inventory are on #11, then those in inventory needed to be updated to #12, then #13, and finally #14.  FE-6 explained that customers do not want product that is not ready to use out of the box unless it came with "a great deal."

defendant Brown pressured distributors, especially TD Synnex, to take extra inventory by threatening the distributor with losing its place at the front of the distribution line for newer inventory. FE-1 recalled defendant Brown telling FE-1 that he was always seeking to sign up more distributors to leverage against each other, including threatening to replace one at the top of the inventory distribution or favorability list if they did not take inventory upon Extreme's request. FE-1 specifically recalled defendant Brown using this tactic against TD Synnex by threatening to put Jenne ahead of TD Synnex if Jenne did not take inventory, and/or replacing this distributor with another new distributor.

117. FE-1 further recalled a specific instance of defendants Rice and Brown trying to get a distributor to take old inventory to improve the Company's pipeline reports. According to the account of FE-1, sometime in the Spring of 2022 defendants Rice and Brown made FE-1 propose to TD Synnex to buy a $40 million package of old inventory nobody wanted, while noting that if TD Synnex accepted this proposal, it would be prioritized for other in-demand product. FE-1 described this old inventory as "terrible inventory" that included, for example, older cables and antennas.

118. Notably, Extreme shipped unwanted and "outdated" inventory to distributors—recognizing it as shipped revenue—with the promise that the distributors would then be able to return a portion of it in later quarters under a "stock rotation" plan. As just one example, FE-1 stated that the Company tried to offload "Brocade" hardware—even though Brocade's technology could no longer manage streaming requirements—onto TD Synnex, under the pretense that TD Synnex could always just return the product in a stock rotation.

119. Specifically, according to the account of FE-1, Extreme's contracts with its distributors included a clause where once a quarter the distributor could rotate 15% of old or

outdated stock out of its inventory back to Extreme in exchange for new stock of equal value for the next quarter. For example, if a distributor purchased $10 million of product in one quarter, then the distributor could rotate $1.5 million of inventory in the next quarter and offset it with a new purchase order.

120. Sometimes the timing was even larger, much to the distributors' displeasure. Indeed, according to the account of the confidential witness referred to in the Securities Complaint as "FE-4", described therein as having worked at Extreme as Senior Regional Distribution Manager until December 2022 and operating out of Europe, the European distributor Westcon (one of Extreme's top three global distributors by revenue) was allowed up to two quarters to return Extreme's "not saleable products." And according to the account of FE-6, distributors took on product and then in six months it needed to be returned for a "refresh."

121. This "right of return" and stock rotation clause thus incentivized distributors to take on unwanted product that did not reflect true organic demand from end users, with the intended result of boosting Extreme's revenues for the immediate quarter. From Extreme's perspective, while a portion of the inventory could be returned by the distributors, that would not be done until after Extreme's fiscal quarter results were reported.

122. However, Extreme reneged even on this stock rotation plan. According to the account of FE-1, Extreme often reneged on allowing distributors to return the unwanted inventory by reneging on the stock rotation agreement clauses in the contracts, which forced the distributors to hold the unwanted inventory.

123. Specifically, according to the Securities Complaint, FE-1 explained that defendant Brown often reneged on honoring Extreme's 15% stock rotation agreement stated in the distributors' contracts. According to FE-1's account, defendant Brown reneged on that clause by

not allowing the distributors to exercise their contractual rights to return the product. This included instead of honoring the 15% rotation, defendant Brown often only agreed to go as high as rotating 5% of recently purchased inventory, as an example. FE-1 added that defendant Brown often also reneged on the 5% and would delay the rotation as long as he could. FE-1 indicated that reneging on the 15% rotating inventory (and even 5%) allowed for inflated numbers to be reported to stockholders, while it created "continued distrust" in the distributor's relationship with the Company. The recently-filed Securities Complaint alleges, based on FE-1's recent conversations with executives at one of Extreme's distributors, that FE-1 advised that the rotating inventory clause in the distributor's contract with Extreme has been reduced from around 15% to 5%, and Extreme is still refusing to meet that obligation.

124.     The Individual Defendants either directed and/or were aware of these channel stuffing tactics and their goals. According to the Securities Complaint, FE-1 explained that defendant Rice as COO directed and was involved in all the improper channel stuffing and manipulative sales conduct – and "he would know 100%" about such conduct as he directed it.

125.     Per the account of FE-6, defendant Rice was defendant Meyercord's "right hand man" during the final "few years" of FE-6's tenure. FE-6 stated that defendant Rice is "part of the problem." According to FE-6, defendant Rice directed the pulling in of sales, based on FE-6's personal experience on a call that included both FE-6's partner and the end customer – attempting to get both the partner and the customer to accept a multi-million dollar deal. According to the Securities Complaint, FE-6 heard of other scenarios where defendant Rice would pull-in sales and where partners and customers would take the inventory. Per FE-6's account, "we all knew where it was coming from," referring to defendant Rice.

126.     FE-1 also stated that defendant Rice was fully engaged and directed stuffing

inventory shipments, because defendant Brown "got his marching orders from defendant Rice." FE-1 further explained there was a likelihood that defendant Meyercord had been exposed to the channel stuffing conduct given that defendant Rice reported the forecasting updates to the CFO position including defendant Thomas, who in turn had to report them to defendant Meyercord. According to the account of FE-1, defendant Thomas would have relied on the information in the updates provided to him by defendant Rice, which was then passed up to defendant Meyercord.

127.    Additionally, the Securities Complaint alleges that FE-1 has provided documentation to the Securities Action plaintiffs' lead counsel demonstrating that FE-1 brought these channel stuffing and manipulative inventory practices **directly to defendant Thomas** on July 20, 2022—just days before the start of the Relevant Period.

128.    Specifically, according to the Securities Complaint, FE-1 wrote an email to defendant Thomas on July 20, 2022, and attached a number of contemporaneous documents to that email. It is alleged that in the body of the email, FE-1 stated that "I greatly appreciate you wanting to know the truth about what is going on...[d]uring our conversation, I referenced several specific and detailed issues and encounters."  It is further alleged that one of the attachments in the email to defendant Thomas was a separate email written by defendant Brown on June 30, 2022 to a group of employees at Extreme—including defendant Rice.

129.    It is alleged in the Securities Complaint that in this attached email, defendant Brown requested that the following clause be added to Extreme's distribution contracts: "If a Distributor stock rotates a specific product, they are no longer eligible to re-order 'said' product for the next 12 months." In that email, defendant Brown allegedly further stated he was "not concerned about policing this new policy. **Having it in there will be a deterrent and drive the behavior we want**."

130. Notably, as alleged in the Securities Action, this email not only shows that the stock rotation described above was in place, but also that Extreme was seeking to renege on allowing its distributors to return the old inventory as previously agreed to. Indeed, this clause was sought to be added to "drive the behavior we want" and discourage distributors from seeking to return or rotate old product, such that it would force the distributors to hold on to this inventory.

131. According to the Securities Complaint, FE-1 forwarded this email to defendant Thomas on July 20, 2022—just days before the start of the Relevant Period—and stated that defendant Brown "***works with the distributors to buy bad product that is not sellable to make the corporate number*** and then artificially suppresses them from rotation [of] bad product to order good product. He basically wants to punish or threaten them that if they return anything, he will not allow them to buy it again for 12 months.... He basically admits having it there will get the behavior he wants and deter them ... from managing their own finances and inventory."

132. The Securities Complaint alleges that in the same July 20, 2022 email to defendant Thomas, FE-1 also attached numerous other documents and emails which reflect that Extreme engaged in channel stuffing conduct with the distributors—most specifically evidencing the existence of the stock rotation plan and the right of return with distributors. These documents are alleged to include the following:

> One IM conversation in which defendant Brown stated "[w]e forecasted $3M for TD [Synnex] to rotate – they submitted $6.8M. That is a HUGE problem for all of us. Josh may have tanked our quarter. I need a plan on how we reverse this . . . if not, our conversion rate will spike, and our auditors will be all over us."

> Another IM conversation in which defendant Brown asked FE-1 whether TD Synnex was "willing to part ways with [its stock rotation clause] for 6+ months?" The discussion concerned a stock rotation submission from TD Synnex for 3Q2022, and defendant Brown commanded FE-1 that "you need to look at what they [TD Synnex] want to rotate and challenge them when it makes sense," stating "we have massive supply challenges . . ."

A screenshot of contemporaneous notes from FE-1's notebook (dated sometime in 3Q2022), indicating that TD Synnex submitted a stock rotation in 2Q2022 and that as a result, defendant Brown wanted to "punish them" – referring to TD Synnex. Specifically, defendant Brown wanted to give them a "bloody nose."

133.    According to the Securities Complaint, FE-1 left the Company as a result of unethical behavior that FE-1 witnessed. FE-1 found the pressure exerted on Extreme's distributors to be "embarrassing" and "unethical."

134.    The Securities Complaint alleges that FE-1 had separate one-on-one exit interview calls in July 2022 with defendant Thomas, Executive Vice President of Global Human Resources Kimberly Basnight ("Basnight"), and Senior Director of Human Resource, Jim Johnson ("Johnson"), respectively. It is alleged that during these exit calls, FE-1 explained the unethical channel stuffing and manipulative sales and inventory conduct that FE-1 witnessed to each individual. Notably, FE-1 explained that FE-1 never heard back from Basnight after Basnight said in the call that she needed to process this feedback. Furthermore, FE-1 stated that Johnson's response was that he was "not shocked" about defendant Brown's alleged behavior. And, according to FE-1, defendant Thomas asked if FE-1 was leaving Extreme because of a new opportunity or because of a problem at the Company, to which FE-1 responded "both."

135.    Notably, the Securities Complaint alleges that FE-1 spoke with a former Extreme colleague in early 2024, who spoke with defendant Thomas sometime after defendant Thomas left the Company (in February 2023). FE-1 explained that the former Extreme colleague told FE-1 that during this particular conversation, defendant Thomas stated that he thought he should have done something about the information that was presented to him, but "he was on his way out" anyway.[4]

_____

[4]    Furthermore, the Securities Complaint alleges that defendant Thomas in that conversation with FE-1's former colleague explained that he (defendant Thomas) had been pressured by defendant Meyercord to change how certain statements in presentations were worded when he (defendant Thomas) was preparing to speak on quarterly stockholder conference calls, which defendant Thomas regretted doing. According to the account of FE-1, defendant Thomas told FE-

136. FE-1 additionally explained that every week the distributors were given inventory lists by Extreme. FE-1 also explained that Extreme receives weekly inventory demand reports from its distributors, and also a pipeline report which shows what is forecasted, and that these reports had visibility into the end user and reseller demand. According to the account of FE-1, from these reports, Extreme could see what the "true real demand" was from the reseller/end user to the distributor. FE-1 explained that nonetheless, Extreme pushed its distributors to buy additional inventory regardless, even when there was no demand downstream. FE-1 added that Extreme ignored its distributors' actual demand from their own resellers and end users, and what was on order. Extreme continued to push inventory to the distributors they did not need, and did not allow them to cancel or return the inventory. FE-1 described these practices as "allowing Extreme to own the distributors' business."

137. Other confidential witness accounts in the Securities Complaint corroborate that these undisclosed channel stuffing and other manipulative sales and inventory practices with distributors were in place during the Relevant Period, and were widespread in nature throughout the Company.

138. As alleged in the Securities Action, FE-3 was a senior level manager of pricing at Extreme from before the Relevant Period until the second half of 2023. FE-3's responsibilities included executing the rollout of pricing and signing off on deals. FE-3 reported into the Finance leadership of defendant Tate, who reported to the CFO.

139. The Securities Complaint alleges that FE-3 also corroborated and explained that it was "**well known internally at Extreme**" throughout FE-3's tenure at Extreme that the sales team was "channel stuffing" by pushing distributors to take orders early in order to meet sales

---

1's former colleague that he left Extreme because he "wanted out."

goals and earn commission. FE-3 explained that this resulted in extra inventory taken by distributors.

140.    Additionally, according to FE-3's account, there were a lot of pre-orders that did not have back-to-back purchase orders. FE-3 described a back-to-back purchase order as a mirror image of a purchase order from an end user for the vendor to have and not just the channel partner. FE-3 recalled Extreme having "a lot of pre-orders" without back-to-back purchase orders.

141.    FE-3 also confirmed that FE-3 witnessed products being pushed to distributors *without end user purchase orders* during FE-3's tenure, during and into mid-2023 as FE-3 left Extreme.

142.    As alleged in the Securities Complaint, FE-4 was employed by Extreme until December 2022, most recently serving as Senior Regional Distribution Manager operating out of Europe. FE-4 worked directly with leading distributor Westcon while FE-4 was employed with Extreme.

143.    FE-4 described Extreme's conduct of prioritizing certain distributors in the backlog line in exchange for the distributor stuffing inventory. FE-4 explained that Westcon and Jenne had a "very big backlog" throughout the latter part of FE-4's tenure at the Company. When it came to Westcon specifically, FE-4 described a Vendor Business Lead at Westcon that was in charge of Westcon's backlog for EMEA. This Westcon Vendor Business Lead was close friends with defendant Thomas.

144.    According to FE-4's account, a dinner occurred sometime in the Spring of 2022, which included very high managers from Westcon and defendant Thomas, and another high-level executive management member from Extreme. FE-4 spoke with the Westcon Vendor Business Lead at least two times per week and was told about this Spring 2022 dinner from the Westcon

Vendor Business Lead, who had heard about the dinner, what had been discussed, and what the individuals had agreed to. According to the account of FE-4, the scheme to prioritize Westcon's orders was discussed at that dinner.

145. FE-4 explained that, based on FE-4's discussions with Westcon Vendor Business Lead as well as other resellers, Extreme was relying on Westcon to clear out Extreme's obsolete and/or end of life products. According to FE-4, Westcon wanted to fill backlog orders but was forced to buy stock of products nobody wanted to order for the same value as the backlog.

146. According to FE-4's account, in exchange for Westcon's agreement to buy Extreme's obsolete and end of life products, Westcon was then allowed to receive orders off the backlog before other customers who had priority on the backlog list. For example, Westcon would buy $50 million of backlogged products and then be willing to also take on another $50 million of "end of sale" products so Extreme could recognize $100 million in sales. These "end of sale" products, FE-4 explained, were "not saleable products" such as cables, fans, switches, brackets, etc. Westcon was then allowed two quarters to return those "not saleable products."

147. The Securities Complaint alleges that FE-4 went on to say that externally, other customers questioned why Westcon had immediate access to Extreme's products, sometimes being able to get products the same day, as opposed to the customers who had been waiting for backlog for months or even years.

148. Notably, the accounts of all these confidential witnesses in the Securities Action, including that of FE-1, corroborate each other and demonstrate a pattern and practice whereby Extreme would prioritize certain distributors (like TD Synnex and Jenne) over others in receiving backlogged products, if those distributors would "play ball" and accepted stuffed inventory.

149. The Securities Complaint alleges that the confidential witness referred to therein

as "FE-11" (described as having formerly been employed by Extreme as an Account Manager from Fall 2022 through the end of the Relevant Period in the EMEA region) also corroborated this conduct, explaining that Westcon was often asked to take early shipments in order to be prioritized in the backlog line, in EMEA. FE-6 also explained that certain Extreme distributors received special treatment and always had backlogged products in stock.

150.     FE-6 further confirmed that Extreme stuffed distributors during FE-6's time at the Company and that Extreme also leaned on partners to pull in deals. FE-6 further explained that instead of letting deals naturally occur in subsequent quarters, Extreme pulled in deals to make its quarterly number. FE-6 described Extreme's method of pulling in sales as "robbing Peter to pay Paul."

151.     According to FE-6's account, Extreme would make calls to its partners and distributors routinely at the end of each fiscal quarter and year to pull in sales – about 15 days or so before the end of each fiscal quarter. Similar to FE-1's account, FE-6 further explained that Extreme's method of pulling in deals eventually "catches up to you" when it is done every quarter. FE-6 explained that after a certain period of time customers no longer need product the next time the Company wants to pull a deal in— and when "everyone is tapped out" then there is "panic," corroborating FE-1's account.

152.     In short, the accounts of the confidential witnesses in the Securities Complaint consistently explain that leading up to, during, and throughout the Relevant Period, Extreme's products were channel-stuffed to its distributors on a regular quarterly basis in order to inflate product revenues. Per the confidential witness accounts in the Securities Action, these business practices could only go on for so long before Extreme's distributors would simply not be able to take on more inventory into their warehouses. At that inevitable point, revenues would

47

significantly decline, as revenues were propped up not by organic demand from the end customer, but by Extreme's undisclosed sales tactics. Indeed, FE-6 explained that FE-6 departed the Company in October 2022 and approximately a year later, in September 2023, the "bottom fell out" (referring to the Company's revenue decline), and FE-6 noticed around that time the Company's stock price began to significantly decline.

### 3. The Individual Defendants Also Caused Extreme to Use Manipulative Sales and Inventory Tactics With Its Partners to Misleadingly Accelerate Quarterly Revenues

153. The Individual Defendants not only caused Extreme to engage in channel stuffing and other manipulative inventory and sales practices with its distributors, but with its partners/resellers as well. Importantly, because products that shipped to either the Company's distributors or partners/resellers were counted as revenues at the time of shipment, early shipments to Extreme's partners also misleadingly accelerated revenues.

154. According to the Securities Complaint. FE-2 confirmed having witnessed "channel stuffing" throughout FE-2's tenure as the Company's Director of Sales (*i.e.*, before the Relevant Period to mid-2023), where FE-2 worked in the "largest revenue producing region in the Americas." FE-2 worked mostly with partner accounts, although FE-2 confirmed that FE-2 had been told that the channel stuffing conduct was occurring with the Company's distributors. According to the account of FE-2, Extreme recognized revenue when product shipped from Extreme to a distributor or partner.

155. FE-2 explained that with respect to Extreme's partner sales, inventory is normally shipped by Extreme to the partner only when there is an end user purchase order placed. In other words, the end user signing a purchase order triggers the sale, and the product ships thereafter and should only then be recognized as revenues. As the confidential witness referred to in the Securities

Complaint as "FE-5" (described as having formerly been employed by Extreme as Senior Channel Account Manager from March 2022 to April 2024) explained it, no inventory should be moved without a purchase order from the end user.

156. FE-2 confirmed that FE-2 witnessed and experienced channel stuffing conduct occur with Extreme's partners. Specifically, FE-2 described a process how, at the end of each fiscal quarter, Extreme would ship inventory to Extreme's partners knowing that those partners did not have a customer purchase order, *i.e.*, a "customer commitment," from the end user. This practice was in conflict with Extreme's policy of shipping to partners only when there was an end user purchase order place. According to FE-2's experience, the described channel stuffing conduct with Extreme's partners was a "regular" practice at Extreme and occurred often during FE-2's tenure.

157. Likewise, the confidential witness referred to as "FE-10" in the Securities Complaint—described as having worked as a Senior Account Executive at Extreme from after July 2023 until April 2024—recalled hearing from upper management that the practice of distributors taking on product without end customer purchase orders was "common practice."

158. According to FE-2's account, when FE-2 was personally directed to ask partners to take early inventory, it was without a customer order existing or even an expectation that a customer order was coming soon. In some situations, the partner was asked to send their own purchase order, but FE-2 explained that this was a partner purchase order not based on an actual (end) customer order.

159. According to the account of FE-2, distributors and partners were incentivized to take on inventory early to help Extreme meet its quarterly goals. FE-2 explained that the usual incentive offered to the partners to take inventory early was a discount of "one or two points," meaning 1% or 2%, "on margin." This included discounted margins, of usually 1% or 2% as part

of Extreme's rebate program. FE-2 explained that backend rebates were offered to partners if they "pulled-in" an order (that is, took early inventory) when Extreme asked them to. FE-2 explained that FE-2 was directed to offer partners an additional 2% in rebates on an order if they took at least $1 million worth of inventory early. With this particular incentive program, Extreme's partners received a monetary incentive to take on the inventory early. Additionally, FE-2 explained that this practice not only caused partners to buy product they did not need at the time, but it was also to the detriment of Extreme, because Extreme gave up revenues that could have later been realized without the 1-2% discount through backend rebates.

160.    FE-2 added that this was done specifically to help meet quarterly goals, recalling that FE-2 was told a number of times by David Savage ("Savage"), Vice President of Sales and Senior Director of State, Local, and Education ("SLED") Sales, that other Extreme departments were not making their numbers so SLED had to make up the difference. FE-2 added that these end-of-quarter shipments that were not based on customer orders were, based upon FE-2's understanding, ***recognized as revenue to make Extreme's quarter look more profitable than it had been in reality***, because the Company cannot recognize revenues until the product ships.

161.    FE-2 explained that Savage directed all 4 or 5 regions under his purview to make the same end-of-quarter requests that he made to FE-2, and FE-2 explained that it was FE-2's understanding that the practice was going on with other Extreme employees who dealt with the distributors.

162.    FE-2 recalled that it was around "two of every four quarters" during the fiscal year where FE-2 was directed by Savage to ask partners to take inventory early, in amounts that were always at least $1 million in value. According to FE-2's account, this occurred throughout FE-2's tenure as Director of Sales at Extreme. FE-2 explained that some of these partners had warehouse

space, while others who did not, could rent warehousing space from distributors.

163.     Notably, FE-2 also explained that the millions of dollars of inventory that were shipped early were on FE-2's orders on FE-2's accounts alone, and that it was much more in total when extrapolating to include FE-2's colleagues who were also directed by Savage to offer incentives for their own partners and distributors accounts to take early inventory and pull-in sales.

164.     FE-2 further explained that this practice "exhausted demand from the future," and that FE-2 complained about it all the time, because it hurt the sales teams that FE-2 worked with—because, according to FE-2, there is "not an infinite amount of deals" out there to close and pull-in. FE-2 further described that the quotas and targets for the next quarter did not decrease, so by pulling in the sales into the present quarter, it became difficult to meet the targets for the future quarters.

165.     FE-6's account also corroborates these allegations regarding Extreme's channel stuffing with its partners. FE-6 was a Senior Account Manager at Extreme from July 2017 to October 2022. During different points of FE-6's tenure at Extreme, FE-6 reported to either Savage or to FE-2. FE-6 also worked as part of the SLED department, and except for the K-12 grades of the Education segment of SLED, FE-6 worked with both distributors and partners throughout FE-6's tenure.

166.     According to the Securities Complaint, FE-6 explained that as an example, a deal would be developing organically to close in approximately three months and, before the end of the quarter or before the end of the fiscal year, FE-6 was instructed to pull in the sales early. According to FE-6's account, FE-6 was instructed to "offer more points [greater discount percentage]" and to do "whatever you need to do" in order to help Extreme meet its numbers.

167.     FE-6 also observed Extreme offering significant incentives to customers to place

larger purchase orders. According to FE-6's account, Extreme was giving partners extra margins on deals to place orders. As one example, FE-6 knew of one partner who stored all the equipment that was shipped by Extreme, and the partner was sitting on several millions of dollars of inventory—***without a purchase order from the end customer***—for about 16 months, before the inventory was finally delivered to the end customer in the first week of October 2022. FE-6's example demonstrates that Extreme, knowing that there was no firm end customer order, would nonetheless ship the product to the partner and recognize revenues, all while the partners would hold the inventory for up to 16 months, before the end user ever received delivery of that order.

168.     Similarly, the Securities Complaint alleges that FE-11 recalled an example that occurred around the Fall of 2023, where a partner in EMEA was forced to hold inventory for the end customer for at least six months, because the end customer did not close on the deal with a purchase order.

169.     In this manner, similar to the misconduct with distributors, Extreme's revenue growth story that the Individual Defendants portrayed was not indicative of true organic demand, but rather, was indicative of unsustainable and accelerated sales tactics that robbed from one quarter to prop up another, creating for that period a misleading representation of organic demand and sustainable growth.

170.     As alleged in the Securities Complaint, FE-2 provided further details as to a particular incident of channel stuffing during the Relevant Period. According to the account of FE-2, in July 2023 Savage directed FE-2 to ask channel partner PC Solutions to take around $1.5 million worth of inventory by the end of that month without a confirmed purchase order. FE-2 advised that this was at the end of Extreme's fiscal year for 2023. Indeed, the timing of this incident comports with the Individual Defendants' reporting of Extreme's revenues for FY2023 on August

24, 2023 via the 2023 Form 10-K—and further corroborates the scheme to inflate revenues through channel stuffing conduct at the end of each fiscal quarter and year.

171.     FE-2 explained that Savage directed FE-2 to ask PC Solutions to take the $1.5 million inventory because that partner had a warehouse in Miami, Florida and was one of the few partners that either had warehousing or a good amount of it. According to FE-2, in the July 2023 instance there was no indication at that time that Extreme was going to be awarded the purchase order, so FE-2 refused to do it. The Securities Complaint alleges that FE-2 did this because (i) FE-2 perceived it as unethical and (ii) Extreme had done this to PC Solutions at least once previously and in that previous occurrence, the purchase order never came and PC Solutions was stuck with the inventory for a year. FE-2 recalled that as a result of refusing Savage's directive in July 2023, FE-2 was demoted from a Director position just a short time later to an Account Executive position.

172.     Notably, FE-2 explained that Savage called PC Solutions directly and got the deal done himself.

173.     According to FE-2's account, after refusing to ask PC Solutions to take the early inventory in July 2023, FE-2 emailed Senior Vice President Sales Strategy, Business Development, and Operations Matt Cleaver ("Cleaver") and asked if Cleaver could make the request to that partner. FE-2 recalled that Cleaver was Extreme's interim CFO for a brief period of time, pre-COVID, and FE-2 described having a close working relationship with Cleaver at that time such that FE-2 could go to him with this request.

174.     FE-2 explained that FE-2 was disturbed enough by Savage's directive to ask PC Solutions to take the early inventory at the end of the fiscal year in 2023 that FE-2 reported it on a quarterly sales survey. According to the Securities Complaint, FE-2 received a call from someone in Human Resources who asked a question or two about it, but nothing ever came of it.

175. Regarding FE-2's demotion, FE-2 stated that Savage told FE-2 that he was "making a change" and moving FE-2 out of SLED and into another department where they were creating a position for FE-2. FE-2 was demoted to an Account Executive position at around half the compensation of the Director of Sales position. According to FE-2, Human Resources never contacted FE-2 for being demoted, and Savage never gave a real reason for the demotion. FE-2 recalled that defendant Rice stated in an exit interview that Savage had wanted to "let go" of FE-2 at that time, but that defendant Rice told Savage to demote FE-2 instead.

176. According to the Securities Complaint, FE-2 believes Extreme, or at least defendant Rice, understood FE-2 could have sued the Company if FE-2 was fired for refusing to do something unethical and possibly illegal and that instead a demotion would not lead to a lawsuit.

177. Additionally, FE-2 explained that when Rice became the Company's CCO in January 2024, he took over and led the sales function at Extreme. FE-2 also explained that around this time, defendant Vitalone resigned from his position as CRO. According to FE-2, through the CCO position, defendant Rice was performing the dual functions of both COO and CRO.

178. FE-2 stated that Savage reported to the Senior Vice President of Sales for Americas, and that John Brams held this role at the end of FE-2's tenure. FE-2 also recalled regularly receiving calls directly from the various SVPs of Sales for America on "the status of deals."

179. FE-2 recalled that another partner—Step CG, headquartered in Kentucky—was also often asked to take early inventory and had the warehousing to do so. FE-2 recalled an early Step CG deal which occurred sometime around 2021 or 2022, that the value of the deal was for $1 million, and that it happened "more than once, for years." FE-2 further explained that Extreme routinely approached both Step CG and PC Solutions during FE-2's tenure because they had the

warehousing to store the inventory.

### a. End User Sales Were Monitored at Extreme, So It Was Known When Product Was Shipped Without an End User Order

180.    Notably, the likelihood that accounts with Extreme's partners would end up with a secured purchase order by the end user was monitored at the Company. And critically, under the Individual Defendants' direction and on their watch, Extreme willingly shipped and stuffed product and inventory to its partners while having access to reports, information, and databases that demonstrate that those end users had ***not*** placed a confirmed purchase order.

181.    As discussed above, FE-2 recalled Savage on weekly calls nearing the end of every quarter, directing FE-2 and the other Directors of Sales reporting to Savage to "find deals," that is, asking partners to pull-in inventory early and accelerate revenues. According to FE-2's account, weekly calls were held by Savage and his team, including FE-2, and that Savage had a "***pull-in list***" of partners to target that could potentially pull-in orders. FE-2 explained that Savage directed FE-2 and FE-2's colleagues to offer back-end rebate deals, margins, and points to their respective partners to place their own purchase order if they did not have an end-user (customer) purchase order being released or soon to be released.

182.    According to the Securities Complaint, FE-2 explained that this "***pull-in list***" would indicate and monitor what deals each partner had with the end customer and the organic timeline for the deal, such that if a deal was to close and the end customer would place the purchase order, in May, for example (which was in 4Q), then Extreme could target that potential partner to seek to "pull-in" the sale into the present, *e.g.*, in March (which had the effect of pulling in the sale for 3Q). According to FE-2, "just based off the timing of the deals" Extreme could see what deals were potentially available to pull-in.

183.    According to FE-2's account, Savage had this "***pull-in list***" in the form of an Excel

spreadsheet that he emailed to his team, including FE-2. FE-2 explained this spreadsheet was "sent up the chain of command" because: (i) Savage occasionally included a corresponding PowerPoint deck of slides along with the spreadsheet, and that on the title page of the deck were the names of Senior Vice Presidents of Sales for Americas, and (ii) FE-2 recalled these SVPs calling FE-2 for updates on deals to be brought in early. FE-2 further explained that these SVPs reported to defendant Rice.

184.     Separately, FE-2 also explained that Extreme account executives received weekly and sometimes daily updates from customers on the likelihood of an end user securing a purchase order with Extreme, and channel sales did the same with their channel accounts. Based on the feedback from their respective counterparts – end user and partner – the order status would be updated based on "three levels of categories" reflecting the likelihood of the end user entering into a purchase order: (i) "Pipeline," which FE-2 described as the "basic" level which indicated there was too little information to decide the likelihood of an end user placing the purchase order; (ii) "Best-Case"; and (iii) "Key Best-Case." When a proposal was actually ***confirmed*** as being accepted by the end user then the category was updated to (iv) "Commit."

185.     Notably, the account of the confidential witness referred to in the Securities Complaint as "FE-8" and described therein as Extreme's Senior Vice President, Global Channel Sales from January 2022 to November 2023, also corroborates and confirms the existence of the "Pipeline"/"Best Case"/ "Key Best Case"/"Commit" framework at Extreme. FE-8 referred to this framework as the deal lifecycle and the "stages of opportunity funnel" that was located in the Company's Salesforce database system for both the direct and partner channels. According to FE-8's account, the "Pipeline"/"Best Case"/"Key Best Case"/"Commit" reporting was aimed at trying to understand what deals were going to close from the perspective of an end user and the likelihood

that the end user will close on a deal.

186. Similarly, according to the Securities Complaint, the account of FE-5 also confirms and corroborates the existence of the "Pipeline"/"Best Case"/"Key Best Case"/"Commit" framework. Again, corroborating the other confidential witness accounts in the Securities Action, FE-5 also confirmed that these four categories measured the likelihood of an end user placing a purchase order with Extreme. FE-5 also described the "Commit" category as *intended to measure only confirmed purchase orders from end users*.

187. Importantly, and according to FE-2, FE-2 was directed by Savage at the end of almost every quarter to ask partners to take early inventory. The partners and sales targeted were from the Key Best-Case and sometimes Best-Case categories (*i.e.¸ but not the "Commit" category*). Thus, this further confirms that Extreme shipped inventory to partners who did not have "committed" purchase orders for the product.

188. Notably, the confidential witness accounts in the Securities Complaint indicated that the "Pipeline"/"Best Case"/"Key Best Case"/"Commit" framework would be shown in the Company's Salesforce and "Clari" database systems – and that the Individual Defendants had access to these databases.

189. Specifically, FE-2 explained that these weekly and daily updates were entered into Extreme's Salesforce system, and the details would be "pulled" by the Company's "Clari" system, which could be accessed in diverse ways through the Company's various dashboards depending on what type of information the user wanted. FE-2 explained that everyone in sales and operations had at least some level of access to Clari and the dashboards, depending on their level at the Company. Additionally, FE-2 explained that senior level SVP executives at Extreme called FE-2 weekly and sometimes daily throughout FE-2's entire tenure asking for more detailed information

on the status of deals worth $1 million or more – and FE-2 explained that they were referencing orders from Savage's list of orders that could potentially be pulled-in. According to the Securities Complaint, FE-2 also received occasional calls from defendant Meyercord checking the status of FE-2's relationship with FE-2's customers.

190.    The Securities Complaint alleges that the confidential witness referred to therein as "FE-9" (described as having worked as a Channel Account Manager during the Relevant Period) provided further detail regarding the Salesforce and Clari database systems. Specifically, FE-9 explained that Clari and Salesforce showed information such as account name, opportunity size, and two columns FE-9 filled out – (i) where the opportunity was in the sales cycle, and (ii) notes on updates FE-9 entered. According to FE-9, Clari pulled data from Salesforce, which was Extreme's CRM (Customer Relationship Management) platform. An Account Executive would create opportunities that show up for that account in Salesforce and it would appear on FE-9's end in Clari. According to FE-9, everybody had access to Clari, and the higher the rank or level, the more access and information the executive had access to. FE-9 also confirmed that one can pull reports from Clari.

191.    Indeed, FE-5's account corroborated that everyone at Extreme had access to Clari and Salesforce, including senior level officers and executives—who could access employees' pipelines or revenue forecasts. According to FE-5, the Clari and Salesforce databases provided the ability to run reports for all sales and purchase orders nationwide and globally. FE-5 further described it as "everyone could pull revenue forecasts," and the "*C-suite could see everything we see*." And FE-5 further corroborated that the Pipeline/Best Case/Key Best Case/Commit framework and updates were entered into the Salesforce and Clari systems.

192.    Furthermore, according to the Securities Complaint, FE-5 stated that FE-5 "knows

for a fact" *that senior level executives reviewed those updates* because FE-5 recalled being told on a number of bi-weekly calls throughout his tenure that defendants Meyercord and Vitalone wanted additional details in the updates so that they could better understand them.

193. FE-5 specifically recalled on a bi-weekly call around January 2024 when the Director of Global Solution Partnerships of Americas, Amy Bravo, and Vice President of Americas Channel, Jennifer Orr, directed participants on the call to write their updates clearly, detailed, and professionally as possible "*as if Meyercord is reading them, because he is*."

194. Similarly, according to the Securities Complaint, FE-5 explained that Extreme regularly received updates from its distributors on their inventory level, at least on a weekly basis, which Extreme in turn shared with each distributor so that they would know what products could be found on hand.

195. FE-5 explained that there was an "Inventory List" group listserv, which detailed how much product Extreme had on-hand at any given moment. According to FE-5's account, the Inventory List listserv was a regular group-wide email that attached an Excel spreadsheet. In the Excel spreadsheet, the device, type of device, serial number, model numbers, current demand, availability, and allocation of Extreme's products was shown. FE-5 indicated that the Inventory List spreadsheet would show, *e.g.*, that "1000 items were committed to this deal" with a particular customer, etc. According to FE-5, "every item, we would have an inventory count on it." FE-5 explained that the Inventory List spreadsheet indicated what Extreme actually had on hand, what it had on order, and what it had on backlog, at any given moment.

196. According to FE-5's account, each distributor had their own Distribution Inventory Excel spreadsheet as well. Accordingly, FE-5 explained that Extreme "would always know what TD Synnex had, what Jenne had, etc." Importantly, FE-5 explained that the CEO

(defendant Meyercord), the CFO (defendants Thomas, Tate, and Rhodes), and "all executive leaders" were "*always*" email recipients on the listservs and would have received the Excel spreadsheets.

197.    Accordingly, the Individual Defendants, based on the "pull-in lists," spreadsheets, and reports that were regularly circulated, including through the use of the Clari and Salesforce database systems, would have always been aware of or had access to which deals were being targeted as "pull-in" sales for the current quarter and the organic timeline for the closing of a deal (*i.e.*, the organic timeline for when the end customer would actually place and secure a firm customer purchase order). Furthermore, these reports and spreadsheets also detailed how much inventory was at Extreme at any given moment in time, how much inventory was being shipped to distributors and partners, and how much of the product was on backlog.

### 4.    The Individual Defendants Improperly Inflated Revenues and the Pipeline Based on Other Illusory Sales

198.    Separate and apart from the channel stuffing and manipulative sales conduct described herein, the Individual Defendants also improperly inflated the Company's revenues by simply—and improperly—double-counting orders into the revenue and pipeline forecast when those orders were knowingly cancelled or non-existent, as well as engaging in other illusory sales tactics.

199.    As discussed above, according to the Securities Complaint, FE-5 was formerly employed by Extreme as Senior Channel Account Manager from March 2022 to April 2024. FE-5 described actions at Extreme that improperly inflated revenues at quarter end based on illusory sales. Specifically, according to FE-5's account, there were a lot of what FE-5 perceived as inappropriate actions of "inflating the pipeline" including "RFPs" (Requests for Proposal) that Extreme knew that it had lost out on to competitors but kept in the revenue forecast or reinserted

back into the forecast until the end of a given quarter in order make the forecast or pipeline look better than it was.

200.     Specifically, FE-5 recalled bids that had been lost out on and orders cancelled being put back into the revenue forecast until the end of a quarter, which FE-5 explained would be done to artificially inflate the forecast. FE-5 explained that whenever FE-5 witnessed this being done, FE-5 pushed back against it *but was told that the correction would not be made until after the quarter was over.* FE-5 recalled this occurring throughout FE-5's tenure even though FE-5 knew for certain that Extreme had lost out on bids or orders had been cancelled.

201.     According to the Securities Complaint, FE-5 confirmed that FE-5 was made aware of similar instances of revenue and pipeline manipulation occurring multiple times at Extreme during FE-5's tenure, based upon the calls FE-5 was in throughout the course of FE-5's tenure.

202.     FE-5 recalled other examples of revenue manipulation at Extreme. In one instance that occurred during the Company's second fiscal quarter of 2024 (*i.e.* 2Q2024), Extreme had ordered the wrong hardware for a New Jersey Transit order whose main component was worth around $1.8 million. When Extreme "called back" the order because it was incorrect, instead of using a new order to clear out the incorrect one, Extreme *put the new order "on top of the old one" and counted it as two orders that were reflected in the forecast or pipeline as two separate orders.* According to FE-5's account, these projected revenues from both the "new" and "old" orders were included in the 2Q2024 revenue forecast.

203.     The Securities Complaint alleges that FE-5 sent an email up the chain of command questioning this, and recalled getting an email response from a Vice President that *the decision had been made to keep it as two orders until the quarter was over and then correct it*. FE-5 recalled someone else in the email chain then advising that Vice President to not say anything else

in email and to take any further discussion on the topic offline. According to FE-5, having the two orders instead of one on the books inflated the forecast until 2Q2024 was over.

204. Similarly, the Securities Complaint alleges that FE-10, who was employed by Extreme as a Senior Account Executive from after July 2023 until April 2024, described other illusory tactics that inflated revenues and forecasting. Specifically, FE-10's account first corroborated that Extreme's forecasting was available through Salesforce. FE-10 explained that quotas were determined by examining the "health" of a territory and then a forecast was put in place based on information collected in Salesforce. FE-10 also explained that Salesforce contained information regarding previous orders made by a customer and then assumptions were made based on when that customer was going to need new equipment, how much additional equipment they will need for their next order, and what revenue that equates to.

205. According to the Securities Complaint, during FE-10's tenure, Extreme had included data in Salesforce from five or six acquisitions that had occurred over the previous seven to ten years. FE-10 stated that data pertaining to customers of the acquired companies was included in Salesforce and the "old data" continued to remain even after the customers had "evolved" and stopped using Extreme technology. This rendered the information in Salesforce "archaic" for including information on companies that were no longer customers of Extreme. According to FE-10's account, this "elevated" the supposed number of customers that Extreme had. FE-10 added that this also "inflated" and claimed to show "elevated" revenue opportunities in a territory and therefore impacted revenue forecasting and assessments of territory health. According to FE-10, "why that matters" is because the revenue forecasting was based upon "archaic" information" and thus inflated.

206. FE-10 recalled that these opportunities contained in the forecasts ended up in the

"pipeline," which contained the sales opportunities for that particular time period. FE-10 continued to explain that Extreme simply "threw out numbers" and put "random" numbers on the books as a result.

207. The Securities Complaint alleges another tactic that FE-10 referenced which inflated Extreme's revenues and forecasting, and which was manipulative in nature. This tactic was the act of Extreme not removing these outdated and archaic deals from the pipeline once Extreme was made aware of the error and old data—but instead, waiting until after the fiscal year numbers were reported to then correct the pipeline and forecasting.

208. Specifically, FE-10 explained that individuals at Extreme had the ability to input comments into Salesforce for opportunities based on conversations with customers without any "back up." FE-10 recalled an instance of a significant opportunity in Salesforce that FE-10 could not get "validated" with the customer as being legitimate. According to FE-10, when FE-10 attempted to remove this opportunity from Salesforce FE-10 was instructed "don't take it out" or "kill it" and instead was instructed to "move" the opportunity to the end of the year. FE-10 explained that this "inflated" the "health" of FE-10's territory and that this practice was "not good." According to FE-10's account, the revenue forecasting should have been "reflecting reality" – which it did not during FE-10's tenure.

209. For example, according to FE-10's account, there was a deal forecasted in the range of $800,000 that in reality was closer to $30,000 during FE-10's tenure. FE-10 sought to clean up the data in order to effectively do FE-10's job, but this "triggered" different alerts to Extreme management. FE-10 explained that removing this old data triggered alerts to management that signified FE-10 was losing deals. FE-10 stated that the triggers then led to review by upper management to assess the status of the opportunity which resulted in instructions to "***move***" ***deals***

*to the end of the calendar year*. FE-10 noted that by "moving" a deal to the end of the calendar year it would remain in Salesforce for revenue forecasting purposes for the end of the fiscal year at Extreme, *which rendered the forecasting for that specific time period inflated*. FE-10 stated that the "deals were taken care of" at the end of the year, and not at that particular moment. According to FE-10, the revenue forecasts and figures that are publicly reported are derived from Salesforce, and Salesforce hosted the Company's pipeline, funnel, and forecasts.

210. Indeed, FE-10 explained that Extreme's upper management would review the "numbers" and take it to the "end of the year," and then decided whether to "kill" the deal or not – but *only after reporting for it and including it in the Company's fiscal year*.

211. FE-10 explained that by cleaning the data FE-10 was responsible for, it "skewed" the pipeline and opportunity forecasts "negatively." FE-10 added that the triggers were in place to assist with identifying individuals to be laid off and that by removing old data and therefore reducing the forecasts for his territory that FE-10's standing at Extreme was negatively impacted. FE-10 further explained that FE-10 was individually performing well and did not have an inclination that FE-10 may be laid off less than one year after starting. FE-10 explained that FE-10 expected to have at least 12 months at the Company to get established.

212. According to the Securities Complaint, FE-10 had internal conversations about "cleaning up" the forecasts when FE-10 joined and noted there were opportunities in the Salesforce maintained by FE-10's predecessors which were not "real" deals. FE-10 recalled that counterparts on FE-10's team were all "older reps" who had been at the Company for at least a year and were not focused on "cleaning" their data. According to FE-10's account, FE-10 was advised by those counterparts "not to focus on that [data cleaning] too much." FE-10 noted that they "all played ball" by leaving old data and opportunities in Salesforce.

213.     FE-10 further explained that when FE-10 was let go from the Company in April 2024, FE-10 was "blindsided" and there was no "heads up." According to the Securities Complaint, FE-10 was the only one on FE-10's team "cleaning up the pipeline" in order to correct the accuracy of the forecasting but was terminated anyway.

214.     Notably, FE-10's account also corroborates that Extreme sought to pull-in sales by pushing inventory to distributors and partners even without an end customer purchase order to justify shipment, and that nonetheless, FE-10 sought to do things "with integrity." Specifically, FE-10 stated that in typical deals, the end customer "cuts a purchase order" to the distributor, who then cuts a purchase order to Extreme. In one particular incident during FE-10's tenure, FE-10 was asked to see if the distributor would issue a purchase order to Extreme without having received the purchase order from the end customer. FE-10 explained that FE-10 was told and directed by upper management to ask the distributor if they could "cut" the purchase order because the customer had not yet, and Extreme was able to recognize revenue once the distributor had done so. FE-10 pushed back against FE-10's superiors and obtained the purchase order from the end customer "with integrity." FE-10 recalled that after the deal was done FE-10's superiors "weren't grateful" and expressed "negative comments." FE-10 recalled hearing from upper management that the practice of distributors taking on product without end customer purchase orders was "common practice" and had been done before.

215.     Indeed, the Securities Complaint alleges that FE-10 stated it appeared to FE-10 that FE-10 arrived at Extreme during a period in which the Company was trying to make up for the misleading perception of its performance that had been on display in the lead up to its year-end filings (around the time FE-10 arrived after July 2023). According to FE-10, what the Company was asking of FE-10 was "impossible." FE-10 explained that FE-10 experienced

"pressure" at Extreme that was "pushed from the top down." FE-10 further explained that there was "a lot of pressure" to meet quotas that heightened at the end of quarters. FE-10 recalled receiving calls from superiors on Christmas Day, New Year's Eve, New Year's Day, and Good Friday pushing FE-10 to get customers to complete deals and that it was suggested to FE-10 that FE-10's job depended on it.

216.     As alleged in the Securities Complaint, FE-11 was formerly employed by Extreme Networks as Account Manager from Fall 2022 through the end of the Relevant Period in the EMEA region. As an Account Manager, FE-11 was responsible for ensuring that FE-11's partner accounts were set up correctly and received the correct discounts from Extreme's distributors. FE-11 was also responsible for ensuring there were no conflicts with end users. FE-11 explained that during FE-11's tenure as Account Manager, FE-11 was informed by a fellow sales Account Manager in the EMEA region, in addition to an Account Manager from an Extreme partner, about sales orders that were "illegal."

217.     Specifically, the Securities Complaint alleges that FE-11 explained of one instance where the sales orders were marked in Salesforce as "sold," *but it was never ordered by a "distributor, partner, or end customer*," which made it look as though the orders had been on the "books" in Salesforce.  Separately, the Securities Complaint alleges that FE-11 explained of another incident, where a number of orders were counted in Salesforce as one large order instead of how it was supposed to be listed—as orders that were to be scheduled over time.

### 5.     Extreme's Extraordinary Decline In Revenues at the End of and After the Relevant Period Demonstrates the Impact of the Individual Defendants' Undisclosed Misconduct

218.     Experts and commentators have noted that channel stuffing conduct may come to light through observed performance reversals of revenue in future periods. By improperly pulling

sales forward and creating artificial demand, a company that has previously engaged in channel stuffing will often inevitably experience revenue shortfalls in future periods when its distributors and partners are unable to sell the excess inventory.

219.     The same performance reversals of revenue are indicators of the materiality of the buildup of channel inventory to a company's financial statements. Accordingly, a period of a significant decline in revenue would be highly probative and indicative evidence of prior channel stuffing conduct within the company.

220.     Consistent with this economic phenomenon, Extreme experienced a steep decline in its quarterly revenues at the end of and after the Relevant Period, as compared to during the Relevant Period – a strong indication of the presence of channel stuffing conduct during the build-up of accelerated revenues from 4Q2022 to 4Q2023.  Specifically, there was a significant decline in the Company's revenues from 1Q2024 through 3Q2024, with all of the sequential quarterly declines attributable to the Distributor segment, as opposed to the Direct segment (which was growing over those two quarters).  The fact that *all* of the revenue decline can be attributed to the Distributor channel of Extreme's business is further evidence of the undisclosed channel stuffing conduct that occurred with Extreme's distributors and partners.

221.     Indeed, total revenue loss from 1Q2024 to 2Q2024 equated to a 16% QoQ drop—with the Distributor channel of Extreme experiencing a 27% QoQ loss of revenue. Total revenue loss from 2Q2024 to 3Q2024 equated to a 28.7% QoQ loss—with the Distributor channel of Extreme experiencing a 57.3% loss in QoQ revenue.

222.     Overall, from quarter-end 1Q2024 (*i.e.*, September 30, 2023) to quarter-end 3Q2024 (*i.e.*, March 31, 2024), Extreme suffered a loss of an astounding *$142 million* of total revenues, or *40%* of its total revenues, with the Distributor channel experiencing an extraordinary

*$147 million loss*, or a *66%* decline.

223.     Additionally, Extreme's product revenues (which comprised 70% of the Company's total revenues during the Relevant Period) tell the same story. Indeed, Extreme experienced a steep decline in quarterly product revenue at the end of and after the Relevant Period, as compared to during the Relevant Period, further evidencing prior undisclosed channel stuffing and manipulative inventory tactics with Extreme's products.

224.     Specifically, product revenue loss from 1Q2024 to 2Q2024 equated to a 26.4% QoQ drop. Product revenue loss from 2Q2024 to 3Q2024 equated to a 43% QoQ loss. Overall, from quarter-end 1Q2024 (*i.e.*, September 30, 2023) to quarter-end 3Q2024 (*i.e.*, March 31, 2024), Extreme suffered a loss of an astounding *$147 million* in product revenues, *i.e.*, an extraordinary *58% decline in product revenues*.

225.     This loss of product revenues—particularly within the Distributor channel—demonstrates that under the Individual Defendants' direction and on their watch, Extreme improperly borrowed demand from the future during the Relevant Period in its Distributor channel, which led to an extraordinary loss of recognized revenues once the distributors reached a breaking point and could no longer hold and stuff product inventory at the request of Extreme.

226.     Thereafter, revenues declined significantly as revenues stalled, given that distributors and partners were now shipping out their stuffed inventory to end users. Indeed, as FE-1 explained, the issue with the channel stuffing and manipulative conduct is that while Extreme's sales and revenue targets appear larger for a quarter (*i.e.*, from 4Q2022 to 1Q2024), Extreme will have to "worry about fixing the next quarter," such that Extreme would constantly have to push off underlying demand problems into the future (by continuously having to stuff inventory in order to keep up the charade). At some point, Extreme's distributors and partners

could no longer keep accepting inventory and thus generating recognized revenue—and it is at that point that Extreme's revenues began to decline. As reflected in the significant revenue declines in 2Q2024 and 3Q2024, this occurred in 2Q2024 and continued onwards into and through 3Q2024.

227. Indeed, at 8am ET on January 31, 2024, prior to market trading, the Individual Defendants spun the narrative and blamed Extreme's distributors and partners during Extreme's 2Q2024 earnings call—stating that: "[o]ur distributors and partners have **lowered inventory purchases**, which we expect to accelerate in the third quarter." The Individual Defendants further stated that they expect "**sell-through to be significantly higher than sell-in,**" *i.e.*, that distributors and partners will be selling off the excess inventory accumulated, and expected a "**$40 million to $50 million reduction in channel inventory** in the third quarter [*i.e.*, 3Q2024], which will allow us to cover to a more normalized level of revenue in the fourth quarter."

228. As a result, on January 31, 2024, the Individual Defendants disclosed that Extreme's revenues declined by $56.7 million sequentially quarter-over-quarter, and that product revenues declined by a significant $66.9 million sequentially quarter-over-quarter. The Individual Defendants also indicated downward total revenue guidance from $296 million in 2Q2024, to a range of $200 million to $210 million for 3Q2024—an extraordinary projected loss of **nearly $100 million**.

229. The combination of this news confirmed that Extreme was not, in fact, growing, and that there was a surplus of inventory at the distributor level. This final disclosure led Extreme's share price to drop from $16.64 on January 30, 2024 to $12.59 on February 2, 2024, a 24% decline over three trading days.

> **E. During the Relevant Period, the Individual Defendants Also Misrepresented the Purported Strength and "Firm" Nature of Extreme's Product Backlog**

230. Throughout the Relevant Period, the Individual Defendants also falsely and

misleadingly touted to stockholders that—based upon the Individual Defendants' "***complete visibility***" into Extreme's product backlog— the "vast majority" of orders included in the backlog reflected "***firm***" customer commitments, were "***not cancelable***," and reflected "***end user demand***." Specifically, the Individual Defendants asserted that:

> "We have complete visibility into our product backlog ***and have received negligible cancellations to date of less than 1% of bookings. Our backlog primarily consists of our latest-generation universal products***." (4Q2022 Earnings Call – July 27, 2022).

> "Once backlog begins to release, it will unlock an accelerated wave of product shipments and revenue growth over multiple quarters. We have complete visibility into our ***product backlog, the vast majority of which is comprised of orders with current delivery request dates***." (1Q2023 Earnings Call – Oct. 27, 2022).

> "***[The backlog] it's not cancelable. These are real projects that we see. . . . the vast majority of our backlog is related to this kind of end user demand project-based business and we don't see double ordering***." (Needham Technology & Media Conference – May 17, 2023).

> "***We have the benefit of a healthy backlog of customer orders with request dates that spread fairly evenly through the end of our fiscal year. End customer orders remain firm*** and distributor orders have normalized, giving us confidence in our outlook for this fiscal year." (FY2023 Earnings Call – August 2, 2023)

231. The Individual Defendants' above statements left stockholders with the impression that the orders in Extreme's backlog reflected firm customer commitments, were not cancelable, and that the present-tense "firm" strength of the backlog orders was poised to lead the Company to strong revenue growth.

232. Moreover, the Individual Defendants amended the Company's definition of its backlog orders at the start of the Relevant Period to reflect the firmness of backlog orders, and therefore the certainty that they indicated future recorded revenue. Before the start of the Relevant Period, the Individual Defendants stated in the Company's SEC Form 10-K for FY2021 (year ended June 30, 2021) (the "2021 10-K"), signed by defendants Meyercord, Thomas, Shoemaker, Carinalli, Holmgren, Kennedy, Khanna and Burton, that backlog orders are subject to

"cancellations by customers which we may elect to allow without penalty to customers[.]" However, at the outset of the Relevant Period, the Individual Defendants changed this definition for backlog, stating in the Company's SEC Form 10-K for FY2022 (year ended June 30, 2022) (the "2022 10-K"), also signed by defendants Meyercord, Thomas, Shoemaker, Carinalli, Holmgren, Kennedy, Khanna and Burton, that "[a]lthough we believe the orders included in the backlog are *firm*, all orders are subject to possible rescheduling by customers, and cancellations by customers, *which we may elect to allow on an exception basis*."

233. Accordingly, this change in the backlog definition from FY2021 to FY2022 further cemented the Individual Defendants' portrayal of the strong and "firm" nature of Extreme's backlog. Indeed, the change in language asserted that Extreme's backlog orders could only be cancelled on an "*exception basis*" that Extreme "*may*" (or may not) elect to allow a customer to cancel an order, which is a more difficult hurdle for cancellation than the Individual Defendants' prior representation that any backlog order could be cancelled at will without penalty or cost.

234. Indeed, defendant Tate strongly confirmed the certainty of Extreme's backlog orders on May 17, 2023, asserting that the backlog orders—on which the Individual Defendants had "excellent visibility"—were simply "*not cancelable*." Similarly, at the outset of the Relevant Period, on July 27, 2022, defendant Meyercord confirmed the very limited nature of any cancellations of the backlog, stating that Extreme received only 1% of "negligible" cancellations of product backlog.

235. Analysts and stockholders believed the Individual Defendants' misrepresentations. On July 27, 2022, Needham stated in its analyst report—in response to defendant Meyercord's statements—that Extreme had "Visibility Down to the Deal Level: *No Double Ordering* as Orders are Tailored to Specific Structured Project Deployments. *Extreme has*

***long had an order cancellation rate that's solidly less than 1%*** and that is not changing. Extreme can see these orders with high degree of specificity down to the details of the deployment architectures*. **They argue they are confident with this visibility . . . [the] orders are real and sustainable.***"

236.     Similarly, Rosenblatt stated in its March 29, 2023 analyst report, in reliance on the Individual Defendants' misrepresentations, that:

> **Backlog risks seem low**. We believe Extreme has excellent visibility to its backlog, and we are confident the risk of double ordering is low. The company has software tools to know what's in backlog and that no projects are duplicates. Backlog includes product for thousands of medium-to-large Enterprises, and includes specifically identifiable projects including stadiums, cruise ships, hotels and casinos, retail spaces, government facilities, hospitals, and factories. We think the risk of backlog cancellations are very low[.]

237.     Other analyst commentary and coverage during the Relevant Period similarly demonstrated that analysts (and stockholders) believed the Individual Defendants' misrepresentations as to the strength and "firm" nature of Extreme's backlog, and the repeated assertions that the present-tense strength of the backlog of orders would lead to strong revenue growth.  For example, on August 28, 2022, Rosenblatt stated that Extreme's revenue "***forecast appears particularly safe due to the Company's highly elevated backlog***." On September 23, 2022, Needham stated that Extreme's operations appear to be "substantially better than average resiliency," which was "driven by its ***massive and sticky backlog***." And on October 28, 2022, Craig-Hallum summed up the market expectation based upon the Individual Defendants' false and misleading statements, finding that: "The company expects its backlog to continue to build for the next few quarters through FY23, before supply constraints ease to a level the backlog can begin to work down starting in Q1 FY24. Management stated however, they expect the work down of the company's backlog to take multiple years and do not expect the backlog to recede to normalized levels of $50- $100 million until FY26, a full three-years from today. Management reiterated

expectations to drive topline growth of 10%-15% in FY23, and for this growth rate to accelerate in FY24 to 15%-175 as the company's backlog begins to work down. . . . With material backlog set to be a multi-year tailwind to already solid demand trends, and margins to expand and drive material leverage at the same time, *we remain very encouraged with Extreme' setup from here*."

238.    Analysts' sentiments in response to the Individual Defendants' statements touting "strong" backlog continued throughout the Relevant Period, with analysts such as Needham stating in its (i) January 25, 2023 analyst report that: "***Extreme believes their demand and robust backlog will enable them to product double-digit Revenue growth across a wide range of potential scenarios and outcomes***," (ii) in its March 6, 2023 analyst report that "***Extreme's strong backlog and pipeline enables the company to even guide to 'accelerated high-teens growth in FY24'*** [quoting the Company]"; and (iii) further stating in its May 18, 2023 analyst report that the "***the company noted project-based-end-customer backlog is still healthy***."

239.    And notably, Needham continued to state in its analyst reports throughout the Relevant Period—in reliance on the Individual Defendants' statements—that there was "***No Double Ordering***," that "***the cancellation rate . . . [is] solidly less than 1%***," and that Extreme was "confident with this visibility . . . ***the orders are real and sustainable***."

F.    **Unbeknownst to Stockholders, Extreme's Backlog Did Not Reflect "Firm" Orders and Was Not Reflective of Assured "Revenue Growth"**

1.    **Confidential Witnesses in the Securities Action Confirm That Backlog Orders Did Not Reflect "Firm" Customer Commitment**

240.    In direct contrast to the Individual Defendants' false and misleading statements concerning Extreme's backlog, the Securities Complaint includes accounts from confidential witnesses which all confirm and corroborate that Extreme's backlog of orders were not "firm." Specifically, the Individual Defendants failed to disclose that: (1) the backlog orders, instead of reflecting "firm" customer commitments, could simply be cancelled at any time by Extreme's

distributors and partners, and did not reflect end user demand; (2) it was well-known internally that the backlog orders consisted of orders that were double or tripled booked by distributors and partners, and that the distributors/partners would cancel such orders depending on which manufacturer met the order first; (3) the Individual Defendants already internally hedged that 10% of the backlog would be cancelled and not be converted to product revenue—far greater than the 1% of backlog cancellation that they led stockholders to believe during the Relevant Period; and (4) even the Individual Defendants' own internal hedge was severely understated, with the more appropriate hedge for backlog cancellations to be up to 66%, according to one confidential witness who met quarterly with the C-Suite. Accordingly, the Individual Defendants misled stockholders as to the strength and "firm" nature of the Company's backlog orders during the Relevant Period.

241.     Moreover, as mentioned above, the questionable sales tactics employed in order to force through sales at the end of each quarter included leveraging distributors' place on the backlog line with their agreement to take early inventory. The logical ramification of this practice was to deprioritize the backlog position of certain distributors who did not cave to channel stuffing demands, increasing the likelihood that those distributors would acquire the product from a competitor and cancel their Extreme orders.[5]

242.     According to the Securities Complaint, FE-3 stated that "Definitely, yes," Extreme's reported backlog was overstated because it included a substantial amount of preferred distributor orders that did not have firm end customer commitments. FE-3 stated that Extreme had

---

[5]     And notably, as illuminated by the account in the Securities Complaint of FE-1, there was an interplay between the backlog and channel stuffing conduct, in that one tactic Extreme employed to channel stuff the inventory to distributors or partners was to tell distributors or partners that they would lose their place at the front of the line on backlog inventory shipments if they did not agree to Extreme's channel stuffing demands for other outdated and unwanted inventory. In this way, not only were the Individual Defendants misrepresenting the "firm" nature of the backlog to stockholders -- the backlog was being used as a tool to aid in the undisclosed channel stuffing and manipulative conduct.

a lack of visibility into its end customers' needs.

243. The Securities Complaint further alleges that FE-3 stated that Extreme's cancellation policy was "*quite flexible*," and that FE-3 explained that a distributor could cancel a purchase order after it had been placed. Specifically, according to FE-3's account, there were many purchase orders to different vendors throughout and after the COVID-19 pandemic due to the longer waiting times in receiving material through the supply chains.

244. According to the account of FE-3, it was "*well known internally at Extreme*" that: (i) distributors were placing an inordinately high number of orders during the COVID-19 pandemic in 2021; and (ii) this ramp-up of orders from distributors was going to negatively impact future orders given the inventory on hand, including the extra inventory from competitors. FE-3 explained that it was well known that distributors were ordering extra inventory from solutions providers*, further adding that these orders were typically cancellable and returnable.* As an example, FE-3 explained that a distributor would make 10 purchase orders (with different vendors) but cancel 5 purchase orders because either (1) lead times were too long or (2) a competitor like Cisco could provide the product ahead of Extreme.

245. According to FE-3's account, it was sometime in 2022 when FE-3 became aware of an increased spike in the cancellation of a number of big deals, which FE-3 described as a "warning sign." FE-3 recalled that most of these cancellations took place in Extreme's Latin America market, but there was also one cancellation by a major U.S. end customer. FE-3 explained that Extreme was not expecting these cancellations and that the Company had little or no visibility into an end customer's commitment to a project.

246. The allegations in the Securities Complaint based on the account of FE-3 further make clear that the true status of the Company's backlog was made known to the C-Suite.

Specifically, FE-3 advised that FE-3 held a video call regularly every other week with defendant Thomas where FE-3 discussed pricing and the Company's business operations, and that on one of these calls FE-3 discussed the high value cancellations that occurred in Latin America and the U.S. FE-3 explained that cancellations were not normally part of the regular calls, but that FE-3 mentioned these cancellations to defendant Thomas because of their high value and that FE-3 felt the Company would have had better visibility into end users' demands if Extreme had "back-to-back" purchase orders, which they did not.

247.    FE-3 advised that FE-3 began to address this issue with defendant Thomas in 2022, and offered a possible solution at that time that would give Extreme better visibility into end customers' needs. According to FE-3's account, FE-3 explained the Latin America and U.S. cancellations to defendant Thomas and proposed that every big deal for Extreme involve a "back-to-back" or "B2B" distribution clause to secure end customer commitment. FE-3 described "back-to-back" as Extreme's paperwork that would essentially mirror the end customer's order. FE-3 explained that this would have given Extreme greater visibility into the end customer's specific needs and when they needed it.

248.    FE-3 advised that many other companies that FE-3 worked for throughout FE-3's career in the same industry as Extreme required "back-to-back" purchase orders, but Extreme did not, and this limited the Company's visibility into an end user's actual demand. FE-3 recalled Extreme having "a lot of pre-orders" without "back-to-back" purchase orders.

249.    FE-3 stated that defendant Thomas's response was that he was hesitant to implement "back-to-back" because it would require getting Extreme's order management and finance teams involved, which defendant Thomas did not want to do. FE-3 also explained that defendant Thomas was hesitant to implement "back-to-back" purchase orders because of the

logistics involved requiring an internal restructuring to work around internal controls issues. FE-3 advised that FE-3's proposed solution *was never implemented* by Extreme by the time FE-3's tenure at Extreme ended in the second half of 2023.

250.     According to the Securities Complaint, FE-1 also corroborated that the backlog orders placed by partners were not "firm." According to FE-1, partners and end users were placing the same order with multiple vendors for the same deal/end-user. After they received the inventory they needed, the partners and end users then cancelled the outstanding orders they placed with the other vendors.

251.     FE-1 further explained that both (1) the reseller's purchase order and (2) the prebought amount by the reseller or end user of that purchase order *could be cancelled at any time* if the reseller/end user placed the same order with multiple other manufacturers or vendors and received the products from someone else first. According to FE-1's account, resellers would double-book purchase orders due to supply chain constraints, and then cancel. Indeed, as FE-1 explained, there were never "non-cancellable" purchase orders at Extreme.

252.     The Securities Complaint alleges that FE-2 was employed by Extreme throughout the Relevant Period, including as Director of Sales from before the Relevant Period to mid-2023. Thereafter, FE-2 was an Account Executive until the end of FE-2's tenure at Extreme. FE-2's account in the Securities Complaint also corroborates the above allegations related to backlog. FE-2 explained that it was *known within the Company* that there were many backlog orders known to often be duplicative of orders placed with other manufacturers (besides Extreme) during the supply chain emergencies brought on by the COVID-19 pandemic, and that these orders were freely cancellable. FE-2 was aware that this continued in 2022 and 2023.

253.     The account in the Securities Complaint of the confidential witness referred to

therein as "FE-7" further corroborates that Extreme's backlog was overstated and did not reflect firm customer commitment. FE-7 is described in the Securities Complaint as having served as the former President of a company which was acquired by Extreme in 2021. According to FE-7's account, FE-7 began working for Extreme in July or August 2021, before officially signing on as an Extreme employee in March 2022. FE-7 was employed as the Senior Vice President, Strategy, of the Office of the Chief Technology Officer ("CTO") from March 2022 until March 2023. FE-7 officially separated from the Company in September 2023. FE-7 reported directly to Extreme's CTO, defendant Bukhari.

254.     During the Relevant Period, the Securities Complaint alleges that FE-7 was tasked with examining the pricing strategy for Extreme's entire product portfolio. FE-7 attended quarterly meetings with C-Suite executives as well as a second meeting which occurred every 30 days. FE-7 explained that the quarterly meeting had detailed discussions on the status of the business, including the Company's backlog. FE-7 explained that both meetings, the quarterly meeting and the meeting occurring every 30 days, were with members of the C-Suite, including defendants Meyercord, Thomas, and Rice. FE-7 further explained that the meetings which occurred approximately every 30 days, took place, on average, every three or four weeks depending on the schedule of defendant Meyercord.

255.     The Securities Complaint alleges that FE-7 recalled a meeting that occurred between late 2021 and mid-2022, attended by defendants Bukhari, Meyercord, Rice, Vitalone, and Thomas. According to FE-7, who reported directly to defendant Bukhari, the CTO, Bukhari wanted FE-7 to attend the meetings given that FE-7 was the former President of a newly acquired company that Extreme acquired. FE-7 explained that at that meeting, FE-7 asked how Extreme was talking about its backlog for reporting purposes. FE-7 explained that FE-7 had experience in

procurement and that it was well understood that end users are going to be "hedging their bets" and placing anywhere from one to four other identical purchase orders with other vendors.

256. According to FE-7's account, at these meetings "everyone [referring to Extreme Networks' C-Suite] in the room knew" that customers hedged their procurement and that it was "standard operating procedure." According to FE-7, *the C-Suite knew that the double-hedging and triple-hedging practice by Extreme's customers was going on*, especially during the constrained supply chain environment.

257. Importantly, FE-7 described how Extreme *already was assuming that at least 10% of the backlog would be cancelled* – in direct contrast to the Individual Defendants' statements that the backlog orders were "firm" and "not cancelable." Indeed, FE-7 stated that the Company had been factoring a "10% cushion" for backlog deals that are estimated will fall through. According to FE-7's account, FE-7 had conversations with defendant Bukhari about why the Company was not taking a more conservative approach to hedging the backlog. FE-7 was "baffled" by the 10% hedge figure the Company applied to its backlog, as it "didn't make sense" based on FE-7's experience.

258. FE-7 explained that the Company should have had "more rigor" in "acid testing" and should have conducted a "comprehensive sweep" of purchase orders to determine how much of the backlog was "real" and firm. FE-7 added that the need to be more conservative was "so obvious", and the figures as the Company had presented them "looked dangerous" to commit to such a high backlog figure.

259. According to FE-7's account, Extreme should have been working "closely" with its "big" distributors and in turn had the distributors working closely with the big end customers to determine what portion of the backlog was "real." FE-7 explained that Extreme is "very channel

centric" and with steps between the Company and end customer it is important to have supporting statements from the distributors and partners and their customers. FE-7 explained that the backlog may have been $500 million, but that the associated revenues were "not in the bank," or confirmed, based upon the nature of the backlog.

260. Indeed, FE-7 further stated that a more realistic figure was as ***much as 66%*** – ***explaining that upwards of two-thirds of those deals may not come to be realized***. FE-7 expressed this in a separate meeting with defendant Bukhari, and according to the Securities Complaint, FE-7 is "confident" that defendant Bukhari relayed this information to the C-Suite, including defendants Meyercord and Thomas.

261. FE-7 continued to explain that FE-7 expressed in the meetings with the members of the C-Suite that what Extreme does "from a hardware point of view" is "not that special" and that selling generic hardware leaves users with several other vendor options. FE-7 added that in these meetings there was "very low to no reflection" on the generic selling that Extreme participated in and just how easy it was for competitors to replicate. FE-7 recalled being thanked for bringing up the point, but the meeting quickly moved to the next topic. FE-7 was "struck" by the fact that not only was more consideration not given to accurately calculating the backlog—but that there was no consideration at all.

262. FE-7 explained that the 10% "cushion" applied to the backlog was "not prudent" and was "not conservative enough." FE-7 stated that the approach was "not acting in accordance with the real world." According to the Securities Complaint, FE-7 could not understand "why no one was thinking about backlog" and that if the Company says that the backlog number is good then stockholders will expect a considerable jump in performance once supply chain issues subsided. Accordingly, FE-7 had concerns about the risks of "leading investors down a bad path."

FE-7 explained that the numbers were "dressed for the Company to write some checks they couldn't cash."

263.     The Securities Complaint alleges that FE-7 also gave specific details as to the form of the contracts for the backlogged purchase orders. FE-7 explained that the language with Extreme customers' contracts was "first come, first serve" and if another supplier was able to provide the product quicker than Extreme, then the contracts were "void." FE-7 further explained that "conditional" purchase orders were an "industry" term that indicated that the purchase orders themselves included specific language in the contract such as "first-come, first-serve" clauses – meaning that the purchase order placed by the customer was conditional on Extreme fulfilling that order first (and not another manufacturer). FE-7 further explained that to effectuate the double-booking and triple-booking practice by Extreme's customers, Extreme's customers would sign "conditional" purchase orders with Extreme, such that it gave them the ability to hedge in case the orders went to backlog. FE-7 explained that if Extreme did not meet an order on backlog, because of the conditional purchase order language, Extreme's customers could cancel the order and then meet that order from another manufacturer and then proceed with that other manufacturer. As an example, FE-7 stated that a customer would place an order with Cisco, Juniper, and Extreme— with Cisco and Juniper being Extreme's competitors—and then cancel the order with Extreme if Cisco or Juniper met the order first.

264.     According to FE-7, there were "open conversations about this" with the C-Suite, and knowledge that if Extreme's competitors fulfill the product order first then Extreme's customers will "void" their order with Extreme. Per FE-7's account, the Procurement Teams at end customers are "well versed" with terms and conditions of deals and Extreme's C-Suite "knew this." Further, FE-7 stated that customers did not have to pay up front with their orders, but instead,

the payment would be due *e.g*., 60 days thereafter. According to FE-7, customers' agreements with Extreme were more like a reservation and did not require upfront payment. As FE-7 explained, 80% to 95% of Extreme's customers were "very big" companies and the companies purchasing from Extreme were "too powerful to require upfront payment."

265.     FE-7 explained that customers like enterprise, federal, and public entities have a "go live" schedule for projects and need the product on site, staged, and tested on a specific timeline to remain on schedule. FE-7 continued to say that including "first come, first serve" language in a contract was "not a one-off thing" and that "this is how they do it [structure the contracts]." FE-7 also recalled in subsequent conversations with defendant Bukhari that FE-7 explained to defendant Bukhari that FE-7 had "acid tested" with customers and was aware that some were "double and triple hedging" and that FE-7 believed a more conservative approach to the backlog was warranted.

266.     Indeed, FE-7 confirmed that if the product backlog had been "good," then it would have been converted into "sustained" product revenue. FE-7 also explained that the decision to calculate backlog in the way that the Company did was "disingenuous," and a "***colossal risk to take***."

267.     Notably, FE-7 also explained that it is "standard operating procedure" from a revenue recognition policy and internal controls perspective to require both Sales and Finance leadership to "sign off on revenue certification." FE-7 added that this practice is "customary," and the certification of revenue is done to ensure that revenue is "free" of "special terms" or "undocumented agreements," such as discounts, concessions, or certain payment terms. According to FE-7, this practice is done to "adhere" to Company policies and accounting regulations, and is done on a quarterly basis.

268.     FE-7 explained that the quarterly revenue certification process was previously and is currently taking place at Extreme to ensure that revenue recognition complies with regulations. FE-7 explained that this process should capture which orders on the backlog were "real and firm" versus those that were "conditional," and thus impacted by the risk of customers hedging and double-booking. FE-7 continued to say that specifically, the quarterly revenue certification process would have exposed how many of the purchase orders on Extreme's backlog were "conditional." FE-7 further explained that if this process is carried out with "discipline" that it should "bring to light" conditional purchase orders in direct sales or with trade partners and in turn have an impact on backlog reporting.

269.     FE-5's account in the Securities Complaint further corroborates the lack of "firm" orders in Extreme's backlog. FE-5 is described as having formerly been employed by Extreme as Senior Channel Account Manager from March 2022 to April 2024.  According to FE-5's account, end users placed orders for the same hardware "all the time" with multiple suppliers such as Extreme and would then cancel the outstanding orders after receiving the hardware they needed from whatever supplier gave it to them first. FE-5 added that it was well known at Extreme that customers placed the same orders with multiple suppliers and that Extreme was likely to lose out on a number of these "supplemental orders," or "secondary orders," as FE-5 called them, through cancellations.

270.     According to FE-5, because of supply chain constraints, Extreme's customers placed "secondary" orders with Extreme, even though customers were also placing orders with Juniper and Cisco, etc. According to FE-5, these "secondary" orders would nonetheless be included in the pipeline/revenue forecast even though Extreme knew the orders would likely be cancelled. The majority of these orders would then go to the backlog and be counted as backlog.

271.     According to FE-5's account, it was "widely known" at Extreme that this double-booking was occurring because of the "RMA" process for double-booked orders. Specifically, FE-5 explained that RMA mean "Return Merchandise Authorization," which was effectively the cancellation. According to FE-5, the practice of RMAs "came from the top."

272.     As alleged in the Securities Complaint, FE-8 served as Extreme's Senior Vice President of Global Channel Sales from January 2202 until November 2023, and the Distribution Teams reported to FE-8. FE-8 similarly stated that it was "hard to ever really know" the true value of Extreme's backlog and that the figure was "driven by projects" and the Company had multiple resellers around the world competing for the same projects. Specifically, FE-8 recalled "Revenue Assurance" calls where the backlog was discussed and there were "conversations around the [backlog] hedge" and the algorithm that Extreme used for this calculation.

273.     According to FE-8's account, the "Revenue Assurance Calls" were attended by defendant Brown, members of the Finance team, defendant Rice, and Senior Vice President Jack Lyon. FE-8 continued to explain that the "Revenue Assurance" calls were led by defendant Rice, who then "took the baton" and had subsequent conversations with the CEO (Defendant deyercord) and CFO (defendants Thomas/Tate/Rhodes) through "Output" calls.

274.     According to FE-8's account, these "Output" meetings were calls that occurred after the "Revenue Assurance" calls, where defendant Rice and others relayed the information to the CEO and CFO—indicating "here's what we're looking at" and the level of risk and the upside. Further, FE-8 explained that it was FE-8's understanding that the information provided to the CEO and CFO in the "Output" calls was also presented through an Excel summary sheet, which included the range of calculations for potential outcomes, ***including the assumed "yield" from the backlog—referring to the conversion from backlog to product revenue.***

275. According to FE-8, the Revenue Assurance calls were a "quarterly function" with meetings becoming more frequent as the quarter progressed. FE-8 explained that during the first two months of the quarter, meetings occurred during the final week of the month to discuss current trends. FE-8 continued to explain that during the third month of each quarter the call became weekly and "week over week" trends were discussed. FE-8 explained toward the end of each quarter, these calls occurred "almost daily" and "day over day" happenings were discussed on a more "precise" level.

276. FE-8 also explained that it was FE-8's understanding that the Output calls between defendants Rice, Meyercord, and the CFO occurred at the same frequency as the Revenue Assurance Calls, so as the number of Revenue Assurance calls increased throughout the quarter so too did the Output calls—because "ultimately" defendants Rice, Meyercord, and the CFO were trying to determine the "earnings story" they were going to tell the market.

277. According to FE-8's account, information from the Revenue Assurance Calls was provided to defendant Meyercord and FE-8 recalled instances where it was noted that an update needed to get to Meyercord and that there was certain information he wanted to know. FE-8 further stated that it was "openly known that the information was going to get to the CEO." According to FE-8, defendant Meyercord was hands-on and a "very involved leader" and "detailed guy."

278. Indeed, it is alleged in the Securities Complaint that one of the documents provided by FE-1 undoubtedly demonstrates that defendant Meyercord and the C-Suite knew about the truth of the backlog. Specifically, according to the Securities Complaint, one of the documents revealed was an IM conversation dated May 27, 2022—just weeks from the beginning of the Relevant Period—in which defendant Brown told FE-1, "why didn't we have [the TD call] scheduled for yesterday? . . . ***Lots of eyes on this backlog process – it's updated all the way up to***

*Ed [Meyercord]*."

        **2.**      **The Significant Gap Between Product Backlog and Product Revenues Further Corroborates That Extreme's Backlog Was Not "Firm"**

279.     A review of Extreme's product revenues in comparison to the Individual Defendants' backlog digestion demonstrates that—contrary to the Individual Defendants' public statements—a significant portion of the Company's backlog was not comprised of "firm" and committed orders, but instead, was comprised of cancellable or double-booked orders that would not lead to revenue generation.

280.     ***First***, as stated in Extreme's 2023 10-K, signed by defendants Meyercord, Rhodes, Shoemaker, Carinalli, Holmgren, Kennedy, Khanna, and Burton, the Individual Defendants defined the Company's backlog during the Relevant Period as "***confirmed orders*** with a purchase order for products to be fulfilled and billed to customers with approved credit status."

281.     ***Second***, as stated in Extreme's 2022 10-K, signed by defendants Meyercord, Thomas, Shoemaker, Carinalli, Holmgren, Kennedy, Khanna and Burton, the Individual Defendants repeatedly asserted that the large majority (*i.e.*, 99%) of Extreme's backlog orders were compromised of these "firm," committed orders—indicating at the outset of the Relevant Period that: "[w]e have complete visibility into our product backlog and have received negligible cancellations to date of less than 1% of bookings."[6] The Individual Defendants also stated that the Company's backlog "***it's not cancelable***. ***These are real projects that we see*** . . . . ***the vast majority*** of our backlog is related to this kind of ***end user demand project-based business and we don't see***

---

[6]     Extreme's 4Q2022 earnings call (defendant Meyercord's statements); *see also* 1Q2023 earnings call (defendant Thomas's statements) ("And I can tell you right now because of our scrutiny around this, each and every decommit, to the extent there is one, gets a lot of scrutiny from us . . . and they remain at a fraction of 1%.").

*double ordering*."[7]

282.     ***Third***, the Individual Defendants characterized backlog as the amount of revenue expected to be recognized based on the present amount of customer orders, such that Extreme's revenue growth would be driven by unleashing the "massive" backlog (given the release of the supply chain constraints) and converting that backlog into recognized revenue. Specifically:

> "[O]ur ***revenue outlook is really a function of supply chain and product that we are able to release, given the massive backlog*** that we've built ***up*** and the continued strength of our bookings. So I'll just start off with supply chain, You've asked about that. What we see is a gradual improvement throughout the year. ***So think of a step function where we will be stepping our revenue, quarter by quarter, throughout the year, based on our outlook of supply chain*** . . . " (4Q2022 Earnings Call – July 27, 2022).

> "[W]e built up quite a bit of backlog because of the supply chain scenario, ***but*** it's all ***very high quality*** and ***we are very confident in the backlog***. ***And so in a way, it just gives us a lot of confidence in the revenue growth forecast*** that we've got into the future and for the next couple of years." (Needham Virtual Security, Network & Communications Conference – November 15, 2022).

> "Really what we want to do is reinforce our outlook of revenue growth. And we're doing that out through our fiscal '25 year, which is out there. ***We baked that [backlog] into our revenue guide, and that's where we're trying to focus everyone***." (3Q2023 Earnings Call – April 26, 2023)

> "We ***have*** the benefit of a ***healthy backlog*** of customer orders with request dates that spread fairly evenly through the end of the year. ***End customer orders remain firm and distributor orders have normalized, giving us confidence in our outlook for this fiscal year***." . . . the Individual Defendants further stated: "***During fiscal year '24, we expect continued strong product revenue growth***, given the growing interest in our solution by customers and ***the ongoing normalization of our backlog***." (FY2023 Earnings Call – August 2, 2023).

283.     ***Fourth***, the Individual Defendants disclosed in Extreme's 2022 10-K, signed by defendants Meyercord, Thomas, Shoemaker, Carinalli, Holmgren, Kennedy, Khanna and Burton, that Extreme recognized revenues at the moment when "control of the product is transferred to the

---

[7]     Needham Technology & Media Conference (May 17, 2023).

customer (*i.e.*, when the Company's performance obligation is satisfied), which typically occurs at shipment for product sales." Based upon this revenue recognition model, if an order in the product backlog was then fulfilled and shipped to a distributor, partner, or end user—and thus taken out of the backlog amount[8]—that order should then be recognized as product revenue at shipment. Given the Individual Defendants' repeated assertions that the majority of Extreme's backlog orders (*i.e.*, ~99%) were compromised of "firm" and committed, non-cancellable orders, then the amount of product backlog digested over a quarter should largely be equivalent to the amount of increase in product revenues in the same quarter (over and above any non-backlog purchase orders in the quarter).

284. Per Extreme's quarterly disclosures of product backlog (which were discontinued after 4Q2023), the Company's backlog was built up from 4Q2021 until 1Q2023, and then began to decline starting in 2Q2023, with major declines in 3Q2023 and 4Q2023. But there was a significant and material gap in backlog decline and recognized product revenues. For example, from 2Q2023 to 3Q2023, the Company's backlog decreased by about $104.5 million, but product revenue only increased by $17.6 million—***leaving an $86.9 million gap***. Similarly, from 3Q2023 to 4Q2023, Extreme's backlog decreased by about $170.2 million, but product revenues only increased by $20.6 million—***leaving a $149.6 million gap***.

285. Consequently, based on the application of established accounting principles, there are three possible explanations for the discrepancy between Extreme's backlog and revenues: (1) the Company's unaccounted-for backlog of $236.5 million for those two quarters was not firm (*i.e.*, was not converted into product revenue); (2) the Company's new orders (*i.e.*, bookings) had

---

[8]     Again, as confirmed by confidential witness accounts in the Securities Action, including FE-1's account, purchase orders made by Extreme's customers that were on backlog could not be counted as revenue, because they had not been shipped.

not only stalled, but regressed significantly and abnormally, and product revenues were being propped up by the fulfillment of backlog orders; or (3) a combination of these adverse headwinds contributed to the decrease in orders recognizable as revenue.

286.    The Individual Defendants, however, have excluded the possibility of options (2) and (3) above, explaining to stockholders during the Relevant Period that new orders were actually sold. For example, during the Company's 3Q2023 earnings call, defendant Meyercord stated that: "[a]lthough our Q3 bookings typically decline sequentially in the March quarter [*i.e.*, 3Q2023], we in fact ***grew*** from December." And during the Company's 4Q2023 earnings call, defendant Meyercord again stated that: "[i]n our fourth quarter, bookings ***grew*** mid- single digits sequentially." In other words, because the Individual Defendants disclosed that bookings (*i.e.*, new orders) grew in 3Q2023 and 4Q2023—and had not regressed or declined—the only explanation for the dissipation and evaporation of the $236.5 million in unaccounted-for backlog orders was that ***those orders were never firm in the first place***.

287.    As Extreme's backlog evaporated at the end of the Relevant Period, the Individual Defendants indicated on Extreme's 2Q2024 earnings call on January 31, 2024 that they made a "conscious decision to put channel digestion ***behind us*** in the March quarter [*i.e.*, the 3Q2024 quarter]." But the disappearance of the backlog had a catastrophic impact on Extreme's reported revenue. ***Product revenues decreased significantly from 1Q2024 to 3Q2024*** (not increased or remained flat). Notably, 3Q2024 product revenues fell to an abysmal $106.4 million— less than half of product revenues reported in any quarter from 2Q2023 to 1Q2024.

288.    That the Company's product revenue declines continued significantly throughout FY2024 further indicates that the previously reported backlog had not reflected "firm" customer commitment and ***far more than 1% of backlog was cancellable by Extreme's customers***, in

contrast to the misleading assertions and impressions made by the Individual Defendants.

289. In short, had Extreme's product backlog actually been firm and real, then its product revenues would have grown by a substantial—and comparable—amount, largely equivalent to the amount of declines in the backlog. This would have represented true "digestion" of the backlog into product revenues. But product revenues did not grow by a comparable amount in 3Q2023 and 4Q2023, and in fact further declined throughout FY2024. As a result, the only logical conclusion is that the backlog orders had dissipated and did not result in the Individual Defendants' promised revenue growth that stockholders and analysts believed would occur.

290. Indeed, analysts arrived at the same conclusion at the end of the Relevant Period, finding that customers were "double-ordering," *i.e.*, cancelling orders, at a far higher rate than the Individual Defendants had portrayed. For example, UBS downgraded Extreme from a "Buy" to a "Neutral" rating on January 31, 2024, finding that: "Extreme's double-digit growth in FY22 and FY23 was the result of pandemic-related supply chain delays and depressed demand in FY20/FY21 *followed by double-ordering by customers in FY22/FY23* to protect against the possibility of supply chain issues. Supply and demand are normalizing in FY24/FY25 and *it is now apparent that Extreme is not growing at a sustainable double-digit rate*."

## VI. THE TRUTH EMERGES THROUGH A SERIES OF PARTIAL DISCLOSURES

291. The truth concerning channel stuffing, manipulative sales and inventory practices, and the true nature of the Company's backlog emerged through a series of partial disclosures from January 25, 2023 through January 31, 2024. Notably, the Individual Defendants continued to make false and misleading statements throughout this time, which either inflated or maintained Extreme's share price at elevated levels until the end of the Relevant Period on January 31, 2024. This series of disclosures involved significant declines and the dissipation of the Company's

product backlog, and significant reductions of its revenues and downward revenue guidance. Critically, stockholders understood both backlog and revenues to be a representation of demand for Extreme's products. The combined dissipation of the backlog and the contemporaneous reduction of revenues thus evidenced that: (1) Extreme's revenue growth was not based upon organic demand as stockholders were previously led to believe; and (2) the backlog was not based on firm customer commitments that would lead to sustainable revenues, as stockholders were previously led to believe.

292.     *First*, on January 25, 2023, the Individual Defendants caused the Company to file a Current Report on SEC Form 8-K which announced the resignation of defendant Thomas as CFO, effective February 16, 2023, that defendant Tate was appointed as interim CFO, effective January 24, 2023, and that effective February 16, 2023, Tate would be the CFO. Defendant Tate was to assume these roles while a search would be conducted for a new CFO.

293.     Also on January 25, 2023, the Individual Defendants caused Extreme to report its financial results for its 2Q2023 ended December 31, 2022. In connection with reporting the 2Q2023 results, the Individual Defendants revealed for the first time that backlog had fallen, from $553 million to $542 million. On the 2Q2023 earnings call, defendant Meyercord also shortened the timeline for backlog normalization to be complete (from previously stated FY2026), stating that: "we see backlog returning to normal by the last quarter of fiscal '25 [*i.e.*, 4Q2025]." As a result of this news, the price of Extreme stock dropped from $19.31 per share when the market closed on January 24, 2023 to $16.50 per share on January 25, 2023, a nearly 15% decline. However, because the Individual Defendants failed to disclose the full truth and continued to make materially false and misleading statements and omissions, the price of Extreme stock remained artificially inflated throughout the remainder of the Relevant Period.

294.    Indeed, on January 25, 2023, Rosenblatt stated in its analyst report that: "[i]n our view, the stock is down because . . . backlog decreased $13mn sequentially to $542mn. Orders were not bad, and Extreme is still doing slightly better than its industry peers, but expectations were higher. Additionally, the company announced CFO Rémi Thomas is leaving for another job . . . his departure from Extreme was unexpected." Similarly, Craig-Hallum stated in its January 26, 2023 analyst report that: "[w]e believe shares of Extreme Networks sold off yesterday with the announced departure of the company's CFO, Remi Thomas. . . That being said, management believes demand will remain strong and expect its strong backlog to remain relatively stable throughout the next several quarters before beginning to be worked down."

295.    **Second**, just a few months later, the Individual Defendants disclosed that the Company's product backlog as of June 30, 2023 declined by an astonishing **$245 million** over the course of FY2023. This decline represented an enormous **48%** wipe-out of the backlog, YoY. Specifically, on August 24, 2023, the Individual Defendants caused Extreme to file with the SEC its 2023 10-K, which was signed by defendants Meyercord, Rhodes, Shoemaker, Carinalli, Holmgren, Kennedy, Khanna, and Burton. The 2023 10-K stated the following:

> **Our product backlog at June 30, 2023,** net of anticipated back-end rebates for distributor sales**, was $267.3 million, compared to $513.0 million at June 30, 2022**. The decrease in backlog year over year is primarily due to a combination of a resumption in shipment of orders during fiscal 2023, after experiencing significant delays due to supply chain constraints in prior years, and a reduction in distributor orders due to shorter lead times.

296.    As a result of this news, the price of Extreme stock dropped from $27.68 per share when the market closed on August 24, 2023 to $25.16 per share on August 25, 2023, a 9% decline. However, because the Individual Defendants failed to disclose the full truth and continued to make materially false and misleading statements and omissions, the price of Extreme stock remained artificially inflated.

297.     Analysts interpreted the news negatively, but nonetheless continued to rely on the Individual Defendants' false and misleading assurances. For example, Rosenblatt stated in its August 28, 2023 analyst report that: "EXTR is down today on its 10-K disclosure that backlog exiting FY23 was $267mn. This means backlog dropped ~$170mn q/q in 4Q, after falling ~$100mn in 3Q. Before the 10-K came out, we have assumed backlog was down ~$100mn so it came in ~$70mn lower than we expected. . . Quarter-to-quarter backlog declines should be smaller from here, and backlog is still expected to normalize in 1Q[2]5, according to our conversation with the company today. The company still sounds confident in its FY24 guidance because the order environment is improving[.]"

298.     *Third*, on November 1, 2023, the Individual Defendants caused Extreme to report its financial results for 1Q2024. Notably, the Individual Defendants also announced that the Company would discontinue disclosure of its current backlog figure on a quarterly basis. Accordingly, the Individual Defendants did not report Extreme's backlog figure as of 1Q2024.

299.     The Individual Defendants caused the Company to report sequential total revenue losses from $363.9 million in 4Q2023 to $353.1 million in 1Q2024, and sequential product revenue losses from $261.7 million in 4Q2023 to $253.5 million in 1Q2024.

300.     On November 1, 2023, the Individual Defendants also provided downward total revenue guidance of $312 million to $327 million for 2Q2024, which reflected a "more cautious tone," as described by defendant Rhodes during the 1Q2024 Earnings Call. The Individual Defendants also revealed that "[b]ased on changing customer buying patterns . . . we are tempering our revenue outlook for this quarter and the balance of the year," which was resultant from an "air pocket" of demand. Despite the "lower[ed] revenue expectations" for FY2024, the Individual Defendants guided to a range of "mid-to-high single digits of revenue growth" for FY2024. The

Individual Defendants also disclosed that Extreme was expecting normalized backlog of between $75 million to $100 million "by the end of Q4 fiscal '24."

301. As a result of this news, the price of Extreme stock dropped from $20.62 per share when the market closed on October 31, 2023 to $17.86 per share on November 1, 2023, a 13% decline. Furthermore, Extreme's stock price continued to decline as stockholders continued to absorb the news, falling from a $17.86 closing price on November 1, 2023 to a closing price of $17.10 per share on November 2, 2023, and a closing price of $16.80 per share on November 3, 2023. In total, Extreme's stock price declined over the three trading days by $3.82 per share, reflecting a decrease of 18% from market close on October 31, 2023.

302. **Fourth**, on January 8, 2024, the Individual Defendants caused Extreme to issue a press release that provided a business update lowering the Company's 2Q2024 and long-term revenue outlook, stating in relevant part that: "[s]econd quarter revenues are now expected to be approximately $294 to $297 million, compared to the prior outlook of $312 to $327 million." The press release confirmed that Extreme's final results for 2Q2024 would be published on January 31, 2024. The press release further stated, in relevant part:

> "Our revised second fiscal quarter outlook reflects industry headwinds of channel digestion and elongated sales cycles. In late Q2, we saw multiple large deals pushing out to future quarters," stated Ed Meyercord, President and CEO at Extreme. "We remain confident in our long-term strategy and our ability to achieve double-digit long- term revenue and EPS growth supported by competitive customer wins and the growth in our opportunity funnel."

303. As a result of this news, the price of Extreme stock dropped from $17.52 per share when the market closed on January 8, 2024 to $16.23 per share on January 9, 2024, a 7% decline.

304. **Finally**, on January 31, 2024, the Individual Defendants caused Extreme to report drastically disappointing financial results and operational trends for 2Q2024. The Individual Defendants disclosed that the Company's total revenues for the quarter were $296.4 million, down

$56.7 million from the prior quarter. Extreme's revenues of $296.4 million represented a decline of 16% in total revenue losses QoQ.

305.     Similarly, on January 31, 2024, the Individual Defendants reported that the Company's product revenues were only $186.6 million for 2Q2024, compared to $253.5 million from the prior quarter. This represented a decline of $66.9 million QoQ, or a 26% decline in product revenue losses QoQ.

306.     Furthermore, during the 2Q2024 earnings call, the Individual Defendants stated that the product revenue decline was attributable to "continued channel digestion and elongated sales cycles." Specifically, the Individual Defendants disclosed that: "[o]ur distributors and partners have lowered inventory purchases, which we expect to accelerate in the third quarter." The Individual Defendants also revealed that Extreme's product backlog had ***already normalized*** during the quarter, "earlier than we initially anticipated."

307.     The Individual Defendants further stated that they had made the "conscious decision to put channel digestion behind us in the March quarter [*i.e.*, 3Q2024]," leading to a "***$40 million to $50 million reduction in channel inventory in the third quarter***" that would result in "[d]emand . . . be[ing] masked by inventory flowing out of the channel."

308.     Additionally, rather than the Company being on track for "mid teens" revenue growth for FY2024, as the Individual Defendants previously represented, the Individual Defendants provided new guidance that revealed the Company was in fact on track to suffer lower revenues in FY2024. Specially, the Individual Defendants stated that looking into 3Q2024, the Company's total revenues would be in the range of just $200 million to $210 million – a further decline from the $296.4 million actuals of 2Q2024.

309.     Indeed, the Individual Defendants disclosed that in 2Q2024, they expected "***sell***

***through to be significantly higher than sell-in***, which we believe will have a meaningful impact on our operating results. To quantify this impact, we expect a $40 million to $50 million reduction in channel inventory in the third quarter, which will allow us to cover to a more normalized level of revenue in the fourth quarter." The Individual Defendants thus disclosed that they anticipated that sales from the Company's distributor/partners to the end users (*i.e.*, the "sell-throughs") will be "significantly" higher than sales from Extreme to the distributor/partner (*i.e.*, the "sell-ins") – which would result in drastically less revenue as less product would be shipped to the distributors and partners. Through this disclosure, the Individual Defendants indicated that there was as surplus of inventory at the distributor/partner level that needed to be sold off.

310.     As a result of this news, the price of Extreme stock collapsed from $16.64 per share when the market closed on January 30, 2024, to $13.51 per share on January 31, 2024, and then fell further to $13.22 per share on February 1, 2024 and $12.59 per share on February 2, 2024, a 24% decline. In total, the price of Extreme stock declined from a Relevant Period high of $32.27 per share to a low of $12.59 per share after the revelation of the truth, a greater than 60% decline. The Company's stock price has never recovered and currently trades for less than $15 per share.

311.     Following the final corrective disclosures on January 31, 2024, stockholders and analysts understood that Extreme was not, in fact, growing at a sustainable rate and that the revenue growth story that the Individual Defendants previously touted was fabricated. For example, UBS downgraded Extreme from a "Buy" to a "Neutral" rating on January 31, 2024, finding that: "Extreme's double-digit [revenue] growth in FY22 and FY23 was the result of pandemic-related supply chain delays and depressed demand in FY20/FY21 ***followed by double-ordering by customers in FY22/FY23*** to protect against the possibility of supply chain issues. Supply and demand are normalizing in FY24/FY25 and ***it is now apparent that Extreme is not growing at a***

*sustainable double-digit rate*." Similarly, Oppenheimer stated in its January 31, 2024 analyst report titled "EXTR F2Q24: Weak Quarter and Very Weak Guidance, Lowering Estimates" that the "stock will continue to be under pressure *until revenue growth reaccelerates*, *which is unlikely until 2025*." And LSCM declared in its January 31, 2024 analyst report titled "High Inventory Level in Channel Results in Massive Guidance Reset," that: "*[w]e initially suspected a typo when we saw Extreme's Q3 midpoint revenue guide of $205M vs the $321M consensus. But no, that is the correct figure*[.]" Accordingly, LSCM lowered its estimates and price target from $17 to $13 for Extreme's shares.

312.    As alleged herein, the Company's significant declines in revenue— including total revenues, distributor revenues, and product revenues—are strong indicators of both (i) the existence of the undisclosed channel stuffing and other manipulative sales tactics, and (ii) the effects of the Individual Defendants' misrepresentations regarding the firmness of the backlog.

## VII.    THE INDIVIDUAL DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE RELEVANT PERIOD

313.    During the Relevant Period, the Individual Defendants falsely and misleadingly told stockholders that Extreme's revenue growth was attributable to "exceptionally strong" demand and the improvement in the supply chain environment, but failed to disclose that channel stuffing and other manipulative sales and inventory tactics allowed for the Company to generate record-high revenues, but improperly masked true organic demand and accelerated revenues into the present by pulling in sales from the future.

314.    Additionally, during the Relevant Period, the Individual Defendants falsely and misleadingly mispresented the strength and "firm" nature of Extreme's current backlog orders, touting the Company's massive backlog, while omitting that such backlog orders were not "firm" and did not reflect strong customer commitment and end user demand.

### A.   4Q2022 Earnings Press Release (July 27, 2022)

315.   The Relevant Period begins on July 27, 2022, when the Individual Defendants caused the Company to issue a press release entitled "Extreme Networks Reports Fiscal Year and Fourth Quarter 2022 Financial Results," and subtitled "Record Bookings and Double-Digit Revenue Growth in FY22 Reiterates FY23 Revenue Growth of 10-15%." The press release stated in relevant part:

> "For FY22 we achieved double-digit growth in both bookings and revenue due to strong demand for our differentiated enterprise networking and 5G infrastructure solutions. Bookings grew 24%, revenue exceeded $1.1 billion for the first time, and we exited the year with a record product backlog of $513 million . . ." stated Ed Meyercord, President and CEO of Extreme.

> "*Our teams continue to see unabated market demand*, as networking projects remain a priority for our global customers. . . ." concluded Meyercord.

> Extreme's Chief Financial Officer Remi Thomas, added, "*After another quarter of solid execution, we achieved double-digit growth for the year and improved operating margins, even in the current supply chain environment*."

316.   The Individual Defendants' statements above were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's revenue growth was not based on "*strong*" and "*unabated market demand*" from end customers "even in the current supply chain environment," but rather, was a function of: (i) stuffing outdated and unwanted inventory with distributors, in order to recognize revenues for the present fiscal quarter, which artificially borrowed demand from future fiscal quarters; (ii) improperly "pulling in" sales from future fiscal quarters into the present by shipping products to Extreme's partners and resellers—even without a firm end customer purchase order justifying the recognition of revenues; (iii) wholly improper management of deals included in the pipeline and revenue forecasts which included orders that were double-booked or double-counted, without correction into the fiscal quarter or year was over; and (iv) other

manipulative sales and inventory tactics as described herein.

### B. 4Q2022 Earnings Investor Presentation (July 27, 2022)

317. On July 27, 2022, the Individual Defendants published their 4Q2022 Financial Results Investor Presentation, which included a slide stating "***Double-Digit Growth Fueled by Strong Demand and Execution***," "***Continued Strong Growth***," and "***Record Fiscal Year Revenue on 10% Y/Y Revenue Growth***," as well as a slide titled "***Driving Growth***" indicating that "Product Backlog" of ***$513 million*** was a key driver of that "***Growth***."

318. These statements were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's revenue growth was not based on "***strong demand and execution***" from end customers, did not reflect "***continued strong growth***," and the Company's product backlog of $513 million was not "***driving growth***" because, in truth, the revenues and backlog were a function of: (i) stuffing outdated and unwanted inventory with distributors, in order to recognize revenues for the present fiscal quarter, which artificially borrowed demand from future fiscal quarters; (ii) improperly "pulling in" sales from future fiscal quarters into the present by shipping products to Extreme's partners and resellers—even without a firm end customer purchase order justifying the recognition of revenues; (iii) wholly improper management of deals included in the pipeline and revenue forecasts which included orders that were double-booked or double-counted, without correction into the fiscal quarter or year was over; and (iv) other manipulative sales and inventory tactics as described herein.

### C. 4Q2022 Earnings Conference Call (July 27, 2022)

319. On July 27, 2022, defendant Meyercord stated the following during the Company's earnings call for FY2022:

> ***Our results for fiscal '22 highlight unprecedented demand for Extreme's***

*solutions* and a very vibrant and healthy market for networking. We reported record bookings growth of 24%, which is a clear indication that we're taking share and winning in the market. And our forward-looking funnel for fiscal '23 is up double digits year over year. This is a leading indicator of future bookings growth. The differentiation of our fabric and cloud solutions for enterprise customers and our targeted solutions for very large service provider customers, ***combined with the high performance of our global sales and channel teams gives us the confidence in our outlook for continued growth and demand***. Our technology solutions are critical to infrastructure initiatives underpinning digital transformation for all of our customers around the world. We believe these important projects will continue to remain a priority, irrespective of a changing macroeconomic environment. ***For the year, our double-digit revenue growth led to an all-time high revenue of $1.1 billion, yet it was understated by the $400 million of incremental backlog we built during the year***. Our total Q4 ending backlog was $513 million, thanks to the current supply chain environment.

320.    Defendant Thomas further stated on that same call:

As Ed [Meyercord] described, ***we had solid execution in fiscal '22 with record bookings and backlog generation, double-digit revenue growth, and overall improving margins, in spite of the supply chain environment. Strong demand for our portfolio of products, services, and subscription drove year over year*** bookings growth of 24% in fiscal '22 and 8% in Q4. With a product book-to-bill ratio of 1.29 for the year and 1.23 for the quarter, we exited the year with $513 million in backlog, up more than $400 million year over year and close to $90 million sequentially. ***That's nearly 3 full quarters of product revenue***.

321.    These statements were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's revenue growth was not the result of "***unprecedented demand for Extreme's solutions***" and not based on "***strong demand for our portfolio of products***." In reality, the revenue growth was due in large part to: (i) stuffing outdated and unwanted inventory with distributors, in order to recognize revenues for the present fiscal quarter, which artificially borrowed demand from future fiscal quarters; (ii) improperly "pulling in" sales from future fiscal quarters into the present by shipping products to Extreme's partners and resellers—even without a firm end customer purchase order justifying the recognition of revenues; (iii) wholly improper management of deals included in the pipeline and revenue forecasts which included orders that

were double-booked or double-counted, without correction into the fiscal quarter or year was over; and (iv) other manipulative sales and inventory tactics as described herein.

322. Additionally, these statements were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's backlog was not poised to generate revenue growth for Extreme and did not reflect "nearly 3 full quarters of product revenue" and reported revenues were not "**understated by the $400 million of incremental backlog we built during the year**" because: (i) the backlog did not reflect "firm" customer commitments as it was well-known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's contracts with its customers allowed the orders to be cancelled and were cancellable on a "quite flexible" basis; (iii) internally it had already been hedged that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers (and the more appropriate number for the hedge was as high as 66%); and (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Relevant Period.

323. Additionally, during the July 27, 2022 earnings call, analysts questioned Extreme's ability to generate revenue and unlock the large, accumulated backlog that had been built up to $513 million, to which defendant Meyercord responded:

> *...our revenue outlook is really a function of supply chain and product that we are able to release, given the massive backlog that we've built up and the continued strength of bookings*. So I'll just start off with supply chain. You've asked about that. What we see is a gradual improvement throughout the year. So think of a step function where we will be stepping our revenue, quarter by quarter, throughout the year, based on our outlook of supply chain. . . . So our teams, as I mentioned in my comments, are more confident today than they have been in our ability to step function our supply of product to our customers' partners. So what does that mean? That is how we built the revenue forecast for fiscal '23, which is that step function, with sharper improvement in the second half of the fiscal. *As it*

*relates to demand, our demand has been strong, as we talked about it for the year, 24% for us. That's record-breaking performance.*

324. These statements were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's revenue growth was not based on "demand" that was "strong" from end customers but rather, was a function of: (i) stuffing outdated and unwanted inventory with distributors, in order to recognize revenues for the present fiscal quarter, which artificially borrowed demand from future fiscal quarters; (ii) improperly "pulling in" sales from future fiscal quarters into the present by shipping products to Extreme's partners and resellers—even without a firm end customer purchase order justifying the recognition of revenues; (iii) wholly improper management of deals included in the pipeline and revenue forecasts which included orders that were double-booked or double-counted, without correction into the fiscal quarter or year was over; and (iv) other manipulative sales and inventory tactics as described herein.

325. Additionally, these statements were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's backlog was not poised to generate revenue growth for Extreme and did not reflect "nearly 3 full quarters of product revenue," because: (i) the backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's contracts with its customers allowed the orders to be cancelled and were cancellable on a "quite flexible" basis; (iii) internally it had already been hedged that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers (and the more appropriate number for the hedge was as high as 66%); and (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Relevant

Period.

326.    Around the time that the Individual Defendants caused Extreme filed its 2022 10-K, the Individual Defendants made available to stockholders on Extreme's website a letter wherein defendant Meyercord highlighted the Company's robust backlog and strong demand, which he claimed positioned the Company for "accelerated growth over the next several years," stating in relevant part:

> We are pleased to report record results, unprecedented economic growth and continued business momentum at Extreme as we closed fiscal 2022. . . .Revenue exceeded $1.1 billion for the first time in Extreme's history despite unprecedented supply chain constraints. ***And we exited the year with a record $513 million in product backlog, up 5x from last year, setting the stage for accelerated growth over the next several years***. The continued strength of bookings demand, the re-leveling of our book-to-bill ratio and the ***high quality of our order backlog gives us greater visibility into the next several years and increased confidence of the returns*** from our investments in new products, people, and innovations.

327.    These statements were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's backlog was not "high quality" and did not "set the stage for accelerated [revenue] growth over the next several years," because (i) the backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's contracts with its customers allowed the orders to be cancelled and were cancellable on a "quite flexible" basis; (iii) it internally had already been hedged that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers (and the more appropriate number for the hedge was as high as 66%); and (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Relevant Period.

### E.     Interview With *CRN Magazine* (August 2, 2022)

328.    On August 2, 2022, defendant Meyercord had an interview with *CRN Magazine* ("*CRN*"), a computer publication trade newspaper targeted at the industry. The publication was titled "Extreme Networks CEO: Beating Cisco an 'Exclamation Mark' on Fiscal Year 2022." One of the questions asked was: "[h]ow does Extreme's most recent fiscal quarter highlight how you're winning against the competition?" Defendant Meyercord responded:

> I can tell you that ***growth is spread across all of our geos*** when we look at the strength and performance in the Americas [sic], in EMEA, in Asia-Pacific. When we look at overall industry vertical growth, our solutions have been very successful across the board, across our verticals, ***so, it's just this very evenly spread, organic growth that we're experiencing at Extreme.*** It means that we're taking share.

329.    These statements were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's revenue growth was not based on "organic growth" from end customers that Extreme was "experiencing," but rather, was a function of: (i) stuffing outdated and unwanted inventory with distributors, in order to recognize revenues for the present fiscal quarter, which artificially borrowed demand from future fiscal quarters; (ii) improperly "pulling in" sales from future fiscal quarters into the present by shipping products to Extreme's partners and resellers— even without a firm end customer purchase order justifying the recognition of revenues; (iii) wholly improper management of deals included in the pipeline and revenue forecasts which included orders that were double-booked or double-counted, without correction into the fiscal quarter or year was over; and (iv) other manipulative sales and inventory tactics described herein.

### F.     2022 Form 10-K (August 29, 2022)

330.    On August 29, 2022, the Individual Defendants caused Extreme to file with the SEC the 2022 10-K, which was signed by defendants Meyercord, Thomas, Shoemaker, Carinalli, Holmgren, Kennedy, Khanna and Burton.  The 2022 10-K stated the following:

*Product revenues increased $62.3 million or 8.9% for the year ended June 30, 2022, compared to fiscal 2021. The product revenues increase for the year ended June 30, 2022 as compared to fiscal 2021 was primarily due to strong demand for our products* partially offset by supply chain constraints which impacted our ability to fulfill the demand for our products during fiscal 2022.

331.     These statements were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's revenue growth was not based "primarily  due to strong demand for [Extreme's] products," but rather, was a function of: (i) stuffing outdated and unwanted inventory with distributors, in order to recognize revenues for the present fiscal quarter, which artificially borrowed demand from future fiscal quarters; (ii) improperly "pulling in" sales from future fiscal quarters into the present by shipping products to Extreme's partners and resellers—even without a firm end customer purchase order justifying the recognition of revenues; (iii) wholly improper management of deals included in the pipeline and revenue forecasts which included orders that were double-booked or double-counted, without correction into the fiscal quarter or year was over; and (iv) other manipulative sales and inventory tactics as described herein.

332.     The 2022 10-K also contained certifications signed by defendants Meyercord and Thomas pursuant to Section 302 of the Sarbanes Oxley Act of 2022 ("SOX"). These SOX certifications attested to the accuracy of the Company's financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

333.     These sections of the 2022 10-K were materially false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading, as the 2022 10-K did not disclose that: (i) Extreme was engaging in manipulative sales and inventory tactics which masked the level of organic demand and artificially inflated the Company's revenues listed therein; and (ii) the backlog of $513.0 million stated therein was

overstated and inflated as the backlog did not reflect "firm" customer commitments.

### G. 1Q2023 Earnings Press Release (October 27, 2022)

334. On October 27, 2022, the Individual Defendants caused the Company to issue a press release entitled "Extreme Networks Reports First Quarter Fiscal Year 2023 Financial Results," subtitled "Reiterates FY23 Revenue Growth Outlook of 10-15%." The press release reported that Extreme's revenues for the quarter were "$297.7 million, up 11% year-over-year, and up 7% quarter-over-quarter." This press release also stated:

> "*We delivered record quarterly revenue of $297.7 million*, and SaaS ARR of $111 million. Our customers view networking as a strategic asset, and they choose Extreme because we are the best choice to drive operational efficiencies and create better outcomes for their end users. *This is evidenced by this quarter's impressive double- digit revenue growth, record revenue, and continued growth of backlog, which now sits at $555 million*," said Ed Meyercord, President and CEO of Extreme.
>
> "Extreme continues to take share in a thriving and competitive market. The flexibility and intelligence of our products like Extreme Fabric, ExtremeCloud IQ, and innovative capabilities such as Digital Twin and AIOps, are gamechangers. We make it simple to deploy and manage networks, which transforms the way our customers drive their businesses. *The combination of our continued revenue growth and record backlog gives us even greater confidence in our long-term growth outlook*," concluded Meyercord.
>
> Extreme's Chief Financial Officer Remi Thomas added, "In addition to our strong topline results, both gross and operating margins improved sequentially. Our subscription business revenue grew approximately 40% year-over-year driven by the adoption of our cloud solutions. Given another quarter of strong free cash flow, we retired $37 million of our debt, which will be accretive to earnings."
>
> "*As we look at the remainder of FY23, the continued improvement in the supply chain environment gives us further confidence in our topline growth outlook of 10- 15%*. We expect to cross the 60% gross margin threshold and achieve an operating margin in the mid-teens in the second half of our fiscal year," concluded Thomas.

335. Similarly, on October 27, 2022, the Individual Defendants also published their 1Q2023 Financial Results Investor Presentation, which included a slide stating "*Double-Digit Growth Fueled by Strong Demand and Execution*," "*Continued Strong Growth*," and "*Record*

*Revenue on 11% Y/Y Revenue Growth*," as well as a slide titled "***Driving Growth***" indicating that "Product Backlog" of *$555 million* was a key driver of that "***Growth***."

336.   These statements above were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's revenue growth was not based on "***strong demand***" from end customers or reflect "***continued strong growth***" but rather, was a function of: (i) stuffing outdated and unwanted inventory with distributors, in order to recognize revenues for the present fiscal quarter, which artificially borrowed demand from future fiscal quarters; (ii) improperly "pulling in" sales from future fiscal quarters into the present by shipping products to Extreme's partners and resellers— even without a firm end customer purchase order justifying the recognition of revenues; (iii) wholly improper management of deals included in the pipeline and revenue forecasts which included orders that were double-booked or double-counted, without correction into the fiscal quarter or year was over; and (iv) other manipulative sales and inventory tactics described herein.

337.   These statements were also false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's "***record backlog***" of $555 million was not poised to generate continued revenue growth for Extreme and was not sufficient to give the Individual Defendants "***greater confidence in our long-term growth outlook***" because: (i) the backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's contracts with its customers allowed the orders to be cancelled and were cancellable on a "quite flexible" basis; (iii) internally it had already been hedged that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers (and the more appropriate number for the hedge was as high as

66%); and (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Relevant Period.

### H.    1Q2023 Earnings Conference Call (October 27, 2022)

338.    On October 27, 2022, defendant Meyercord stated the following during the Company's earnings call for 1Q2023:

> *We had a record quarter as demand for cloud-driven networking and for Extreme Solutions has never been stronger. Again, our share gains are evident by double-digit revenue growth, record revenue and continued growth of backlog, which now sits at $555 million.*

***

> *On the supply chain side, we continue to be laser-focused on tactical execution to meet our customers' needs. Our distributors give us the highest rank in the networking industry for delivering on our commit dates, and this is driving demand* and has become a source of new customer logos and partners for Extreme. This quarter alone, we qualified an additional 50 component suppliers and reduced our part shortages. Our success in reengineering products has also helped ease constraints. Based on all the actions we've taken with our supply chain over the past year, we now have better visibility and confidence in the ramp of our product deliveries. With a strong outlook for bookings growth and the gradual improvement in supply, we expect to build backlog through the end of the fiscal year. We anticipate neutral book-to-bill or release of backlog in our fiscal Q1 of '24. *Once backlog begins to release, it will unlock an accelerated wave of product shipments and revenue growth over multiple quarters. We have complete visibility into our product backlog, the vast majority of which is comprised of orders with current delivery request dates.*

339.    These statements above were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's revenue growth was not based on "demand [that] has never been stronger" from end customers but rather, was a function of: (i) stuffing outdated and unwanted inventory with distributors, in order to recognize revenues for the present fiscal quarter, which artificially borrowed demand from future fiscal quarters; (ii) improperly "pulling in" sales from future fiscal quarters into the present by shipping products to Extreme's partners and resellers— even without

108

a firm end customer purchase order justifying the recognition of revenues; (iii) wholly improper management of deals included in the pipeline and revenue forecasts which included orders that were double-booked or double-counted, without correction into the fiscal quarter or year was over; and (iv) other manipulative sales and inventory tactics described herein.

340.     These statements were also false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's backlog of $555 million was not poised to generate continued revenue growth for Extreme, because: (i) the backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's contracts with its customers allowed the orders to be cancelled and were cancellable on a "quite flexible" basis; (iii) internally it had already been hedged that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers (and the more appropriate number for the hedge was as high as 66%); and (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Relevant Period.

341.     Defendant Thomas further stated during that same call:

> Now turning to guidance. ***Our confidence in our outlook is further solidified by $555 million worth of product backlog exiting Q1.*** For Q2, we expect revenue to be in the range of $299 million to $309 million. . . . ***So for the year, we expect 10% to 15% revenue growth.***

342.     These statements were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's backlog of $555 million was not poised to generate continued revenue growth for Extreme, because: (i) the backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from

Extreme and then cancelling those orders; (ii) Extreme's contracts with its customers allowed the orders to be cancelled and were cancellable on a "quite flexible" basis; (iii) internally it had already been hedged that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers (and the more appropriate number for the hedge was as high as 66%); and (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Relevant Period.

343. During that same call, analysts asked the Individual Defendants about "decommits"—*i.e.*, cancellations by customers—and asked: "[t]he other question I had is on the decommits comments you made, it sounded liked decommits are declining, but still happening. Is that accurate? Or have the decommits basically stopped at this point?" Defendant Thomas responded:

> Alex, decommits are just -- it would be a normal part of the business. ***These are one- offs.*** And I can tell you right now because of our scrutiny around this, each and every decommit, to the extent there is one, gets a lot of scrutiny from us. And there's no consistency around it. So the example I might give would be a government agency that has budget. They can't get supply by the end of the year, it's use it or lose it. So they want to reprioritize another spend. ***So they might cancel an order or and maybe that comes into the budget for the following year based on that dynamic. But these are things that are not really supply chain. I guess you could say that supply chain related, but these are more one-offs. And so we're not really seeing a change in the one-offs, and they remain at a fraction of 1%.***

344. These statements were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements: (i) it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's contracts with its customers allowed the orders to be cancelled and were cancellable on a "quite flexible" basis; and (iii) internally it had already been hedged that Extreme's backlogged orders would be cancelled by as much as 10% from Extreme's customers (and the more appropriate number for the hedge

was as high as 66%).

**I.**     **1Q2023 Form 10-Q (October 28, 2022)**

345.     On October 28, 2022, the Individual Defendants caused Extreme to file with the SEC its Quarterly Report on Form 10-Q for 1Q2023 (the "1Q2023 10-Q"), which contained signed certifications by defendants Meyercord and Thomas pursuant to Section 302 of SOX. These SOX certifications again attested to the accuracy of the Company's financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

346.     These sections of the 1Q2023 10-Q were materially false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading, as the Individual Defendants did not disclose that Extreme was engaging in manipulative sales and inventory tactics which masked the level of organic demand and artificially inflated the Company's revenue listed therein.

**J.     Needham Virtual Security, Networking & Communications Conference (November 15, 2022)**

347.     On November 15, 2022, during the Needham Virtual Security, Networking & Communications Conference, analysts asked defendant Meyercord regarding the "robust results" that Extreme had been experiencing, to which defendant Meyercord responded in relevant part:

> And as you and I've discussed, ***we built up quite a bit of backlog because of the supply chain scenario, but it's all very high quality and we are very confident in the backlog. And so in a way, it just gives us a lot of confidence in the revenue growth forecast that we've got into the future and for the next couple of years***. So, we are in a different place and we're going to continue to build on this.
>
> \*\*\*
>
> ***We're not seeing [decommits], we're not seeing de-books. The number that we've thrown out as a fraction of 1% and we would attribute that more than normal course of business kind of thing. So, yeah to your point, we're feeling a lot of confidence in the backlog number we have***.

348. These statements were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements Extreme's backlog was not "high quality" and poised to generate continued revenue growth for Extreme, because: (i) the backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's contracts with its customers allowed the orders to be cancelled and were cancellable on a "quite flexible" basis; (iii) internally it had already been hedged that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers (and the more appropriate number for the hedge was as high as 66%); and (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Relevant Period.

349. Later during that same conference, defendant Meyercord stated that revenues had actually been underreported, as they had been stored in the Company's backlog:

> There's operating leverage in the model, Alex, what as you know, gets us excited as we look at this, because I say it kind of tongue in cheek, **_but we've been underreporting our earnings, because we haven't been showing our revenue, because we've been putting in backlog._** Meanwhile, we've been paying for it.

350. These statements were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's backlog was not poised to generate continued revenue growth for Extreme, because: (i) the backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's contracts with its customers allowed the orders to be cancelled and were cancellable on a "quite flexible" basis; (iii) internally it had already been

hedged that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers (and the more appropriate number for the hedge was as high as 66%); and (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Relevant Period.

### K. 2Q2023 Earnings Press Release (January 25, 2023)

351.     On January 25, 2023, the Individual Defendants caused Extreme to issue a press release entitled "Extreme Networks Reports Second Quarter Fiscal Year 2023 Financial Results," and was subtitled "Delivers Consistent Double-Digit Growth and Raises FY23 Revenue Outlook." This press release stated that Extreme's revenues for the quarter were "$318.3 million, up 13% year-over-year, and up 7% quarter-over-quarter." The press release also stated in relevant part:

> President and CEO Ed Meyercord stated: "Extreme delivered another quarter of great results. ***The continued strength of subscription and accelerated product deliveries drove another quarter of double-digit year-over-year revenue growth. We are raising our FY23 revenue growth outlook to the high-end of our 10-15% range and expect this momentum to continue into FY24, as the supply chain environment continues to improve***."

> "***We feel confident in end customer demand***. The majority of our bookings are with government, education, and healthcare sectors, where spending is more resilient. Our enhanced fabric and cloud subscription offerings are gaining traction in the marketplace. Finally, we have good visibility for the second half of the year based on the strength of our sales funnel," continued Meyercord.

352.     These statements above were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's revenue growth was not based on "end customer demand," but rather, was a function of: (i) stuffing outdated and unwanted inventory with distributors, in order to recognize revenues for the present fiscal quarter, which artificially borrowed demand from future fiscal quarters; (ii) improperly "pulling in" sales from future fiscal quarters into the present by shipping products to Extreme's partners and resellers—even without a firm end customer purchase order

justifying the recognition of revenues; (iii) wholly improper management of deals included in the pipeline and revenue forecasts which included orders that were double-booked or double-counted, without correction into the fiscal quarter or year was over; and (iv) other manipulative sales and inventory tactics as described herein.

<h2 align="center">L. 2Q2023 Earnings Investor Presentation (January 25, 2023)</h2>

353. On January 25, 2023, the Individual Defendants published their 2Q2023 Financial Results Investor Presentation, which included a slide stating "***Continued Double-Digit Y/Y Revenue Growth***," "***Continued Strong Growth***," and "***Record Revenue on 13% Y/Y Revenue Growth***," as well as a slide titled "***Driving Growth***" indicating that Product Backlog of ***$542 million*** was a key driver of that "***Growth***."

354. These statements above were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's revenue growth was not based on "end customer demand," but rather, was a function of: (i) stuffing outdated and unwanted inventory with distributors, in order to recognize revenues for the present fiscal quarter, which artificially borrowed demand from future fiscal quarters; (ii) improperly "pulling in" sales from future fiscal quarters into the present by shipping products to Extreme's partners and resellers—even without a firm end customer purchase order justifying the recognition of revenues; (iii) wholly improper management of deals included in the pipeline and revenue forecasts which included orders that were double-booked or double-counted, without correction into the fiscal quarter or year was over; and (iv) other manipulative sales and inventory tactics as described herein.

355. These statements were also false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's backlog was not poised to generate "revenue growth," because: (i) the

backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's contracts with its customers allowed the orders to be cancelled and were cancellable on a "quite flexible" basis; (iii) internally it had already been hedged that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers (and the more appropriate number for the hedge was as high as 66%); and (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Relevant Period.

### M.    2Q2023 Earnings Conference Call (January 25, 2023)

356.    On January 25, 2023, defendant Meyercord highlighted the Company's "exceptionally strong" customer demand, the Company's market share gains, and the size of its backlog in raising Extreme's guidance, stating:

> ***We had another record quarter, as demand for cloud-driven networking and for Extreme Solutions remains exceptionally strong with good visibility through fiscal year end '23, leading us to raise our full year revenue outlook to the high end of our range***.
>
> Our share gains are evident by a second consecutive quarter of double-digit revenue growth, 17% growth in product revenue, record free cash flow and a sizable backlog.
>
> ***
>
> On the supply chain side, our ability to pull in components enabled us to achieve revenue upside, which we believe is sustainable into the second half of the year. As a result, we are raising our revenue outlook to the high-end of our prior 10% to 15% guidance range. We continue to be laser-focused on tactical execution to meet our customer's needs. . . . With a strong outlook for bookings growth and the gradual improvement of supply, we expect backlogs to remain relatively stable for the next several quarters. ***We're in the beginning stages of an accelerated wave of product shipments and revenue growth over multiple quarters. The majority of our backlog consists of the latest generation universal products*** that pull-through subscription and service bookings.

357.    The statements above were false or, at a minimum, misleading when made and

omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's revenue growth was not based on "exceptionally strong" demand from Extreme's customers, but rather, was a function of: (i) stuffing outdated and unwanted inventory with distributors, in order to recognize revenues for the present fiscal quarter, which artificially borrowed demand from future fiscal quarters; (ii) improperly "pulling in" sales from future fiscal quarters into the present by shipping products to Extreme's partners and resellers—even without a firm end customer purchase order justifying the recognition of revenues; (iii) wholly improper management of deals included in the pipeline and revenue forecasts which included orders that were double-booked or double-counted, without correction into the fiscal quarter or year was over; and (iv) other manipulative sales and inventory tactics as described herein.

358. These statements were also false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's backlog was not poised to generate "an accelerated wave of product shipments and revenue growth" for Extreme, because: (i) the backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's contracts with its customers allowed the orders to be cancelled and were cancellable on a "quite flexible" basis; (iii) it internally had already been hedged that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers (and the more appropriate number for the hedge was as high as 66%); and (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Relevant Period.

359. Later during that same earnings call, defendant Tate said:

Now turning to guidance. *As we enter the second half [of FY2023], our confidence in the revenue outlook is supported by our product backlog of $542 million*, our

services and subscription deferred revenue balance of $446 million, as well as a product pipeline that is up double-digits year-over-year. . . . ***Against this backdrop, we expected for Q3 revenue to be in the range of $315 million to $325 million***, gross margin to be in the range of 58% to 60%, operating expenses to be in the range of $140 million to $145 million, and earnings to be in the range of $31.1 million to $38.4 million, or $0.23 to $0.29 per diluted share. We expect to cross the 60% gross margin threshold in Q4. For full fiscal year '23, we expect revenue growth towards the high end of our 10% to 15% outlook, with an operating margin in the mid-teens.

360.    The statements above were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's backlog was not poised to generate continued revenue growth for Extreme, because: (i) the backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's contracts with its customers allowed the orders to be cancelled and were cancellable on a "quite flexible" basis; (iii) it internally had already been hedged that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers (and the more appropriate number for the hedge was as high as 66%); and (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Relevant Period.

### N.    2Q2023 Form 10-Q (January 27, 2023)

361.    On January 27, 2023, the Individual Defendants caused Extreme to file with the SEC its Quarterly Report on Form 10-Q for 2Q2023 (the "2Q2023 10-Q"), which contained signed certifications by defendants Meyercord and Thomas pursuant to Section 302 of SOX. These SOX certifications again attested to the accuracy of the Company's financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

362.    These sections of the 2Q2023 10-Q were materially false or, at a minimum,

misleading when made and omitted material facts necessary to make the statements not misleading, as the Individual Defendants did not disclose that Extreme was engaging in manipulative sales and inventory tactics which masked the level of organic demand and artificially inflated the Company's revenue listed therein.

**O.** **3Q2023 Earnings Conference Call (April 26, 2023)**

363. On April 26, 2023, the Individual Defendants highlighted the quarter's record results, which the Individual Defendants attributed to "improvements in our supply chain" and "demand trends." Additionally, the Individual Defendants stated that Extreme's backlog would normalize to a revised range of $75 million to $100 million in 1Q2025. Defendant Meyercord further indicated that the Company's current product backlog for the end of 3Q2023 "represented 5x our expected normalized level," or about $437.5 million at the midpoint. During this same earnings call, defendant Meyercord stated:

> ***Extreme delivered another quarter of record results, driven by solid execution of our teams. Our top line performance was highlighted by improvements in our supply chain that drove 16% total revenue growth and 22% product revenue growth on a year-over-year basis.*** We achieved double-digit growth in 8 of the past 9 quarters. Our operating margin and EBITDA also achieved quarterly records in Q3. . . .Although our Q3 bookings typically decline sequentially in the March quarter, we in fact grew from December***, reflecting strong demand.***

364. These statements were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's revenue growth was not based on "strong demand" from Extreme's customers, but rather, was a function of: (i) stuffing outdated and unwanted inventory with distributors, in order to recognize revenues for the present fiscal quarter, which artificially borrowed demand from future fiscal quarters; (ii) improperly "pulling in" sales from future fiscal quarters into the present by shipping products to Extreme's partners and resellers—even without a firm end customer purchase order justifying the recognition of revenues; (iii) wholly improper

management of deals included in the pipeline and revenue forecasts which included orders that were double- booked or double-counted, without correction into the fiscal quarter or year was over; and (iv) other manipulative sales and inventory tactics as described herein.

365.     During that same earnings call, defendant Tate stated:

*Q3 financial results reflect record revenue*, operating margin, and EBITDA, *driven by increased product availability. . . . We are confident in our Q4 and FY '23 outlook and reiterate our commitment to mid-teens long-term growth through fiscal year '25. Our third quarter revenue of $332.5 million grew 16% year-over-year and 4% quarter-over-quarter, exceeding the high end of our expectations entering the quarter. . .*

*Now turning to guidance, we remain confident in the revenue outlook for Q4 as supported by* our strong funnel of opportunities, *our product backlog* and our services and subscription deferred revenue balance. . . . We continue to expect that the reduction in expedite fees and shipping costs, combined with the full impact of our recent pricing actions, will lead to a continued recovery in gross margin in Q4 and into fiscal year '24. *Against this backdrop, we expect for Q4 revenue to be in the range of $340 million to $350 million*[.]

366.     These statements were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's backlog was not poised to generate continued revenue growth for Extreme, because: (i) the backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's contracts with its customers allowed the orders to be cancelled and were cancellable on a "quite flexible" basis; (iii) it internally had already been hedged that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers (and the more appropriate number for the hedge was as high as 66%); and (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Relevant Period.

367.     In response to continued analyst concerns about the decrease in backlog and

conversion of backlog into revenue, defendant Meyercord again sought to divert discussion of the backlog decrease and to not "get into sort of dissecting backlog." Specifically, defendant Meyercord stated:

> What we've said is that overall backlog is about 5x. Obviously, distributor behavior is a little more tied to lead times and lead times came down faster. ***We're expecting them to come down, so we really don't want to get into sort of dissecting backlog. Really what we want to do is reinforce our outlook of revenue growth. And we're doing that out through our fiscal '25, which is out there. We baked that into our revenue guide, and that's where we're trying to focus everyone.***

368.    The statements above were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because Extreme's backlog was not poised to generate continued revenue growth for Extreme, because (i) the backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's contracts with its customers allowed the orders to be cancelled and were cancellable on a "quite flexible" basis; (iii) it internally had already been hedged that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers (and the more appropriate number for the hedge was as high as 66%); and (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Relevant Period.

## P.    3Q2023 Form 10-Q (April 27, 2023)

369.    On April 27, 2023, the Individual Defendants caused Extreme to file with the SEC its Quarterly Report on Form 10-Q for 3Q2023 (the "3Q2023 10-Q"), which contained signed certifications by defendants Meyercord and Tate pursuant to Section 302 of SOX. These SOX certifications again attested to the accuracy of the Company's financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the

disclosure of all fraud.

370.     These sections of the 3Q2023 10-Q were materially false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading, as the Individual Defendants did not disclose that Extreme was engaging in manipulative sales and inventory tactics which masked the level of organic demand and artificially inflated the Company's revenue listed therein.

### Q.     Needham Technology & Media Conference (May 17, 2023)

371.     On May 17, 2023, defendant Tate made the following statements in her exchange with an analyst during the Needham Technology & Media Conference:

> ***And we're seeing good demand. We're seeing double-digit growth in our weighted funnel year over year. And so that gives us confidence that demand is going to continue****. We saw, like you said, new logo growth, 20% bookings growth from new logos. And so we're expanding into different markets, going beyond our installed base. We're seeing larger deals in our funnel than we have in the past. And so we're competing at a higher level. So all of those things contribute.*
>
> ***As far as visibility, we have our backlog. We talk a lot about our product backlog, but we also have services and subscription backlog that goes along with that. We've been growing our subscription business, which gives us visibility as far as our deferred revenue balance, our ARR, what we can expect quarter-after-quarter. So between the backlog and the deferred revenue that we will recognize over time, we have really good, probably better than ever visibility into what we're going to achieve through the next fiscal year***.

372.     These statements were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's "double-digit" revenue growth was not based on "good demand" from Extreme's customers, but rather, was a function of: (i) stuffing outdated and unwanted inventory with distributors, in order to recognize revenues for the present fiscal quarter, which artificially borrowed demand from future fiscal quarters; (ii) improperly "pulling in" sales from future fiscal quarters into the present by shipping products to Extreme's partners and resellers—even without

a firm end customer purchase order justifying the recognition of revenues; (iii) wholly improper management of deals included in the pipeline and revenue forecasts which included orders that were double-booked or double-counted, without correction into the fiscal quarter or year was over; and (iv) other manipulative sales and inventory tactics as described herein.

373.     The statements were also false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because Extreme's backlog was not poised to generate continued revenue growth for Extreme, because: (i) the backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's contracts with its customers allowed the orders to be cancelled and were cancellable on a "quite flexible" basis; (iii) internally it had already been hedged that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers (and the more appropriate number for the hedge was as high as 66%); and (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Relevant Period.

374.     Later during that same conference, the analyst asked defendant Tate to "talk a little bit about where the backlog was, what it did last quarter, why it did what it did last quarter and, to some extent, the difference between the end customer demand and the disties that support the end customers, that stock inventory?" Defendant Tate continued to make misleading statements about Extreme's backlog, saying:

> ***The backlog is – consists of both the end user demand, and so orders for specific deals, specific projects; stadiums, hospitals, schools, et cetera. And then we have orders that are from our distributors for get – having product on hand and on order to be able to deliver customers when the demand hits***.

***

*Now, we expect to see that continue over the next several quarters. We expect to see both releasing product, being able to ship to customers, enjoying that product revenue growth*, and we also expect to see the distributor orders adjusting as the lead times come down. It may not be linear, we may not see the same level of reduction in backlog in Q4 that we saw in Q3. We think it'll still be kind of gradual over the next several quarters but – four to five quarters until we get to that normalized level, which we said would be around $75 million to $100 million.

375.     Defendant Tate's statement above was false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because Extreme's backlog did not "consist[] of . . . end user demand," because: (i) the backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's contracts with its customers allowed the orders to be cancelled and were cancellable on a "quite flexible" basis; (iii) internally it had already been hedged that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers (and the more appropriate number for the hedge was as high as 66%); and (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Relevant Period.

376.     Finally, an analyst at the conference pressed for more information about the Company's visibility into backlog, to which defendant Tate responded:

So we have excellent visibility into our backlog. If I think about the question of double ordering or triple ordering, to me that means somebody needs some access points for a school, let's call it, and they're going to order access points from us and they're going to order access points from another vendor, or they may order it twice from us just to get the product. That is not happening, that's not a phenomenon we see at all.

Our customers have to go through a deal registration process, it goes through – *it's not cancelable. These are real projects that we see. And so I would say the vast majority of our backlog is related to this kind of end user demand project-based business and we don't see double ordering*.

377.     Defendant's Tate's statements above were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because: (i) Extreme's backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's contracts with its customers allowed the orders to be cancelled and were cancellable on a "quite flexible" basis; (iii) it internally had already been hedged that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers (and the more appropriate number for the hedge was as high as 66%); and (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Relevant Period.

### R.     4Q2023 Earnings Press Release (August 2, 2023)

378.     On August 2, 2023, the Individual Defendants caused the Company to issue a press release entitled "Extreme Networks Reports Fourth Quarter and Fiscal Year 2023 Financial Results," which was subtitled "Marks Second Consecutive Year of Double-Digit Revenue Growth; Expect Continued Strong Growth in FY 24." The press release reported that Extreme's revenues for the fourth quarter were "up 31% year-over- year, and up 9% quarter-over-quarter." This press release quoted defendant Meyercord, who stated:

> "*Extreme delivered a year of exceptional performance, with revenue growth accelerating to 31% in the fourth quarter and 18% overall for the year*," said Ed Meyercord, President and Chief Executive Officer.   "This marks our second consecutive year of double-digit growth. We're outgrowing our competitors, gaining share, and winning new logos, which helped drive more than 30% growth in the value of deals over $1 million. . . . I remain confident in our growth prospects and am excited about the new innovations and opportunities we have in store for FY24 and beyond," concluded Meyercord.
>
> Kevin Rhodes, Executive Vice President and Chief Financial Officer stated, "the strong topline growth we achieved in Q4 and FY23 resulted in significant operating leverage that drove over 76% growth in GAAP EPS. We doubled our cash generation to $235 million in free cash flow this year, and even after repurchasing

another $100 million worth of shares, and paying down $80 million in debt, we improved our year- end balance sheet to achieve a net cash position. ***Extreme has never been in a more robust financial position***, and I am encouraged about our future prospects."

379.    These statements were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's "revenue growth" was not based on Extreme having "never been in a more robust financial position," but rather, was a function of: (i) stuffing outdated and unwanted inventory with distributors, in order to recognize revenues for the present fiscal quarter, which artificially borrowed demand from future fiscal quarters; (ii) improperly "pulling in" sales from future fiscal quarters into the present by shipping products to Extreme's partners and resellers— even without a firm end customer purchase order justifying the recognition of revenues; (iii) wholly improper management of deals included in the pipeline and revenue forecasts which included orders that were double-booked or double-counted, without correction into the fiscal quarter or year was over; and (iv) other manipulative sales and inventory tactics described herein.

### S.    4Q2023 Earnings Conference Call (August 2, 2023)

380.    On August 2, 2023, during an earnings conference call to discuss the Company's fourth quarter and fiscal year 2023 financial results, in prepared remarks, defendant Meyercord indicated that "[e]nd customer orders remain firm" and that the normalization of the Company's backlog in 1Q25 remained on track, stating in relevant part:

> This quarter, we were able to bring our product lead times down again as our supply chain environment continues to improve. ***We have the benefit of a healthy backlog of customer orders with request dates that spread fairly evenly through the end of our fiscal year. End customer orders remain firm and distributor orders have normalized, giving us confidence in our outlook for this fiscal year***.
>
> We continue to expect our backlog to settle in a range of $75 million to $100 million in Q1 '25.

381.    Defendant Meyercord's statements above were false or, at a minimum, misleading

when made and omitted material facts necessary to make the statements not misleading because: (i) Extreme's backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's contracts with its customers allowed the orders to be cancelled and were cancellable on a "quite flexible" basis; (iii) internally it had already been hedged that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers (and the more appropriate number for the hedge was as high as 66%); and (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Relevant Period.

382. Defendant Meyercord later stated during the same earnings call that: "*in EMEA and the rest of the markets, they remain very strong, and the demand in the U.S. market remains very strong*."

383. These statements in the prior paragraph were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's demand was not "strong" bur rather was a function of: (i) stuffing outdated and unwanted inventory with distributors, in order to recognize revenues for the present fiscal quarter, which artificially borrowed demand from future fiscal quarters; (ii) improperly "pulling in" sales from future fiscal quarters into the present by shipping products to Extreme's partners and resellers—even without a firm end customer purchase order justifying the recognition of revenues; (iii) wholly improper management of deals included in the pipeline and revenue forecasts which included orders that were double-booked or double-counted, without correction into the fiscal quarter or year was over; and (iv) other manipulative sales and inventory tactics described herein.

384. On that same conference call, defendant Rhodes delivered prepared remarks in which he highlighted Extreme's revenue outlook for fiscal year 2024 ("FY24"), saying:

> "[F]ourth quarter earnings per share were $0.33 at the high end of our guidance entering the quarter. For the full year, fiscal '23, revenue of $1.3 billion grew 18% from the prior year on product revenue growth of 22%. ***During fiscal year '24, we expect continued strong product revenue growth, given the growing interest in our solution by customers and the ongoing normalization of our backlog***."

385. Defendant Rhodes' statements above were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because the backlog was not poised to generate "continued strong product revenue growth," because at the time of the statements: (i) Extreme's backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's contracts with its customers allowed the orders to be cancelled and were cancellable on a "quite flexible" basis; (iii) internally it had already been hedged that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers (and the more appropriate number for the hedge was as high as 66%); and (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Relevant Period.

386. Later, when pressed by an analyst for an update on Extreme's backlog, defendant Meyercord refused to quantify the amount of backlog and stated that the Company's backlog would start to normalize throughout FY24 and into 1Q25, stating in relevant part:

> ***So Mike, we said last quarter that we were not going to give – we were going to move away from giving a specific backlog number each and every quarter. I think what Ed said in his prepared remarks is that our backlog is now – we feel like it will start to normalize throughout 2024 and into Q1 of 2025. We feel good about the level of backlog we have. For instance, it's primarily, I'd say, 90-plus percent is all end customer orders at this point. And so the distribution orders that we had in the past have basically worked themselves through the system, especially with supply chain getting better.*** And so we feel good about those end customer orders and the timing of when those orders need to be shipped to those customers based

on their own, I'll call it, like upgrade cycle and whatnot, we feel like it will come down fairly evenly throughout the year and into Q1 of '25. So feeling good about the level of backlog that we have and the timing of that coming out.

387. Defendant Meyercord's statements above were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements: (i) Extreme's backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's contracts with its customers allowed the orders to be cancelled and were cancellable on a "quite flexible" basis; (iii) internally it had already hedged that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers (and the more appropriate number for the hedge was as high as 66%); and (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Relevant Period.

### T.    Rosenblatt Securities Technology Summit (August 22, 2023)

388. On August 22, 2023, certain of the Individual Defendants participated on behalf of the Company in the Rosenblatt Securities Technology Summit. During the question-and-qnswer portion of the Summit, defendant Rhodes indicated that the Individual Defendants were very confident in the mid-teens revenue growth guidance that was given:

> ***So, this year, we've got strong visibility into 2024, in particular Q1 and beyond Q2 and et cetera. And I can see it in the pipeline. I can see in our win rates, et cetera. And that gives me confidence in our ability to kind of say what we think is going to happen in 2024.*** In 2025, I'm not changing yet the long-term guidance that the company had. I have no reason to. The reality is I went and looked at what we had as inherent assumptions within that model. We're already hitting some of those numbers that we have in long-term model from a – hey, we think that operating income is going to be closer to the 20% range. Well, geez, we just landed in Q4 at 17%. And then, OpEx, we're going to be in the 43% range. We're hitting that as well. And so, there's a number of different areas within the long-term model, growth rates, et cetera, as well in the 13% to 17% range. ***We're already calling mid-teens growth this year and think in 2025 with the momentum we are building today, we don't see a lot of change for that at this moment***. We will update it again

in November at our Analyst Day, and we're excited for that.

389. Defendant Rhodes' statements above were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements: (i) Extreme's backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's contracts with its customers allowed the orders to be cancelled and were cancellable on a "quite flexible" basis; (iii) internally it had already been hedged that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers (and the more appropriate number for the hedge was as high as 66%); and (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Relevant Period.

## U. 2023 Form 10-K (August 24, 2023)

390. On August 24, 2023, the Individual Defendants caused Extreme to file with the SEC the 2023 10-K, which was signed by defendants Meyercord, Rhodes, Shoemaker, Carinalli, Holmgren, Kennedy, Khanna, and Burton. The 2023 10-K contained signed certifications by defendants Meyercord and Rhodes pursuant to Section 302 of SOX. These SOX certifications attested to the accuracy of the Company's financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

391. These sections of the 2023 10-K were materially false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading, as the Individual Defendants did not disclose: (i) the manipulative sales and inventory tactics which masked the level of organic demand and artificially inflated the Company's revenues listed therein; and (ii) that the backlog of $267.3 million stated therein was overstated and inflated as the backlog did not reflect "firm" customer commitments.

## V. 1Q2024 Earnings Conference Call (November 1, 2023)

392. On November 1, 2023, certain of the Individual Defendants participated in an earnings conference call to discuss the Company's 1Q2024 financial results. In his prepared remarks on the call, defendant Meyercord stated:

> Our increasing pool of large, high-profile customers and our technology differentiation is why we continue to see the value of deals over $1 million grow each quarter. In Q1, we have more than 30 deals over $1 million. ***We continue to have a healthy customer order backlog with clear visibility to order with specific customer request dates through the balance of our fiscal year***.
>
> This quarter, our product lead times normalize, allowing us to continue working down backlog from product and strengths. We continue to expect our backlog to [settle] in a range of $75 million to $100 million by the end of Q4 fiscal '24.

393. The statements above were false and misleading, as Extreme did not have a "healthy customer order backlog" because: (i) Extreme's backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's contracts with its customers allowed the orders to be cancelled and were cancellable on a "quite flexible" basis; (iii) internally it had already been hedged that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers (and the more appropriate number for the hedge was as high as 66%); and (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Relevant Period.

394. During the same earnings call, defendant Rhodes stated:

> ***In the first quarter, we again demonstrated strong financial and operational performance. . . First quarter revenue of $353.1 million grew 19% year-over-year, exceeding the high end of our expectations entering the quarter. . . Product revenue of $253.5 million grew 23% year-over-year, reflecting continued improvement in our supply chain environment***.

395. These statements were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the

statements, Extreme's product revenue growth was not reflective of "continued improvement in [Extreme's] supply chain environment," but rather, was a function of: (i) stuffing outdated and unwanted inventory with distributors, in order to recognize revenues for the present fiscal quarter, which artificially borrowed demand from future fiscal quarters; (ii) improperly "pulling in" sales from future fiscal quarters into the present by shipping products to Extreme's partners and resellers— even without a firm end customer purchase order justifying the recognition of revenues; (iii) wholly improper management of deals included in the pipeline and revenue forecasts which included orders that were double-booked or double-counted, without correction into the fiscal quarter or year was over; and (iv) other manipulative sales and inventory tactics described herein.

396. Finally, defendant Meyercord also sought to quell analysts' and stockholders' concerns about Extreme's backlog, indicating that the backlog was still healthy and would lead to revenue generation:

> *I think it's fair to say that the – our backlog as it relates to distribution has normalized, but we still have a fair amount of customer backlog that's out there* – and I can give an example of like Kroger. We had a very large win with Kroger. They're deploying all their stores. They don't necessarily want all the equipment upfront at once. They want to time that with their deployment.

397. Defendant Meyercord's statements above were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements: (i) Extreme's backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's contracts with its customers allowed the orders to be cancelled and were cancellable on a "quite flexible" basis; (iii) internally it had already been hedged that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers (and the more appropriate number for the hedge was as high as 66%); and (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause

were never implemented during the Relevant Period.

## W. 1Q2024 Form 10-Q (November 2, 2023)

398. On November 2, 2023, the Individual Defendants caused Extreme to file with the SEC its Quarterly Report on Form 10-Q for 1Q2024 (the "1Q2024 10-Q"), which contained signed certifications by defendants Meyercord and Rhodes pursuant to Section 302 of SOX. These SOX certifications again attested to the accuracy of the Company's financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

399. These sections of the 1Q2024 Form 10-Q were materially false and misleading and omitted material facts, as the Individual Defendants did not disclose the manipulative sales and inventory tactics which masked the level of organic demand and artificially inflated the Company's revenue listed therein.

## X. Interview With *CRN* (November 22, 2023)

400. On November 2, 2023, defendant Meyercord had another interview with *CRN*. The publication was titled "Extreme Networks CEO: 'These are Boon Times for Our Channel Partners." In this interview, defendant Meyercord stated:

> *As you know, we put up 19 percent growth [in 1Q2024]. And I think the channel is very healthy because the channel is digesting all this backlog that is being released*. From a project perspective, our channel partners are busy at work implementing our technology and networking solutions. So from that standpoint, these are boon times for our channel partners.

401. Defendant Meyercord's statements above were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's channel was not "very healthy," and the channel was not "digesting all this backlog that is being released," because at the time of the statements: (i) Extreme's channels were being used, including through distributors and partners, to stuff outdated

and unwanted inventory with distributors, in order to recognize revenues for the present fiscal quarter, which artificially borrowed demand from future fiscal quarters; and (ii) Extreme's channels were being used to improperly "pull in" sales from future fiscal quarters into the present by shipping products to Extreme's partners and resellers—even without a firm end customer purchase order justifying the recognition of revenues. Additionally, these statements were false and misleading with respect to the digestion of the Company's backlog, because: (i) Extreme's backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's contracts with its customers allowed the orders to be cancelled and were cancellable on a "quite flexible" basis; (iii) internally it had already been hedged that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers (and the more appropriate number for the hedge was as high as 66%); and (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Relevant Period.

402. Following the above misconduct and the resulting damage to the Company's stock price as the truth gradually emerged from January 25, 2023 through January 31, 2024, the Company was named as a defendant in the pending Securities Action.

403. As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself and certain of the Individual Defendants in the Securities Action and exposed the Company to potentially massive liability. The Company will continue to incur significant sums in relation to the Securities Action and any liability or settlement that results.

## VIII. THE INDIVIDUAL DEFENDANTS WERE UNJUSTLY COMPENSATED DURING THE RELEVANT PERIOD

404. During the Relevant Period, the Company paid lucrative compensation to the Individual Defendants. The Company paid the Individual Defendants in connection with their respective roles as officers and/or directors of the Company.

405. Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner. Further, each of the Individual Defendants had additional duties and responsibilities owed to the Company by virtue of their executive, directorial and/or committee roles, for which they were compensated.

406. However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein. Because the Individual Defendants failed to carry out their respective duties, the compensation they received during the Relevant Period was excessive and undeserved. As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

407. Moreover, certain of the Individual Defendants were specifically motivated to engage in or permit the channel stuffing and manipulative sales scheme at the Company in order to reap financial benefits from Extreme's executive compensation program. The Company disclosed its executive compensation payouts for fiscal year 2023 (July 1, 2022 through June 30, 2023) in its Form DEF14A Proxy Statement ("2023 Proxy") filed with the SEC on September 26, 2023.

408. The 2023 Proxy revealed that defendants Meyercord, Thomas, Tate, and Rhodes

were named executive officers, or "NEOs." The 2023 Proxy further explained that an executive compensation plan was in place at the Company, referred to as the Extreme Incentive Plan ("EIP"). The EIP applied to Extreme's NEOs, including defendants Meyercord, Thomas, Tate, and Thomas.

409. According to the 2023 Proxy, the EIP was a "short-term cash incentive plan," which was "designed to reward Company performance . . . *particularly in the short term*." Furthermore, according to this EIP, the executive compensation plan for defendants Meyercord, Thomas, Tate, and Rhodes was both: (1) "*directly linked to* the performance of the Company and *to our stock price*," and (2) based on the achievement of *pre-established revenue goals*.

410. Specifically, the EIP for FY2023 provided for semi-annual payouts based on the achievement of pre-established revenue goals for the Company, for each of the first and second halves of fiscal year 2023.

411. For the first half of FY2023 (*i.e.*, July 1, 2022 through December 31, 2022), the Company's "threshold" revenue—which would grant certain of the Individual Defendants' additional compensation (*i.e.*, a bonus)— was $505.6 million. And the "target" goal for revenues was $594.8 million. According to the 2023 Proxy, the Individual Defendants reached and surpassed both, achieving $616.0 million in revenues for the first half of FY2023.

412. For the second half of FY2023 (*i.e.*, January 1, 2023 through June 30, 2023), under the EIP compensation incentive, the Company's threshold revenues goals were $585.1 million, and the target was $688.3 million. And again, according to the 2023 Proxy, the Individual Defendants reached and surpassed both goals, achieving $696.4 million in revenues for the second half of FY2023.

413. *As a direct result of Extreme's increased revenues*, defendants Meyercord, Thomas, Tate, and Rhodes were thus eligible—and did—receive hefty cash payment bonuses for

each half ("1H or 2H") of the year. These EIP cash payments paid out as a result of the increased revenues were significant, and in some cases, larger than these Individual Defendants' base salaries. Indeed, for FY2023, defendant Meyercord received **$1,114,400** in EIP bonuses—cash payments that were only brought about by the increased revenues. And these monetary cash payments were 139% larger than his base salary for the year, which was $800,000.

414.     These monetary incentives continued during the Relevant Period. Extreme's 2024 Proxy Statement, filed with the SEC on September 27, 2024 (the "2024 Proxy"), disclosed that from July 1, 2023 to December 31, 2023, defendant Meyercord received $183,456 in an EIP cash bonus, and that defendant Rhodes received a $71,400 cash payment.

415.     Thus, given that the Individual Defendants' "***short term***" executive compensation was "directly linked" and "directly tied" to the Company's revenues and stock price performance, and with the opportunity to earn substantial cash sums twice in the same fiscal year, these Individual Defendants had a strong personal pecuniary motive to engage in or permit the channel stuffing and manipulative sales and inventory tactics described herein—which artificially inflated Extreme's revenues and Extreme's stock price, and which in turn, allowed the Individual Defendants to obtain millions of dollars of additional compensation.

## IX.     DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

416.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

417.     Plaintiff is a current stockholder of the Company, has continuously held shares of the Company's stock since May 2022, and was a stockholder of the Company at all times relevant to the Individual Defendants' wrongdoing alleged herein.

418.     Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

419.     As a result of the facts set forth herein, Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants. Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously pursue this action.

420.     The Board currently consists of seven (7) directors: defendants Meyercord, Shoemaker, Carinalli, Kennedy, Holmgren, Khanna, and Burton. A derivative plaintiff need only demonstrate reason to doubt that a majority of the directors are disinterested or objective in order to establish pre-suit demand excusal. Plaintiff has adequately alleged that there is reason to doubt that at least four (4) current directors of Extreme are capable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action, for the following reasons:

### A.     Defendant Meyercord Is Not Disinterested and Is Not Independent

421.     Defendant Meyercord is not a disinterested director because during the Relevant Period, he received substantial, personal financial benefits as a result of the Individual Defendants' wrongdoing and scheme giving rise to this derivative litigation. Specifically, defendant Meyercord was paid significant EIP cash bonuses described above, which were the direct result of Extreme's increased revenues achieved via channel stuffing and manipulative sales tactics. Accordingly, defendant Meyercord is directly interested, and cannot exercise independent business judgment on the issue of whether Extreme should prosecute this derivative action.

422.     Notwithstanding that he is an interested director, there is also reason to doubt that defendant Meyercord is capable of independently considering a demand to commence and vigorously prosecute this action, because defendant Meyercord's principal professional occupation is his employment as President and CEO of Extreme. As President and CEO of the Company, defendant Meyercord has earned and stands to earn tens of millions of dollars in annual salary,

bonuses, and other compensation. For fiscal years 2022 through 2024, defendant Meyercord's total compensation was over $8.9 million, over $16.1 million, and nearly $15 million, respectively.

423. Accordingly, defendant Meyercord is incapable of independently considering a demand to commence and vigorously prosecute this action against those defendants who control his annual compensation. The Company's Proxy Statements on Form DEF 14A, including its most recent 2024 Proxy, also admit that defendant Meyercord is not an independent director.

**B.    All Seven Current Board Members Face a Substantial Likelihood of Liability For Signing False and Misleading SEC Form 10-Ks**

424. As alleged herein, defendants Meyercord, Shoemaker, Carinalli, Kennedy, Holmgren, Khanna, and Burton each signed the Company's materially incomplete, misleading, and deceptive SEC 10-Ks during the Relevant Period. Thus, even putting aside that these directors turned a deliberate blind eye to materially false and misleading statements alleged herein that were made by certain other Individual Defendants – in connection with the Company's SEC Form 10-Ks, they participated in making false and misleading statements to stockholders themselves.

425. It is well-established that a substantial likelihood of liability exists where there is a conscious disregard of a duty to act. Demand is regularly excused under Delaware law where, based on the facts alleged, it is reasonable to infer that directors consciously failed to take such action, in violation of their duties of loyalty and good faith.

426. Under Delaware law, shareholders are entitled to honest communication from directors, given with complete candor and in good faith. Communications that depart from this expectation, particularly where it can be shown that the directors involved issued their communication with knowledge that it was deceptive or incomplete, violate the fiduciary duties that protect shareholders. Such violations are sufficient to subject directors to a derivative claim. Directors who issue false and misleading statements to shareholders are considered to be interested

for purposes of pre-suit demand.

427. Conscious disregard for the truth or falsity of statements issued on behalf of the corporation is a breach of the non-exculpable duties of loyalty and good faith. When public representations are made to shareholders, directors are duty-bound to ensure that those statements are complete and truthful. A fiduciary may be held liable for making a material misdisclosure, or if he or she authorizes without fault or knowledge a misleading disclosure, later comes into knowledge of the misleading nature of the previous communication, and knowingly and in bad faith -- in other words, dishonestly -- fails to correct the misleading impression created by the earlier communication.

428. Based on the facts alleged herein, the only reasonable inference is that: (a) defendants Meyercord, Shoemaker, Carinalli, Kennedy, Holmgren, Khanna, and Burton knew and approved of or consciously disregarded the issuance of the series of false and misleading statements made during the Relevant Period; and (b) in fact joined in making materially incomplete, misleading, and deceptive statements to stockholders in the Company's SEC Forms 10-K.

429. Accordingly, defendants Meyercord, Shoemaker, Carinalli, Kennedy, Holmgren, Khanna, and Burton each face a substantial likelihood of liability, excusing demand.

## C. Defendants Kennedy, Holmgren, and Khanna Also Face a Substantial Likelihood of Liability Based On Their Failures as Audit Committee Members

430. As alleged herein, defendants Kennedy, Holmgren, and Khanna serve as members of the Audit Committee. Per the Audit Committee Charter, the members of the Audit Committee are responsible for, among other things, reviewing and discussing all Company press releases regarding financial results and any other information provided to securities analysts and rating agencies, reviewing significant deficiencies in the design or operation of the Company's internal

controls, and reviewing any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls

431.    Defendants Kennedy, Holmgren, and Khanna and the Audit Committee, among other things, caused and/or permitted the Company to issue a series of false and misleading public statements complained of herein, and to adopt ineffective internal controls over its disclosure and financial reporting.    In addition, upon information and belief, notwithstanding the serious allegations that have been raised in the Securities Action, to date the Audit Committee has failed to conduct any inquiry whatsoever into the events giving rise to the Securities Action. Accordingly, there is reason to doubt that defendants Kennedy, Holmgren, and Khanna would respond to a stockholder demand impartially and disinterestedly, and they each face a substantial likelihood of liability.

## COUNT I

### For Violations of Section 14(a) of the Exchange Act Against Defendants Meyercord, Shoemaker, Carinalli, Kennedy, Holmgren, Khanna, and Burton

432.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

433.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that:

[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l].

434.    SEC Rule 14a-9 provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in

order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

435. Under the direction and watch of defendants Meyercord, Shoemaker, Carinalli, Kennedy, Holmgren, Khanna, and Burton, who each served on the Board during the Relevant Period and continue to serve on the Board, the Company issued materially misleading statements in its Annual Proxies filed with the SEC on September 28, 2022 and September 26, 2023 ("the 2022 and 2023 Proxies"). Specifically, the 2022 and 2023 Proxies contained false statements and failed to disclose that: (i) Extreme was experiencing adverse client demand trends, as its clients had over-ordered products during the COVID-19 pandemic to mitigate supply shortages and due to limited alternative sourcing options, thereby cannibalizing their purchasing needs; (ii) Extreme was increasingly compensating for these adverse organic demand trends by fulfilling backlog orders at a rate that materially exceeded the proportion previously represented to stockholders; (iii) Extreme was depleting its backlog at a significantly faster rate than had been represented to stockholders; (iv) Extreme's backlog was already declining and at a much faster pace than indicated by Defendants' statements to stockholders; (v) Extreme's backlog was not on course to continue growing to $600 million; (vi) Extreme was not in a position to reasonably achieve "mid-teens revenue growth through [its] fiscal '25," and such representations lacked a reasonable and objective factual basis; and (vii) the Individual Defendants had materially misrepresented Extreme's organic demand, revenue growth, and market share gains, as the fulfillment of Extreme's backlog concealed a decline in organic demand and the associated revenues.

436. Defendants Meyercord, Shoemaker, Carinalli, Kennedy, Holmgren, Khanna, and Burton knew or should have known that by misrepresenting and/or failing to disclose the foregoing material facts, statements contained in the 2022 and 2023 Proxies were materially false and misleading.

437.    The Company was damaged as a result of the material misrepresentations and omissions in the 2022 and 2023 Proxies.

438.    No adequate remedy at law exists for Plaintiff by and on behalf of the Company.

## COUNT II

### Breach of Fiduciary Duty Against the Individual Defendants

439.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

440.    The Individual Defendants, as current or former Extreme officers and/or directors, owe (or owed) the Company the fiduciary duties of due care, loyalty, good faith, candor, oversight, reasonable inquiry, and supervision.

441.    By virtue of their positions as Extreme directors and/or officers, these Individual Defendants at all relevant times had the power to (and did) control, influence, and cause the Company to engage in the practices complained of herein, including the false and misleading statements alleged herein.

442.    Each Individual Defendant was required to: (a) use his or her ability to control and manage Extreme in a fair, just, and equitable manner; and (b) act in furtherance of the best interests of Extreme rather than his or her own interests.

443.    By their acts alleged herein, including but not limited to causing Extreme to issue false and misleading statements while concealing material adverse information and failing to ensure that the Company maintained adequate internal controls regarding financial disclosures, the Individual Defendants each breached their fiduciary duties.

444.    The Individual Defendants acted in bad faith, willfully, and/or recklessly in violating their fiduciary duties owed to the Company.

445.     Extreme has been injured as a direct and proximate result of the Individual Defendants' wrongful conduct.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

446.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

447.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Extreme.

448.     Plaintiff, as a shareholder and representative of Extreme, seeks restitution from the Individual Defendants, and each of them, and seeks an order of this Court disgorging all profits, salaries, benefits and other compensation obtained by these Individual Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT IV

### Against Defendants Meyercord, Thomas, Tate, Rhodes, Rice, and Brown for Contribution Under Section 21(D) of the Exchange Act

449.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

450.     The misconduct of defendants Meyercord, Thomas, Tate, Rhodes, Rice, and Brown as described herein has exposed the Company to significant liability under various federal securities laws.

451.     Extreme and defendants Meyercord, Thomas, Tate, Rhodes, Rice, and Brown are named as defendants in the related Securities Action that alleges and asserts claims arising under the federal securities laws. Extreme is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein.

452.	If Extreme is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of defendants Meyercord, Thomas, Tate, Rhodes, Rice, and Brown as alleged herein, who have caused the Company to suffer substantial harm through their misconduct. Extreme is entitled to contribution and indemnification from the Individual Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

453.	As officers and directors, defendants Meyercord, Thomas, Tate, Rhodes, Rice, and Brown had the power or ability to, and did, control or influence, either directly or indirectly, Extreme's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated the federal securities laws.

454.	The Individual Defendants are liable under §21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of any private right of action for contribution asserted pursuant to the federal securities laws.

455.	Defendants Meyercord, Thomas, Tate, Rhodes, Rice, and Brown have damaged the Company and are liable to the Company for contribution.

456.	As such, Extreme is entitled to receive all appropriate contribution or indemnification from defendants Meyercord, Thomas, Tate, Rhodes, Rice, and Brown.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.	Against all the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.     Directing Extreme to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders holders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

C.     Awarding to Extreme restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Date: March 25, 2025                    **HAUSLER LAW FIRM, PLLC**

                                        */s/ Kurt F. Hausler*
                                        Kurt F. Hausler
                                        NC Bar No.: 22103
                                        524 East Boulevard
                                        Charlotte, NC 28203
                                        T: (704) 247-3255
                                        F: (704) 247-3267
                                        khausler@hauslerlaw.com

                                        **SHUMAN, GLENN & STECKER**
                                        Rusty E. Glenn
                                        600 17th Street, Suite 2800 South
                                        Denver, CO 80202

T: (303) 861-3003
F: (303) 536-7849
rusty@shumanlawfirm.com

**SHUMAN, GLENN & STECKER**
Brett D. Stecker
326 W. Lancaster Avenue
Ardmore, PA 19003
T: (303) 861-3003
F: (303) 536-7849
brett@shumanlawfirm.com

**RM LAW, P.C.**
Richard Maniskas
1055 Westlakes Drive, Suite 300
Berwyn, PA 19312
(484) 324-6800
rmaniskas@rmclasslaw.com

*Counsel for Plaintiff Gregory Miller*

## <u>EXTREME NETWORKS, INC. VERIFICATION</u>

I, Gregory Miller, hereby verify that I am familiar with the allegations in the Verified Stockholder Derivative Complaint and that I have authorized the filing of the Verified Stockholder Derivative Complaint, and that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date: 03/24/25

*Gregory Miller*
Gregory Miller (Mar 24, 2025 13:24 EDT)
GREGORY MILLER